# EXHIBIT A

# MAY vs.
# SAN MATEO COUNTY

# VIDEOTAPED DEPOSITION OF
# JOHN E. SANCHEZ

## CONDENSED TRANSCRIPT

## September 21, 2016



CRANGLE REPORTING SERVICES

(510) 653-1312

www.cranglereporting.com

```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA


RICHARD EARLY MAY, individually
                                    CERTIFIED
        Plaintiff,                  TRANSCRIPT

-vs-                         CASE NO.
                             3:16-cv-00252-LB
SAN MATEO COUNTY, a public entity;
SAN MATEO COUNTY SHERIFF GREG
MUNKS, in his individual and
official capacities; DEPUTY JOHN
SANCHEZ; DEPUTY CHRIS LAUGHLIN;
AND DEPUTY ERIC MICHEL, and COUNTY
DEPUTIES DOES 1-10, individually,
jointly, and severally,
        Defendants.
_____/


                  VIDEOTAPED

        DEPOSITION OF JOHN E. SANCHEZ


         Taken before KAREN A. CRANGLE
          Certified Shorthand Reporter
               State of California
            C.S.R. License No. 3816


               September 21, 2016
```

1  VIDEOTAPED DEPOSITION OF JOHN E. SANCHEZ
2
3      Pursuant to Notice of Taking Deposition, and on
4  Wednesday, September 21, 2016, at the hour of 10:07 a.m.,
5  at HADDAD & SHERWIN, 505 17th Street, Third Floor,
6  Oakland, California, before me, KAREN A. CRANGLE,
7  Certified Shorthand Reporter, personally appeared JOHN E.
8  SANCHEZ, produced as a witness in the above-entitled
9  action, who, having been first duly sworn, was thereupon
10 examined as a witness to said action.
11
12
13               APPEARANCES
14
15     Michael Haddad, Attorney at Law, T. Kennedy Helm,
16 Attorney at Law, and Maya Sorensen, Attorney at Law,
17 HADDAD & SHERWIN, 505 17th Street, Third Floor, Oakland,
18 California, 94612, were present on behalf of the
19 plaintiff.
20
21     Justin W. Mates, Deputy Counsel Counsel, San
22 Mateo County, 400 County Center, 6th Floor, Redwood City,
23 California, 94063, was present on behalf of the
24 defendants.
25

2

---

1
2      And there also being present Brad Lipetz,
3  Videographer, Benchmark Video, Mill Valley, California.
4
5              ---oOo---

3

1                  I N D E X
2
3
4  Videotaped Deposition of JOHN E. SANCHEZ
5
6                                            Page
7
8  Examination by:
9
10     MR. HADDAD                              6
11
12
13 Plaintiff's Exhibits
14
15   1  Four-page CAD report entitled Incident    94
        History Summary Bates stamped CSM_MAY_01880
16      through 01883
17
18              ---oOo---

4

**Page 5**

1    PROCEEDINGS
2        THE VIDEOGRAPHER: We are on the video record. The
3  time is 10:07 a.m. Today is September 21st, 2016. We're
4  located at 505 17th Street in Oakland, California.
5        This marks the beginning of media unit number one,
6  Volume I, in the deposition of John Sanchez in the matter
7  of May versus San Mateo County, et al. being heard in the
8  United States District Court, Northern District of
9  California. Case number is 3-16-cv-00252-LB.
10       Deposition is noticed on behalf of plaintiff's
11 counsel. Videographer is Brad Lipetz for Benchmark Video.
12 Court reporter is Karen Crangle for Crangle Reporting.
13       Will the counsel present please identify themselves
14 for the record beginning with taking counsel.
15       MR. HADDAD: Michael Haddad for the plaintiff
16 Richard May.
17       MR. HELM: Kennedy Helm for the plaintiff
18 Richard May.
19       MS. SORENSON: Maya Sorenson for the plaintiff
20 Richard May.
21       MR. MATES: Justin Mates, Deputy County Counsel for
22 the deponent.
23       THE VIDEOGRAPHER: Thank you. If there are no
24 stipulations will the court reporter please swear in the
25 witness.

**Page 6**

1            JOHN E. SANCHEZ,
2    sworn as a witness by the Court Reporter,
3    testified as follows:
4         EXAMINATION BY MR. HADDAD
5    MR. HADDAD: Q. Would you please state your name
6  for the record.
7        A. John Sanchez.
8        Q. Okay. Have you been deposed before?
9        A. Yes.
10       Q. About how many times?
11       A. Once.
12       Q. Okay. So I'm going to ask you some questions
13 today related to this federal civil rights lawsuit. And
14 if you don't understand one of them, let me know and we'll
15 try to come to an understanding about it. Okay?
16       A. Okay.
17       Q. Just like court testimony, you're going to need
18 to answer verbally so that we can get an accurate
19 transcript to use later. Okay?
20       A. Okay.
21       Q. And there may be objections to some of my
22 questions from your attorney. And if that happens, you
23 generally still have to answer the question unless your
24 lawyer specifically tells you not to answer that question.
25 Okay?

**Page 7**

1        A. Okay.
2        Q. And that's because there's no judge here to
3  decide the objections and some judge may review those
4  later and make some rulings. Okay?
5        A. Okay.
6        Q. Have you reviewed anything in preparation for
7  this deposition?
8        A. No.
9        Q. Do you recall writing a report in connection
10 with Richard May's arrest?
11       A. Yes.
12       Q. When was the last time that you reviewed that?
13       A. Probably when we were first notified of this --
14       Q. Lawsuit?
15       A. Yes.
16       Q. And do you remember interviewing Richard May
17 while that was being recorded at some point?
18       MR. MATES: Objection. Ambiguous.
19       MR. HADDAD: I'll rephrase it.
20       Q. Do you remember doing an audio recorded
21 interview of Mr. May after he was arrested?
22       A. I did not.
23       Q. Do you remember interviewing him somewhere?
24       A. I did not.
25       Q. Okay. Have you reviewed any photographs in

**Page 8**

1  preparation for this deposition?
2        A. Yes.
3        Q. What photos have you looked at?
4        A. Some of the photographs with counsel.
5        Q. What did they show?
6        A. The scene.
7        Q. The scene?
8        A. Yes.
9        Q. Did you look at any photos of Mr. May or his
10 injury?
11       A. Uh, yes.
12       Q. And did you listen to any audio recordings?
13       A. No.
14       Q. All right. Are you still employed by San Mateo
15 County?
16       A. Yes.
17       Q. When did you start working with the county?
18       A. June of 2011.
19       Q. Had you worked for other law enforcement
20 agencies before that?
21       A. Yes.
22       Q. And where did you work prior?
23       A. Half Moon Bay Police Department.
24       Q. What was the term of years that you worked
25 there?

VIDEOTAPED DEPOSITION OF JOHN E. SANCHEZ

```
1    A. It would have started at 6:00.
2    Q. P.m.?
3    A. P.m.
4    Q. Were you assigned with any other deputies that
5  day?
6    A. Sergeant Laughlin -- I mean Deputy Laughlin was
7  my partner, my Half Moon Bay officer.
8    Q. And he was a canine officer?
9    A. Yes.
10   Q. So were you driving around in the same car?
11   A. No.  Single cars.
12   Q. Single cars.  And so what does it mean to be in
13 separate cars but to have Deputy Laughlin be your partner?
14 How does that work at the time?
15   A. We respond, depending on what the call is, we
16 would respond to the same call.  Or we would go to
17 separate calls.
18   Q. Okay.  And what would you typically have had on
19 your duty belt that night?  In terms of tools or weapons.
20   MR. MATES:  Objection.  Vague and ambiguous.  As
21 both in general and specific.
22   MR. HADDAD:  Q.  What do you believe that you were
23 carrying with you in terms of police tools that night?
24   A. So I would have had my duty weapon --
25   Q. Um-hum.
                                                        41
```

```
1    A. -- handcuffs; my asp --
2    Q. Um-hum.
3    A. -- my Taser; my extra magazines for my duty
4  weapon --
5    Q. Um-hum.
6    A. -- radio.  I think that's it.
7    Q. Did you carry OC?
8    A. I have it in the car.
9    Q. Okay.  Flashlight?
10   A. Yes.  I'm sorry, yes.
11   Q. And would you have been wearing some sort of
12 bullet-proof vest?
13   A. Yes.
14   Q. And how was your radio on your person?  If you
15 wanted to listen to a radio communication could you hear
16 it while you were away from your car?
17   A. Yes.
18   Q. Where would you hear the sound come from?
19   A. I have an ear piece.
20   Q. So you would have worn an ear piece at the time
21 of the May incident?
22   A. Yes.
23   Q. And if you wanted to make a communication to
24 tell something to other officers or a dispatcher over the
25 radio how would you have done that at the time?
                                                        42
```

```
1    A. With the microphone.
2    Q. On your shoulder?
3    A. Yes.
4    Q. So you would have just turned your head to your
5  shoulder and pressed a button and then made a
6  transmission?
7    A. Correct.
8    Q. Did your radios work okay in the vicinity where
9  the May incident took place?
10   A. Yes.
11   Q. Some cities have dead spots but you didn't have
12 one there, did you?
13   A. Not in the city there is not.
14   Q. Okay.  What was the first information that you
15 can recall receiving about the incident to which you
16 responded that later involved Mr. May?
17   A. With this incident?  I'm sorry.
18   Q. Yes.  What's the first information you
19 remember?
20   A. That there was a possible commercial burglary.
21 That there was a video security on scene and they
22 were observing three subjects within the fenced-in area
23 moving objects back and forth.
24   Q. And where did you receive this information
25 from?
                                                        43
```

```
1    A. From County Communications.
2    Q. From your dispatcher?
3    A. Yes.
4    Q. Was it over the radio or some other means?
5    A. The radio.
6    Q. And would you have received this information
7  shortly before 11:00 p.m. that night?
8    A. Whatever time that shows on the report would
9  have been about the time we would have got the call.
10   Q. So your report says at 2255, 10:55 p.m. you
11 were responding.  So you probably received this
12 information, what, right before that?
13   A. Right before that.
14   Q. And so you were informed that the -- the
15 dispatcher informed you that there was a possible
16 commercial burglary in progress.  Right?
17   A. Yes.
18   Q. And it wasn't confirmed yet.  Right?
19   A. No.
20   Q. Is that correct?
21   A. No, it was not confirmed.
22   Q. And that the information that the dispatcher
23 got came from some sort of video security camera on scene.
24 Right?
25   MR. MATES:  Objection.  Misstates testimony.
                                                        44
```

1    MR. HADDAD:  Q.  Was it your understanding that a
2 person was on scene observing this, or that somebody was
3 watching it possibly happen through a camera?
4    A. I don't know -- I don't recall the exact -- how
5 it came up, but that there was live security -- or not
6 live security -- but a video security watching the
7 property and that's how they were observing the -- the
8 security company was observing the incident go down.
9    Q. Okay.  And obviously at that time it was
10 nighttime.  Right?
11    A. Correct.
12    Q. And you still hadn't had an opportunity to
13 investigate yourself what might actually be happening at
14 that site.  Right?  You just heard it over the radio?
15    A. Right.  We were dispatched to the call.
16    ==Q. And had there been any description from the==
17 ==dispatcher that anyone had observed through video or==
18 ==otherwise any person actually stealing something?==
19    ==A. They described it as moving, I believe, to the==
20 ==best of my recollection, that they were moving boxes or==
21 ==moving items back and forth towards the fence.==
22    Q. All right.  And you haven't had an opportunity
23 to review -- strike that.
24    Has there been any time since this incident that
25 you've had a chance to listen to the recording again to

45

1 refresh your memory?
2    A. No.
3    MR. MATES:  Objection.  Vague and ambiguous.
4    MR. HADDAD:  Q.  So what you're telling me is based
5 on your memory.  Right?
6    A. Correct.
7    Q. Going back to that first night that you heard
8 it.
9    A. Correct.
10    Q. Okay.  So after receiving this information of a
11 possible commercial burglary from the dispatcher, what did
12 you do next?
13    A. Responded to the location.
14    Q. Did you communicate in any way with any other
15 deputy on route?
16    A. I believe I -- I'm sorry.  I don't recall.
17    Q. There was a recording provided for us in the
18 case that referenced an officer's radio -- radio call name
19 as 3 Charles 76.  Was that you?
20    A. That would be me.
21    Q. I've also seen reference to a 2 Charles 76.  Is
22 that also you?
23    A. It's the same -- same call sign.  Just
24 sometimes we leave out the 2.
25    Q. Okay.  What would it be if it were the whole

46

1 thing?
2    A. It would be 32 Charles 76.
3    Q. Got it.  So the recording that we were
4 provided, I listened to it and it sounded like the
5 dispatcher also told you that they haven't taken anything
6 yet.
7    Does that refresh your memory?  Does that sound
8 like another fact you would have learned?
9    A. I don't recall that part.
10    Q. They haven't taken anything yet?
11    A. If they had said that, but I don't recall that.
12    Q. Okay.  Did you have in-car computer terminals
13 at that time?
14    A. The car computers have been up and down.  And I
15 don't recall if mine was working that night or not.  But
16 we normally do have computers in the car.
17    Q. So the next thing after receiving this, and
18 possibly communicating with another officer that you were
19 responding, the next thing you did was you went there.
20 Right?
21    MR. MATES:  Objection.  Misstates his testimony.
22    THE WITNESS:  Correct.
23    MR. HADDAD:  Q.  Your answer was what?
24    A. Correct.
25    Q. What happened when you got there?

47

1    A. I got -- I drove up to the driveway of Bloom
2 Lane and drove up towards the -- no, I take that back.
3 I'm not sure where I -- I know that I walked up or I was
4 there at the front gate of the -- but I'm not sure where I
5 parked; I might have parked offset but I don't recall
6 exactly.
7    Q. So when you got there, do you remember that you
8 had also been told by the dispatcher that the people you
9 were looking for were possibly Hispanic males?
10    A. Yes.
11    ==Q. And you had not received any information that==
12 ==anybody on that site was armed.  Right?==
13    ==A. No.==
14    ==Q. Is that correct?  What I just said?==
15    ==A. Correct.==
16    Q. And you had no information of any specific
17 threat from Hispanic males or anybody else at the site you
18 were directed to.  Right?
19    MR. MATES:  Objection.  Vague and ambiguous.
20    THE WITNESS:  I'm sorry.  Could you repeat the
21 question again for me?
22    MR. HADDAD:  Uh-huh.
23    ==Q. You had no information of any specific threat==
24 ==from Hispanic males or anybody else that might be at the==
25 ==site you were directed to.  Right?==

48

VIDEOTAPED DEPOSITION OF JOHN E. SANCHEZ

1    MR. MATES:  Same objection as to "threat".
2    THE WITNESS:  Correct.
3    MR. HADDAD:  Q.  So you pulled up to the front
4  gate.  Is that right?
5    A. Either pulled up or walked up.  I can't
6  remember if I offset my car and walked -- it's only
7  between where the street is to where the construction gate
8  was was a short distance.
9    Q. When you arrived at the site did you inform
10 dispatch that you were on scene?
11   A. Yes.
12   Q. How do you do that?
13   A. We go on the radio and saying I was 1097.
14   Q. Okay.  And how soon after you got there did you
15 notice any other officers there?
16   A. I believe Officer Laughlin and Officer Michel
17 were there at the same time or shortly thereafter.
18   Q. Now, you were there to investigate a possible
19 commercial burglary.  Right?
20   A. Correct.
21   Q. And based on your experience and training at
22 the time, what was the Penal Code section in particular
23 that would have applied to that crime?
24   A. There could have been several.
25   It could have been just a -- if it was out in the

49

1  open it could have been just a petty theft; it could have
2  been grand theft; if they entered the buildings it could
3  have been a burglary.
4    Q. Could also have just been trespassing, right?
5    A. Could have been.
6    Q. Or it could have been no crime at all depending
7  on what you found.  Right?
8    A. Correct.
9    Q. And you understood at the time that commercial
10 burglary, Penal Code 459, required entry into a building.
11 Right?
12   MR. MATES:  Objection.  Misstates testimony.  He
13 said commercial burglary; he didn't cite the code.
14   MR. HADDAD:  Q.  You understood that commercial
15 burglary required entry into a building.  Right?
16   A. Correct.
17   Q. And commercial burglary is covered by
18 California Penal Code 459.  Right?
19   A. Correct.
20   Q. That was one of those crimes that you had been
21 investigating and arresting people for going over many
22 years of your career, right?
23   A. Correct.
24   Q. Including when you were a detective at Half
25 Moon Bay.  Right?

50

1    A. Correct.
2    Q. Did you stage with other officers before
3  entering the site?
4    MR. MATES:  Objection.  Vague and ambiguous.
5    THE WITNESS:  Uh, Deputy Laughlin and Deputy Michel
6  were both with me at the gate -- the construction gate.
7    MR. HADDAD:  Q.  Did they both arrive in separate
8  cars?
9    A. Yes.  I'm sorry.  I believe they did.
10   Q. Okay.  So it was the three of you were then
11 going to be working together to investigate this
12 situation.  Right?
13   A. Correct.
14   Q. And who was in charge?
15   A. It would have been dual.  We're both assigned
16 to Half Moon Bay.  Actually, Deputy Laughlin is a senior
17 deputy, so if anything, he would have been not really in
18 charge but we're both -- it's equal; we're both equal
19 rank.
20   Q. All right.  So and then Deputy Michel -- is
21 that how you pronounce his name?
22   A. That's the way I pronounce his name.
23   Q. Okay.  I haven't met him yet.
24   Deputy Michel was a newer deputy compared to you
25 and Deputy Laughlin.  Correct?

51

1    A. Right.
2    Q. Did the three of you make any plan before
3  entering inside the fence?
4    A. I'm not really sure we made a plan.  I knew
5  that we had talked about how we were going to try to gain
6  entry into the complex itself.
7    Q. Can you describe what that complex looked like
8  as you were standing there?
9    A. Right off from the beginning there's a -- I
10 believe it's either seven or eight-foot cyclone fence with
11 a green mesh which I guess would diffuse vision into
12 the -- some sort of code for -- for -- to diffuse people
13 from looking inside the construction area.
14   Then there was behind that you could see a
15 three-story building under construction.
16   There was scaffolding; there didn't appear -- some
17 of them didn't have windows, so it was -- still looked
18 like framing or early -- not early stages, but the frame
19 and the roof are already up so, you know, and the
20 finishing of the exterior and interior of the building.
21   Q. And as you're standing there with the other two
22 officers outside of the fence did you see any sign of
23 criminal activity?
24   A. Not at that time, no.
25   Q. Did you see any evidence of people who might

52

**Page 57**

1  they're involved in a crime.  Right?
2      A. Correct.
3      Q. And if you do a detention, you're supposed to
4  investigate reasonably quickly to determine whether or not
5  they're involved in a crime, and if not, if they're not in
6  a crime, to let them go.  Right?
7      A. Correct.
8      Q. So as you're just starting to walk around the
9  site, you did not have probable cause to arrest anybody
10 yet.  Right?
11     A. If we'd walked around -- if we'd found -- if
12 I'd found somebody on the complex clearly marked that it
13 was a Construction, Do Not Enter area, it could have
14 been -- the subject could have been arrested for
15 trespassing.
16     Q. Or it may not have been a trespass.  Right?
17     A. Correct.
18     MR. MATES:  Objection.  Argumentative.
19     MR. HADDAD:  Q.  So wouldn't you have to detain the
20 person first and then find out if it was justified to
21 arrest them?
22     A. With this incident or just in general?
23     Q. In that situation as you're walking around
24 before you saw anybody.  Didn't you believe that you would
25 have had to detain whoever you encountered and then

**Page 58**

1  determined if an arrest was justified?
2      A. In this incident we already knew that the video
3  security had advised these people to leave; that they were
4  moving objects from the building and moving around, moving
5  to the fence line.  The building site was dark.  So it
6  would not have been construction.  The security that was
7  on scene was the video so there should have been no one
8  there other than for some unlawful -- unlawful activity.
9  They would have had to have jumped the fence to gain entry
10 to the facility or the complex.
11     Q. Okay.  Now, based on your experience and
12 training as a law enforcement officer, there are
13 particular crimes of trespass.  Right?
14     A. Yes.
15     Q. And they have particular requirements for each
16 trespass crime.  Right?
17     A. Correct.
18     Q. And if you're going to arrest somebody for a
19 trespass crime you need to know what those elements are.
20 Right?
21     A. Correct.
22     Q. And as a law enforcement officer you're
23 expected to know the requirements to arrest someone for a
24 particular trespass violation.  Right?
25     A. Correct.

**Page 59**

1      Q. So you started walking in a south direction by
2  yourself.  And how long did you walk before you
3  encountered something?  Or saw something of interest.
4      MR. MATES:  Objection.  Misstates the testimony
5  about walking in a south direction.
6      THE WITNESS:  I believe it would have been a short
7  time, short period of time.
8      MR. HADDAD:  Q.  Okay.  And what happened next?
9      A. I observed the subject down the open area,
10 subject wearing a gray and white checkered shirt, moving
11 between and fence or moving in the area, in the open area.
12     Q. How far away from you was that individual?
13     A. I'm just estimating, maybe 75 yards.  I'm not
14 really sure.  75 yards?  I'm not.
15     Q. Was he in a lit, lighted area?
16     A. No, it was not lit.
17     Q. Could you see anything in his hands?
18     A. No.
19     Q. Did it look like he was walking with his hands
20 down by his sides?
21     A. I couldn't tell.
22     Q. Is there any other than just the shape of the
23 person wearing the plaid shirt or whatever that you could
24 observe at that time?
25     A. That was it.  That's all I could see.

**Page 60**

1      Q. What did you do in response?
2      A. I'm sorry.  What was that?
3      Q. What did you do?
4      A. I got the attention of Deputy Michel and
5  Deputy Laughlin.  Laughlin had them come to my position.
6      Q. How did you get their attention?
7      A. I don't recall.  I shined my flashlight or I
8  might have just told them to come over.  I'm not even
9  sure.
10     Q. And Deputy Michel wrote in his report and in
11 his report he said that Sanchez motioned for us to come
12 over.
13     Does that sound accurate to you?
14     A. I'm not sure what he meant by motion.
15     Q. Yes.  But you recall being within visual
16 contact of Deputies Michael and Laughlin?
17     A. Yes.
18     Q. Did you take any sort of position of cover
19 while you were waiting for them to come over to you?
20     A. Yes.
21     Q. What did you do?
22     A. I just stayed within the -- where the lumber
23 and the container were.
24     Q. So you were kind of hiding behind some lumber
25 and some containers?

**Page 65**

1    Q. And this is from a distance; your rough
2 estimate was about 75 yards. Is that right?
3    A. About that or -- after we started walking up
4 closer to him would have been a little bit less.
5    Q. Did you see the man in the plaid shirt react in
6 any way to Deputy Laughlin's dog command?
7    A. He started to move south towards the darkness
8 and towards the fence.
9    Q. Did he make any gesture with his hands or arms?
10   A. Not that -- again, not that I saw. Not that I
11 could see.
12   Q. Could you see anything in his hands?
13   A. I couldn't see anything there.
14   Q. Was the man in the plaid shirt carrying a
15 flashlight?
16   A. Not that I recall.
17   Q. Okay. And how was the man moving towards the
18 fence? Was he just walking?
19   ==A. I -- I don't recall. I know that he moved==
20 ==towards the fence but if he was moving fast or running or==
21 ==walking I don't recall.==
22   ==Q. All right. And at that point you still hadn't==
23 ==seen evidence of any burglary, had you?==
24   ==A. No.==
25   Q. So you're walking towards the man, Laughlin and

**Page 66**

1 Michael are ahead of you a little bit and to the right,
2 you hear Laughlin give that statement about the dog, and
3 what happened next?
4    A. When the subject started moving towards the
5 fence line we thought he was going to run or jump the
6 fence so we started running towards his position.
7    Q. Okay. Did you say anything to him as you
8 started running?
9    A. I'm sorry?
10   Q. Did you say anything to the man as you were
11 running over?
12   A. Myself?
13   Q. Yes.
14   A. No.
15   Q. Did you hear other officers say anything else
16 to the man as the three of you were running towards him?
17   A. No.
18   Q. And do you know whether Laughlin had already
19 released Riggs on him?
20   A. I don't recall. I know that I stayed behind
21 the handler and the dog. It was dark. My job at the time
22 was to watch the building for the other two, or in my
23 mind, that's my job was to watch for the other two.
24   Q. Okay. But you were also trying to see what was
25 happening with the man. Right?

**Page 67**

1    A. I wasn't. I knew that Officer Michel and
2 Officer Laughlin were handling that instance. I was
3 trying to watch to see -- since we knew there was -- the
4 video security had told us there was three, you know,
5 suspects, that there was two more somewhere, and that I
6 was trying to look through the buildings while we were
7 moving to make sure, number one, we didn't get hurt; that
8 I didn't get shot; that I didn't have something dropped on
9 my head; and to watch and see if I could see maybe the
10 other suspects running the other direction.
11   Q. All right. So in relation to your point of
12 view, while you were moving towards Mr. May, and you said
13 he moved from his first position towards the fence, right?
14 Correct?
15   A. Correct.
16   Q. Did that to you from your vantage point look
17 like he was moving to your right or to your left?
18   A. He would have moving to my right.
19   Q. And so you said that you were directing your
20 attention elsewhere to make sure that there was nobody
21 else that could do the officers harm.
22      Which direction were you looking?
23   A. To the left.
24   Q. And were you still running in the direction
25 that you believed Mr. May had gone to?

**Page 68**

1    A. With -- with everything that was -- there was
2 objects everywhere. This is a new construction; they had
3 boxes and pipe and whatever else everywhere.
4       So basically you're literally looking down and -- I
5 was looking down, number one, so I don't trip; and number
6 two, trying to also watch to the left as much as I could
7 to, again, for my safety, their safety, and to see if the
8 suspects were running.
9    Q. You still had your flashlight turned off.
10 Right?
11   A. Correct.
12   Q. Was there any ambient light around the site at
13 that time where you were?
14   A. There's ambient light. There was lighting
15 actually inside the construction building, the buildings
16 that were under construction. And ambient lighting from a
17 senior housing that is to the south.
18   ==Q. Okay. Now, the first time you saw Mr. May he==
19 ==was not in the building. Right?==
20   ==A. Correct.==
21   Q. He was standing on the grounds somewhere
22 outside of where the building would be?
23   A. Between the building and the fence line.
24   Q. All right. So as you're moving in a direction
25 towards Mr. May, you're looking for other people, what

**Page 77**

1 through the building?
2     A. Yes, he did.
3     Q. How long did it take to search that building?
4     A. You know, I don't know.
5     Q. Was there more than one story that you
6 searched?
7     A. Yes.
8     Q. How did you get from story to story?
9     A. There was a stairwell.  I stayed on the bottom
10 and they were the ones that did a floor by floor.
11     Q. Approximately how long did it take the three of
12 you to search that building?
13         MR. MATES:  Objection.  Vague and ambiguous as to
14 "that building".
15         THE WITNESS:  I don't know.
16         MR. HADDAD:  Q.  Okay.  So but you didn't discover
17 anything out of order as far as you could tell.  Right?
18     A. I wouldn't say I couldn't find anything out of
19 order.  We would not know if anything was out of order,
20 because again it was a construction site.  We wouldn't
21 have known until a responsible person -- responsible party
22 from the construction party was to come and tell us that
23 something was out of place or something had been moved or
24 something was gone.
25     We wouldn't know that unless we had a responsible

**Page 78**

1 person there to show us that or tell us that.
2     Q. Okay.  So what's the next thing that happened?
3     A. Deputy Laughlin went back to the station and
4 Deputy King and I talked about, we started looking to --
5 looking at boxes, looking at things that were outside --
6 in this open area, to see, as I said, that there was --
7 the video security company had said that they were
8 building items from the building over to the fence line.
9     Q. And that statement of what you recall hearing
10 from the dispatcher, that the security company had seen
11 people moving boxes from the building to the fence line --
12     A. Um-hum.
13     Q. -- you didn't know if this was from inside the
14 building or next to the building, did you?
15     A. In my memory I believe they said at one time
16 one person was in the building.
17     Q. That's your recollection?
18     A. That's my recollection, yes.
19     Q. But you don't know if it was Miss Coster or
20 Mr. May or neither of them.  Right?
21     A. No, I don't know.
22     Q. You didn't know it at the time, either.  Right?
23     A. No.
24     Q. And one thing you knew, though, if you were
25 going to arrest somebody for commercial burglary, they had

**Page 79**

1 to at least have gone inside the building.  Right?
2     A. Correct.
3     Q. Before or during the time you were searching
4 that building with Deputy Laughlin and Deputy King, did
5 Laughlin tell you anything about the apprehension of
6 Mr. May or his status?
7     A. No.  Not that I recall.
8     Q. Okay.  He didn't mention the fact that, okay,
9 we've got that guy over there; the dog bit him; he's been
10 arrested for some crime.  Anything like that?
11     A. No, I don't recall us talking about that.
12     Q. Okay.
13     A. Again we were more concerned about another
14 suspect being in the building.
15     Q. Okay.  So did you and any other deputy continue
16 searching the construction site for any longer time?
17         MR. MATES:  Objection.  Vague and ambiguous as to
18 time.
19         MR. HADDAD:  Q.  After finishing searching the
20 building with Deputy Laughlin, did you continue searching
21 the site?
22     A. Yes, Deputy King and I went into that open area
23 where there were boxes and things like that.
24     Q. All right.  And you couldn't determine if any
25 items had, in fact, been stacked up by the suspects as the

**Page 80**

1 dispatcher said might have been happening.  Right?
2     A. We did observe near the fence line two -- and I
3 can't remember if they were concrete boxes or prefab kind
4 of boxes, I would call them like a utility box, that were
5 placed on their sides towards the fence line.
6     Q. But you didn't know if they were put there by
7 Mr. May or Ms. Coster, did you?
8     A. No.
9     Q. And you didn't even know if they might have
10 been put there by people involved in the construction.
11 Right?
12     A. Correct.
13     Q. You wrote in your report afterward:  Building
14 materials were laid out throughout the construction
15 complex.  It was difficult to determine if any items had
16 indeed been stacked up by the suspects.
17     That's correct, right?
18     A. Correct.
19     Q. And that's still your recollection of how it
20 was at the time.  Right?
21     A. Correct.
22     Q. Let me show you a page from your report.  It's
23 page two.
24     About the third paragraph you wrote:  I placed the
25 second suspect later identified as Sharon Coster in

1  another deputy would have done it?
2      A. The records check?
3      Q. Yeah.
4      A. Well, Deputy Laughlin or Deputy Michel might
5  have done one just so they have some understanding of, you
6  know, what sort of criminal background they may or may not
7  have while they were talking with them.
8         If this went to the Court, the D.A., the Court
9  officer would have done a records check on both of them.
10     Q. Okay.  Your report had a heading at Bates page
11 58 under Evidence, and you just wrote:  None.
12     Right?
13     A. That's because I didn't submit any evidence.
14     Q. Okay.  You had no evidence to submit in
15 connection with this investigation.
16     A. I did not.  Correct.
17     Q. Before that night had you had any experience
18 with the police dog Riggs?
19     A. We were -- we were partners, so we have a lot
20 of -- the dog goes to a lot -- we have a lot of calls that
21 we go -- we go together.
22     Q. And on how many prior occasions were you aware
23 that Deputy Laughlin had deployed Riggs to bite somebody?
24     A. There was one prior that I was involved --
25 there was one prior that I was involved in where I was

93

1  chasing the subject and Riggs was deployed.
2      Q. Okay.  Since Sharon Coster was your arrestee,
3  did you recommend any charges for her?
4      A. I did not.
5      Q. Do you know if somebody else did?
6      A. Would have been Deputy Laughlin, I believe,
7  did.
8         MR. HADDAD:  Would you mark this, please?
9         (Plaintiff's Exhibit 1 was marked for
10 identification.)
11        MR. HADDAD:  Q. I've marked as Exhibit 1 Bates
12 pages 1880 to 1883.  This looks like a Computer Assisted
13 Dispatch report.  Is that what it is?
14     A. Correct.
15     Q. Sometimes called a CAD report.  Right?
16     A. Correct.
17     Q. Do you see an entry on here that will indicate
18 when you called in to the dispatcher that you were on
19 scene?
20     A. Yes.
21     Q. And what time would that be?
22     A. At 2300.
23     Q. Can you point it out for me so I can see where
24 you are?
25     A. Right here (indicating).

94

1      Q. Ah, where it says 2 C 76?
2      A. Yes.
3      Q. So it's actually 2300 and 23 seconds.  Right?
4      A. Correct.
5      Q. And it says:  On scene 2C76.  That's you,
6  right?
7      A. Correct.
8      Q. What's the next transmission that this CAD
9  report associates with you?
10     A. Says:  Two in cuffs.
11     Q. And that's the entry "cuffs" at 23 --
12     A. -- 03.
13     Q. -- 03 and 28 seconds.  Right?
14     A. Correct.
15     Q. So where were you when you made that
16 transmission that there were two in cuffs?
17     A. Right there.
18     Q. Okay.  Was that after Laughlin and Michel had
19 come up to you and informed you, okay, we got that guy in
20 the cuffs over there and you obviously have one here?
21        MR. MATES:  Objection.  Misstates his testimony.
22        MR. HADDAD:  Let me rephrase that.
23     Q. How did you know that Mr. May had been arrested
24 by the point you radioed in there that there were two in
25 cuffs?

95

1      A. Well, I had mine, I had Miss Coster; and I know
2  that they had to have him in custody.
3      Q. How did you know that?  Because I thought that
4  basically you weren't looking in that direction?
5      A. I wasn't.
6      Q. How did you --
7      A. I can only assume he was in custody.  That the
8  incident was over.
9         The incident was fluid; other deputies were moving
10 in my direction.
11     Q. Had anyone confirmed for you that Mr. May was
12 in cuffs at the time when you told the dispatcher at 2303
13 you had two in cuffs?
14     A. I'm sorry?
15     Q. Had anyone told you that Mr. May was in cuffs
16 when you told the dispatcher at 2303 you had two in cuffs?
17     A. No.
18     Q. Have you been sued in any other lawsuits?
19     A. In the one, in Alaska.
20     Q. In Alaska, going back to the early '70's?
21     A. Yes.
22     Q. All right.  Who was your sergeant for this
23 incident?
24     A. Would have been Sergeant Loubal.
25     Q. Can you spell Loubal for me?

96



```
 1      A. L-o-u-b-a-l.
 2      Q. Oh, Loubal.  Okay.
 3      Did Sergeant Loubal have to approve your report?
 4      A. I believe he approved it.  It would be on the
 5  bottom.
 6      Q. Loubal, L-o-u-b-a-l.
 7      A. I'm sorry, what did I --
 8      Q. I didn't hear the L.
 9      A. I'm sorry.
10      Q. Did you have any conversation with any
11  supervisor about the incident with Mr. May at any time?
12      A. I'm sure we talked about it.
13      Q. Anything you can remember?
14      A. No.
15      Q. When you say "we" which supervisor are you
16  referring to?
17      A. Again, bad terminology.  Me and Sergeant
18  Loubal.
19      Q. Okay.  To your knowledge has your department
20  changed the way it does anything as a result of what
21  happened in this incident with Mr. May?
22      A. Not that I'm aware of.
23      MR. HADDAD:  All right.  That's all I've got.
24      Thank you.
25      MR. MATES:  Let's take a quick break real quick and
                                                              97
```

```
 1  then we can close out the depo.
 2      MR. HADDAD:  Okay.
 3      THE VIDEOGRAPHER:  Off the record.  12:19 p.m.
 4      (Recess.)
 5      THE VIDEOGRAPHER:  We're on the record.  12:22 p.m.
 6      MR. HADDAD:  We're finished with the deposition.
 7      THE VIDEOGRAPHER:  Original media will be retained
 8  by Benchmark Video at 33 Roques Moraes Court, Mill Valley,
 9  California.  We're off the record at 12:24 p.m.
10      (Deposition concluded at 12:24 p.m.)
11             ---oOo---
12
13
14
15         _____
               JOHN E. SANCHEZ
                                                              98
```

```
 1  STATE OF CALIFORNIA   )
                         ) ss
 2  COUNTY OF ALAMEDA     )
 3
 4      I, Karen A. Crangle, hereby certify that the
 5  witness in the foregoing deposition named
 6
 7             JOHN E. SANCHEZ
 8
 9  was by me duly sworn to testify to the truth, the whole
10  truth, and nothing but the truth in the within-entitled
11  cause; that said deposition was taken at the time and
12  place herein named; that the testimony of said witness was
13  reported by me, a certified shorthand reporter and a
14  disinterested person, and thereafter transcribed into
15  typewriting.
16
17      And I further certify that I am not of counsel or
18  attorney for either or any of the parties to said
19  deposition, nor in any way interested in the outcome of
20  the cause named in said caption.
21
22  Date: October 17, 2016
23
24  [signature] Karen A. Crangle
       Karen A. Crangle, C.S.R.
25
                                                              99
```

```
 1                October 17, 2016
 2
 3
 4  JOHN E. SANCHEZ
    c/o Justin W. Mates, Deputy Counsel Counsel
 5  San Mateo County
    400 County Center, 6th Floor
 6  Redwood City, California 94063
 7
 8
    RE:  MAY vs. SAN MATEO COUNTY
 9
10
    Dear Mr. Sanchez:
11
    Your deposition transcript has been prepared and is
12  available at our office for reading, correcting and
    signing, and shall remain so available for 35 days.
13
    Should you wish to review your deposition transcript,
14  please contact our office for an appointment.
15
    Sincerely,
16
17  [signature] Karen A. Crangle
18
    Karen A. Crangle, C.S.R.
19
20
21
22
23  cc:  Michael Haddad, Attorney at Law
24
25
                                                             100
```