1   MICHAEL J. HADDAD (State Bar No. 189114)
    JULIA SHERWIN (State Bar No. 189268)
2   T. KENNEDY HELM (State Bar No. 282319)
    MAYA SORENSEN (State Bar No. 250722)
3   HADDAD & SHERWIN LLP
4   505 Seventeenth Street
    Oakland, California 94612
5   Telephone: (510) 452-5500
    Fax: (510) 452-5510
6
7   Attorneys for Plaintiff
    RICHARD EARL MAY, JR.
8
9              UNITED STATES DISTRICT COURT
10            NORTHERN DISTRICT OF CALIFORNIA
11
12  RICHARD EARL MAY, JR.,          )
13  Individually,                   )   No. 3:16-cv-00252-LB
                                    )
14          Plaintiff,              )   Hon. Laurel Beeler
                                    )
15  vs.                             )   **PLAINTIFF'S RESPONSE IN**
                                    )   **OPPOSITION TO DEFENDANTS'**
16  SAN MATEO COUNTY, a public entity; )   **MOTION FOR PARTIAL SUMMARY**
    SAN MATEO COUNTY SHERIFF'S       )   **JUDGMENT; MEMORANDUM OF**
17  DEPUTY CHRIS LAUGHLIN; DEPUTY    )   **POINTS AND AUTHORITIES IN**
    ERIC MICHEL; and DOES 1 through 10, )   **SUPPORT**
18  individually, Jointly and Severally, )
                                    )
19          Defendants.             )   Date: March 23, 2017
                                    )   Time: 9:30 a.m.
20                                  )   Place: Courtroom C, 15th Floor
                                    )
21                                  )
                                    )
22                                  )
                                    )
23                                  )
                                    )
24  _____ )
25
26
27
28

# MEMORANDUM OF POINTS AND AUTHORITIES
## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................... iii

I.    INTRODUCTION ...........................................................................................................1

II.   STATEMENT OF FACTS ...........................................................................................1

    A.   Defendant County trains its canine handlers to make audible canine announcement-warnings, yet a reasonable jury could find that Defendant Laughlin failed to do so. ...............................3

    B.   Defendant San Mateo County defines a police canine like *Riggs* as a high level of force, and the Canine Services Unit Manual's § 5-01 limits deployment. .................................................4

    C.   Defendant Laughlin sics *Riggs* for the first time to bite and hold Mr. May after seeing him either: (1) move into the shadows; (2) walk away; or (3) stand still with his arms at his sides. ...................................................................6

    D.   Defendant Laughlin deploys *Riggs* for the second time, and this time he bites and holds Mr. May, who ends up on the ground face first, flailing his legs in pain. .......................................9

    E.   Defendant County trains its canine handlers that Mr. May's involuntary reaction in flailing around while *Riggs* bit him does not constitute willful resistance.........................................10

    F.   Defendant County's training and policies require a canine handler to disengage the canine as soon as the person has been subdued, and Defendant Michel admitted his duty to intervene. ..............................................................................11

III.   STANDARD OF REVIEW ..........................................................................................13

IV.   ARGUMENT ...............................................................................................................13

    A.   Defendants Laughlin and Michel violated Mr. May's Fourth Amendment right to be free from a warrantless arrest without probable cause. ................................................................13

    B.   Defendants Laughlin and Michel violated Mr. May's Fourth Amendment right to be free from excessive force by deploying *Riggs* to bite and by deciding to prolong the bite once Mr. May was already subdued on the ground. ...........................................................................13

        a.   Defendant Laughlin lacked probable cause to arrest Mr. May for any crime, thereby tilting the "severity of the crime" factor in Mr. May's favor.........................................16

        b.   No reasonable jury could find that Mr. May posed an immediate threat to Defendant Laughlin's or anyone's safety. ......................................................................................17

c.   Mr. May was neither resisting arrest nor fleeing: he was either standing still, moving slowly, failing to obey Defendant Laughlin's alleged commands, or moving his legs in pain while being bitten. ................................................................................................ 19

d.   Defendant Laughlin's failure to warn Mr. May before releasing *Riggs* to attack him weighs in favor of finding a Fourth Amendment violation ............................................ 20

e.   Defendants Laughlin and Michel had less intrusive alternatives to using *Riggs* against Mr. May, a visibly older man. ...................................................................................... 20

C.   Defendant Michel's Liability stems from: (1) his failure to intervene to stop Defendant Laughlin's use of excessive force; and (2) his integral participation in providing backup, handcuffing, and searching Mr. May. .................................................................................. 21

D.   Defendants Laughlin and Michel do not have qualified immunity for their violation of Mr. May's clearly established rights. ............................................................................................. 22

E.   A reasonable jury could find *Monell* liability against Defendant County. ............................ 23

V.   CONCLUSION AND RELIEF REQUESTED ................................................................. 25

# TABLE OF AUTHORITIES

## <u>Federal Cases</u>

*Anderson v. Creighton*,
483 U.S. 635 (1987) ........................................................................................ 22

*Beaver v. City of Federal Way*,
507 F. Supp. 2d 1137 (W.D. Wash. 2007),
*aff'd*, 301 F. App'x 704 (9th Cir. 2008) ............................................................ 18

*Blankenhorn v. City of Orange*,
485 F.3d 463 (9th Cir. 2007) ......................................................................... 6, 22

*Bryan v. McPherson*,
630 F.3d 805 (9th Cir. 2010) ............................................................... 14, 17, 18

*Chew v. Gates*,
27 F.3d 1432 (9th Cir. 1994) .................................................................... passim

*Clouthier v. County of Contra Costa*,
591 F.3d 1232 (9th Cir. 2010) ..................................................................... 23, 25

*Conerly v. Flores*,
No. 4:15-cv-04079-KAW,
2016 U.S. Dist. LEXIS 162822 (N.D. Cal. Nov. 23, 2016) ................................ 20

*Davis v. Mason County*,
927 F.2d 1473 (9th Cir. 1991) ............................................................................ 6

*Deorle v. Rutherford*,
272 F.3d 1272 (9th Cir. 2001) .................................................................... passim

*Detoy v. City & County of San Francisco*,
No. C 99-3072 CRB (JL), 196 F.R.D. 362 (N.D. Cal. 2000) ............................... 3

*Drummond v. City of Anaheim*,
343 F.3d 1052 (9th Cir. 2003) ........................................................................... 23

*Fogel v. Collins*,
531 F.3d 824 (9th Cir. 2008) ............................................................................. 25

*French v. Carson City*,
No. 3:13-cv-00209-HDM-WGC,
2015 U.S. Dist. LEXIS 13992 (D. Nev. Feb. 4, 2015) ...................................... 19

*Frunz v. City of Tacoma*,
  468 F.3d 1141 (9th Cir. 2006)..................................................................... 17

*Fuller v. Cantrell*,
  No. C-03-5616 MMC (PR),
  2005 U.S. Dist. LEXIS 37014 (N.D. Cal. July 27, 2005) ...................................... 18, 21

*Garlick v. County of Kern*,
  167 F. Supp. 3d 1117 (E.D. Cal. 2016) .......................................................... 15

*Glenn v. Washington County*,
  673 F.3d 864 (9th Cir. 2011)..................................................................... 15, 20

*Graham v. Connor*,
  490 U.S. 386 (1989) .............................................................................. 14, 15, 16

*Gravelet-Blondin v. Shelton*,
  728 F.3d 1086 (9th Cir. 2013)..................................................................... 20

*Green v. City and County of San Francisco*,
  751 F.3d 1039 (9th Cir. 2014)..................................................................... 14, 16

*Headwaters Forest Defense v. County of Humboldt (Headwaters II)*,
  276 F.3d 1125 (9th Cir. 2002)..................................................................... 14, 23

*Headwaters Forest Defense v. County of Humboldt*,
  240 F.3d 1185 (9th Cir. 2000)..................................................................... 14

*Hesterberg v. United States*,
  71 F. Supp. 3d 1018 (N.D. Cal. 2014) ........................................................... 20

*Hope v. Pelzer*,
  536 U.S. 730 (2002) .............................................................................. 22

*Kerr v. West Palm Beach*,
  875 F.2d 1546 (11th Cir. 1989)................................................................... 4, 23, 24, 25

*Ledesma v. Kern County*,
  No. 1:14-cv-01634-DAD-JLT,
  2016 U.S. Dist. LEXIS 156554 (E.D. Cal. Nov. 10, 2016) ...................................... 15

*Lolli v. County of Orange*,
  351 F.3d 410 (9th Cir. 2003)..................................................................... 14, 16

*Mattos v. Agarano*,
  661 F.3d 433 (9th Cir. 2011) (en banc).......................................................... 17, 18, 21

*McKay v. City of Hayward*,
    949 F. Supp. 2d 971 (N.D. Cal. 2013) ................................................... 20, 22

*Mendoza v. Block*,
    27 F.3d 1357 (9th Cir. 1994) ..................................................................... 22

*Mighell v. City of Edmonds*,
    No. C14-285-RSM-MAT,
    2015 U.S. Dist. LEXIS 26610 (W.D. Wash. Jan 22, 2015) ....................... 20

*Miller v. Clark County*,
    340 F.3d 959 (9th Cir. 2003) ............................................................... 18, 19

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ............................................................... 19, 21

*Rodriguez v. City of Modesto*,
    No. 1:10-CV-01370-LJO-MJS,
    2015 U.S. Dist. LEXIS 46109 (E.D. Cal. Apr. 8, 2015) ........................... 16

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002) ..................................................................... 16

*Scott v. Harris*,
    550 U.S. 372 (2007) ................................................................................... 15

*Smith v. City of Hemet*,
    394 F.3d 689 (9th Cir. 2005) (en banc) ............................................. passim

*Tekle v. United States*,
    511 F.3d 839 (9th Cir. 2007) ..................................................................... 14

*Tennessee v. Garner*,
    471 U.S. 1 (1985) ................................................................................. 17, 21

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014) ............................................................................... 22

*United States v. Koon*,
    34 F.3d 1416 (9th Cir. 1994),
    *aff'd in part, rev'd in part,* 518 U.S. 81 (1996) ..................................... 21

*Velazquez v. City of Long Beach*,
    793 F.3d 1010 (9th Cir. 2015) ................................................................... 16

*Watkins v. City of Oakland*,
    145 F.3d 1087 (9th Cir. 1998) ..................................................... 18, 22, 25

*Winterrowd v. Nelson*,
   480 F.3d 1181 (9th Cir. 2007).......................................................................... 17, 21

*Young v. County of Los Angeles*,
   655 F.3d 1156 (9th Cir. 2011)................................................................. 16, 22, 23

## **California Statutes**

California Penal Code § 148 .................................................................................. 5

## **Other Authorities**

Ninth Circuit Civil Jury Instruction 9.25 ...................................................... 14, 20

## I. INTRODUCTION

In this civil rights case arising out of the use of a trained police canine, *Riggs*, to bite and hold Richard May, a jury could easily find that the force used was excessive under the Fourth Amendment. In essence, Defendant Laughlin used potentially deadly force to make an investigatory stop of Mr. May, a non-threatening person standing still, whom Defendant Laughlin had no objective facts to believe posed an immediate threat to anyone justifying the use of the substantial and potentially deadly force of a police canine bite apprehension. Mr. May's right to be free from such an attack was clearly established. Summary judgment is therefore not appropriate on Plaintiff's Fourth Amendment excessive force claim. For the reasons set forth in Plaintiff's Motion for Partial Summary Judgment (*see* Docs. 60–61), summary judgment for Defendants also is not appropriate for Mr. May's Fourth Amendment false arrest claim. Finally, a jury could also find that these violations of rights were set in motion by Defendant San Mateo County's policies and customs. This Court should deny Defendants' motion in its entirety.

Defendants do not seek summary judgment of Plaintiff's state law claims, including for violation of the Bane Act (Cal. Civil Code § 52.1), battery, false arrest, and negligence.

## II. STATEMENT OF FACTS[1]

Shortly before 11:00 p.m. on January 1, 2015, San Mateo County dispatch advised deputies of a possible, unconfirmed commercial burglary in progress. (**Ex. A**, Sanchez Dep., 43:18–44:21).[2] As briefed in more detail in Plaintiff's Motion for Partial Summary Judgment (Doc. 60, pp. 2–4), deputies heard that an off-site security employee had seen on a live video: "two, possibly three, suspects . . . hopping back and forth over a perimeter fenc[e] and stacking items of property near the fence line." (**Ex. B**, Laughlin Dep., 75:23–76:1). An officer with Deputy Sanchez's call sign confirmed over the radio that no one was actually stealing anything. (**Ex. A**, 45:16–21; 46:17–47:9; **Ex. B**, 79:9–14).

At his deposition, Deputy Laughlin admitted his lack of confidence in the information received

---

[1] Additional relevant facts are set forth in Plaintiff's Motion for Partial Summary Judgment (Doc. 60, pp. 2–11). For the sake of brevity, Plaintiff does not repeat them here.

[2] Exhibits A–Q are attached to the previously filed Declaration of T. Kennedy Helm in Support of Plaintiff's Motion for Partial Summary Judgment. (Doc. 61). Exhibits R–GG are attached to the Supplemental Declaration of T. Kennedy Helm in Support of Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

from the off-site security employee. (**Ex. B**, 77:17–21, 78:19–22). Moreover, Defendant Laughlin himself possessed no independent knowledge about criminal activity at this construction site, having neither responded to a commercial burglary there, nor heard that the site had a history of commercial burglaries. (**Ex. B**, 76:4–9; 90:7–8; **Ex. K**, 65:4–9). Consequently, Defendant Laughlin acknowledged that, when he arrived at the construction site, he needed to investigate to ascertain whether a commercial burglary was occurring or had occurred. (**Ex. B**, 78:23–24; 80:10–15). Defendants Laughlin, Michel, and Deputies Sanchez, De Martini, and King all agree that dispatch provided them information about only a *possible* commercial burglary in progress. (**Ex. B**, 80:10–13; **Ex. A**, 44:14–21; **Ex. D**, De Martini Dep., 7:21–23; **Ex. E**, King Dep., 18:25–19:06).

Deputies also had no specific information that any of the three people were armed or violent. (**Ex. B**, 79:15–18; 90:7–9; **Ex. A**, 48:11–15; 48:23–49:2) (*see also* **Ex. C**, CAD, p. 01880, "UNK IF VIOLENT"; **Ex. R**, Michel Dep., 83:17–24. Instead, Defendant Laughlin could only identify "potential" threats and generalized concerns about the people who could be inside the construction site. (**Ex. B**, 79:19–80:2).

Defendants Laughlin, Michel, and Deputy Sanchez all arrived on scene between 11:00—11:01 p.m. (**Ex. C**, CAD p. 01880; **Ex. A**, 94:17–95:7). All were trained and well-armed.[3]

Deputies King and De Martini set up a perimeter to prevent the people from escaping. (**Ex. R**, 64:4–13; **Ex. B**, 176:14–19). Deputy Zeugin staged in nearby Lesley Gardens, near the construction site's perimeter fence, and stayed there. (**Ex. S**, Zeugin Dep., 8:23–24; 9:3–21; 13:20–25). Sergeant Loubal also stood at the perimeter by Leslie Gardens. (**Ex. N**, Loubal Dep., 14:25–15:6).

When Deputy Sanchez first saw Mr. May, about 75 yards away, he could not see anything in Mr. May's hands, and Mr. May was not doing anything threatening. (**Ex. T**, Sanchez Dep., 59:12–18; 69:11–17). Although Deputy Sanchez had his duty weapon out, he pointed it to the ground because, as he agreed,

---

[3] Defendant Laughlin, 5'10", 230 lbs., carried an asp (collapsible baton); a taser, and a gun; he was wearing a bullet-proof vest, and was carrying a small flashlight. (**Ex. B**, 23:11–19; 26:20–27:8). Defendant Michel, 290 lbs, 6'6," a weightlifter trained in the martial art *Aikido*, wore a bullet-proof vest and carried his firearm, handcuffs, OC spray, an asp, and a flashlight. (**Ex. R**, 15:17–24; 16:6–12; 66:24–67:11; 68:7–9). Deputy Sanchez carried his duty weapon with extra magazines, his Asp, and his Taser. (**Ex. A**, 41:22–42:6).

there was *no threat*.  (**Ex. T**, 62:18–63:17).  Defendant Laughlin saw a man in a plaid shirt, holding a flashlight, about 100 yards away, standing in the open, and he could not see any weapons in his hands or anywhere else.  (**Ex. B**, 95:8–15; **Ex. K**, 67:19–25, 68:9–12).  Mr. May neither said anything threatening, nor made any threatening gestures to Defendant Laughlin.  (**Ex. B**, 106:12–19).

Then, while still about 100 yards away from Mr. May, Defendant Laughlin put *Riggs* in the down position and *claims* he made an unamplified canine announcement-warning: "Sheriff's canine, stop right there, show me your hands, get on the ground or you're going to get bit by the dog."  (**Ex. B**, 97:10–12, 16–21; 100:25–101:8).  Defendant Laughlin conceded that he did not know if the man (Mr. May) heard this canine warning, and he knew that sometimes it can be difficult for a person to hear the canine announcement-warning.  (**Ex. B**, 101:9–10; 103:3–6; 127:10–13).

### A. Defendant County trains its canine handlers to make audible canine announcement-warnings, yet a reasonable jury could find that Defendant Laughlin failed to do so.

It is disputed whether Defendant Laughlin made a canine announcement-warning.  Mr. May never heard one.  (**Ex. U**, 58:11–18; 67:17–25; 81:15–18).  Nor did Sharon Coster.  (**Ex. V**, 23:17–24; 26:19–27:5; 69:8–11; **Ex. J**, Duri Dep., 41:19–22; 42:17–24).  Nor did Deputies Zeugin, King, DeMartini, and Sgt. Loubal.  (**Ex. O**, Zeugin Dep., 10:13–15; **Ex. W**, King Dep., 14:11–18; **Ex. N**, 14:22–24; **Ex. X**, De Martini Dep., 10:7–8).

Lieutenant Mark Duri, Defendant San Mateo County's Rule 30(b)(6) witness[4] regarding training, policies and procedures for canine deployments and canine uses of force, as well as Sgt. Gary Ramos, the County's current Canine Unit Commander, confirm that the County requires canine handlers to give *audible* warnings, whenever possible, so that the canine handler is confident the suspect heard it.  (**Ex. Y**, 29:17–24; **Ex. Z**, Ramos Dep., 53:16–18, 52:6–8; **Ex. B**, 71:10–23).  According to Defendant County, "[w]arnings must be loud, clear, and documented *being heard at the far side of the building/area*."  (**Ex. Y**, 30:11–15; **Ex. Z**, 52:16–53:9) (emphasis added).  Defendant County trains its canine handlers to position someone at the far side of the building or area to ensure that the suspect *actually heard* the canine warning.

---

[4] As its 30(b)(6) witness, Lt. Duri's testimony binds Defendant County.  *See, e.g., Detoy v. City & County of San Francisco*, No. C 99-3072 CRB (JL), 196 F.R.D. 362, 365 (N.D. Cal. 2000) (a 30(b)(6) witness's testimony is "binding" on City).

(**Ex. Y**, 30:19–24). Defendant Laughlin agreed that, pursuant to Defendant County's policy and practice, a canine handler will "have somebody *move to a far side of a perimeter to see if they can hear an announcement*." (**Ex. B**, 127:14–23) (emphasis added). Or, Defendant County trains that its canine handlers may have someone move to a position to ensure the warning was heard, or radio to deputies holding the perimeter to ask if they have heard the canine warning. (**Ex. Y**, 30:25–31:9). Canine handlers are so trained—as Defendant County's 30(b)(6) witness admitted—for the suspect's safety *and because the law requires such a warning*. (**Ex. Y**, 31:13–17).

Defendant Laughlin did not follow this training. (**Ex. J**, 42:7–16). Before sending *Riggs* to bite and hold Mr. May, Defendant Laughlin did not try to have someone move to a far side of the perimeter to see if the person could hear the announcement. (**Ex. B**, 127:24–128:3). And, none of the deputies working with Deputy Laughlin documented that they could hear, from the far side of the construction yard, Deputy Laughlin's canine warning to Mr. May. (**Ex. Z**, 78:10–14). Defendant County places such an emphasis on audible warnings because it classifies canines as high-liability due to their ability to inflict serious bodily injury—even death.

## B. Defendant San Mateo County defines a police canine like *Riggs* as a high level of force, and the Canine Services Unit Manual's § 5-01 limits deployment.

Lieutenant Duri explained that, in sending a dog to find and bite, the canine handler effectively turns over control to the dog about how severely the resulting injury will be. (**Ex. Y**, 17:18–22). Experienced in viewing police dog bites, Lt. Duri agrees that a police canine bite is a high level of force. (**Ex. Y**, 17:1–18:3). Indeed, Sgt. Ramos, Canine Unit Supervisor, agrees that police dog bites can cause very severe injuries—even death. (**Ex. Z**, 22:1–3). Both agree that "'[d]eployment of a police canine constitutes the use of a high level of force that should be reserved for situations that justify this response alternative." (**Ex. Y**, 16:16–25; **Ex. Z**, 21:17–25; **Ex. AA**, IACP Whitepaper). Lt. Duri agreed that the bite-and-hold training can cause serious injury, due in part to the natural reaction of a person to escape the bite, and he specifically agreed with this statement from *Kerr v. West Palm Beach*, 875 F.2d 1546, 1550 (11th Cir. 1989):

> Under the bite and hold method of training, a dog seeks to subdue a suspect by biting his arm or leg; if, however, the dog has no access to such an appendage, the dog will bite the suspect on any available area of his body. Upon being bitten by a dog, a suspect usually attempts to free himself; the dog, however, is trained to maintain his hold on the suspect until ordered to release the suspect by its handler. Thus, if the dog should lose his hold as a result of the suspect's attempts to free

himself, the dog will seek to reestablish it. As a result, suspects often suffer serious injury from multiple bites received during the course of an apprehension.

(**Ex. Y**, 32:18–33:15). Therefore, SMCSO Policy § 5-01 limits canine use; as Lt. Duri explained, the policy exists because of "*the severity of using the dog*." (**Ex. Y**, 28:20–29:16) (emphasis added). Specifically, § 5-01 provides:

> Deploying a canine to search for, or attempt apprehension of a suspect constitutes use of force. As such, it is subject to General Order 5-01 as well as this manual. Canine teams shall only use that degree of force that is reasonably necessary to apprehend or secure a suspect. A canine may be deployed to locate and apprehend a suspect if the handler reasonably believes that the individual has committed, or threatened to commit, a serious or violent felony <u>and</u> any of the following conditions exist:
>
> > 1. There is a reasonable belief that the individual poses an immediate threat of death or serious bodily harm to the public, another officer or to the handler.
> > 2. The individual is physically resisting or threatening to resist arrest, and such resistance would likely result in death or serious bodily injury to the public, another officer, or to the handler, and the use of the canine reasonably appears necessary to overcome such resistance.
> > 3. The individual is believed concealed in an area where entry by any means reasonably available, other than a canine, would pose a threat to the safety of the public, another officer, or to the handler.

(**Ex. G**). Section 5-01 limits canine use to arresting a serious or violent suspect. (**Ex. Z**, 26:4–7).

First, a canine handler must have probable cause to believe that the person has committed or threatened to commit a serious or violent felony. (**Ex. J**, 22:3–6; **Ex. B**, 68:1–5; **Ex. Z**, 41:12–42:6). Probable cause for a misdemeanor—such as trespass or a violation of California Penal Code §148—will not suffice, as these crimes lack the severity to justify a canine's high level of force. (**Ex. Z**, 26:8–10; 41:3–11; 87:25–88:9). Further, a canine handler may only deploy his dog to bite to effectuate a valid *arrest—not* to effect a simple investigatory detention for any crime. (**Ex. J**, 22:7–21; **Ex. B**, 68:7–12; **Ex. Z**, 26:12–27:2). Nor may a canine handler deploy a dog to bite someone who has merely failed to comply with the canine handler's commands. (**Ex. Z**, 47:11–16; 90:18–22). Defendant Laughlin admitted that he deployed *Riggs* on Mr. May for failure to comply with his commands, testifying that "*disobedience to simple orders... got him [May] bit by a dog.*" (**Ex. B**, 144:24–145:1) (emphasis added). Indeed, Sgt. Ramos agreed that Mr. May's alleged disobedience to Defendant Laughlin's commands would not suffice to send a dog to bite him. (**Ex. Z**, 101:13–23). Nor may a dog be deployed to apprehend someone merely for climbing over a fence of a commercial construction area and failing to heed a recorded warning

announcement.  (**Ex. Z**, 59:14–23).

In addition to a "serious or violent felony," § 5-01 requires a canine handler to articulate—*before* deploying the canine to bite and hold—facts to establish one of the three enumerated elements.  (**Ex. Y**, 26:12–27:10; **Ex. Z**, 36:12–37:16; **Ex. B**, 65:16–66:16; 66:17–24; 67:20–25; 68:14–22).  It is undisputed that (3) did not apply here, because Mr. May was never concealed or hiding.  (**Ex. Z**, 90:24–91:2). Therefore, Defendant Laughlin had to show, under § 5.01, that he had probable cause to believe that Mr. May had committed a serious or violent felony *and* posed an immediate threat of death or serious bodily injury.  (**Ex. Z**, 91:6–14; 101:24–102:5; **Ex. B**, 67:2–68:22).  The immediate threat of death or serious bodily harm must be contemporaneous and specific to the suspect.  (**Ex. Y**, 28:2–19; **Ex. Z**, 45:7–13; 46:19–22).  Generalized circumstances do not pose an "immediate threat."  (**Ex. Y**, 28:8–11; **Ex. Z**, 47:6–10).  Indeed, the canine handler needs *probable cause* to believe that the person also poses an immediate threat of death or serious bodily harm to someone.  (**Ex. Z**, 43:17–25; 44:1–7).  Defendant Laughlin was so trained on this "immediate threat" requirement.  (**Ex. B**, 69:12–22).

Moreover, the SMCSO requires canine handlers to consider *alternatives* before deploying their canines.  (**Ex. B**, 59:19–23).  For example, a canine handler who sees a non-threatening person standing motionless may just call off the dog.  (**Ex. J**, 21:4–9).  Or, a canine handler may command the dog to "*gib laut*" or audibly bark, while on leash, as a "show of force" to intimidate the suspect into complying.  (**Ex. B**, 25:9; **Ex. Z**, 27:3–12).  Or, a canine handler may keep the dog on leash while approaching the suspect and continuing to give commands. (**Ex. Z**, 89:21–25).  Defendant Laughlin did none of these.  Other alternatives existed.  (**Ex. BB**, Burwell Rule 26 Report, p. 14).[5]

Moreover, a warning must give the person a reasonable amount of time to comply to avoid getting bitten.  (**Ex. B**, 71:24–72:7).  Yet, Deputy Laughlin waited only 5–30 seconds before sending *Riggs* to bite Mr. May.  (**Ex. B**, 101:16–102:6).

### C.    Defendant Laughlin sics *Riggs* for the first time to bite and hold Mr. May after seeing

---

[5] The Ninth Circuit has repeatedly held that police practices experts' testimony concerning regional and statewide police protocol is relevant both to the merits and to qualified immunity of a court's deciding a dispositive motion.  *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc); *Davis v. Mason Cnty.*, 927 F.2d 1473, 1484–85 (9th Cir. 1991); *Blankenhorn v. City of Orange*, 485 F.3d 463, 485–86 (9th Cir. 2007).

**him either: (1) move into the shadows; (2) walk away; or (3) stand still with his arms at his sides.**

After allegedly giving the first canine announcement-warning, Defendant Laughlin claims that Mr. May "[p]retty much right away" began to move into the shadows, right next to the fence line; as soon as Mr. May did so, and Deputy Laughlin lost sight of him, Deputy Laughlin ordered *Riggs* to *FASS!* or bite him. (**Ex. B**, 101:11–15, 102:7–17; **Ex. J**, 41:2–9). Defendant Laughlin "took him moving back into the shadows as *basically being disobedient of the command* and trying to go toward the fence, which was described by the reporting parties as an entrance/exit." (**Ex. B**, 102:22–103:2). Sgt. Ramos agreed that Mr. May's alleged turning towards the fence constituted a potential threat at most. (**Ex. Z**, 92:25–93:23). Contradicting Defendant Laughlin, Defendant Michel testified that Defendant Laughlin deployed *Riggs* allegedly because Mr. May and Ms. Coster *started to walk* towards the fenceline—which Defendant Michel thought appeared to be an attempt to escape. (**Ex. R**, 79:17–80:10). Defendant Laughlin admitted that he never saw Mr. May's body in any other posture other than standing up and moving slowly. (**Ex. B**, 125:24–126:1). At this point, Deputy Sanchez still had not seen any evidence of a burglary. (**Ex. A**, 65:19–24). Defendants Laughlin, Michel, and Deputy Sanchez followed behind as *Riggs* bounded towards Mr. May.

Mr. May tells it differently. As he and Ms. Coster were leaving with *Domino*, Ms. Coster's cat they had been trying to rescue, Mr. May heard a commotion behind him, turned around, and saw, at the very far end of the construction site, about 100 yards away, three people in dark clothes walking side by side towards him. (**Ex. U**, 53:9–11; 54:2–4, 11–16). He assumed they were security. (**Ex. U**, 60:6–9). Mr. May stood near the fence, with his hands at his side, thinking he was going to "stay right here and talk to them" and that they were going to ask him "what the heck" he was doing there, and he could explain himself. (**Ex. U**, 56:6–9; 55:6–11; 57:25–58:3). While standing and waiting, he may have put his hand on the fence to lean on to be comfortable. (**Ex. U**, 56:14–18; 60:12–61:3). The construction site was "pretty well lit"; although there were some shadows, streetlights and other lights illuminated the construction site, which earlier had enabled Mr. May to climb the scaffolding to try to get *Domino* down. (**Ex. U**, 56:19–25; 57:1–4). Defendant Laughlin claimed the lighting around Mr. May was dim. (**Ex. B**, 95:18–20). As the three individuals approached Mr. May, none of them said anything, and Mr. May did not say anything, either—although it was possible Mr. May just did not hear. (**Ex. U**, 58:4–18; **Ex. T**, 66:10–17).

Then, Mr. May saw what he thought was a guard dog running towards him, and he thought to himself: "Don't move." (**Ex. U**, 62:12–15; 63:18–20). *Riggs* ran up to Mr. May, who was standing with his arms at his sides, and nudged his right arm with his nose. (**Ex. U**, 64:13–25). Mr. May did not react, and he stood there; "Don't move" was his only thought. (**Ex. U**, 65:1–6). Mr. May did not hear any of the three men say anything, and Mr. May did not say anything to them. (**Ex. U**, 65:18–66:8). Then, *Riggs* ran back towards the three men, who were now closer to Mr. May. (**Ex. U**, 66:22–67:16).

In contrast, Defendant Laughlin claims that after he called *Riggs* back he gave Mr. May two more orders: "Show hands, get on the ground, the dog is going to bite you." (**Ex. B**, 107:12–14). At this point, Defendant Laughlin was "about a car length away" from Mr. May, "a lot closer," and Defendant Laughlin could see Mr. May standing "a few steps away from the fence line." (**Ex. B**, 107:15–22; **Ex. R**, 83:25–84:7). Despite standing "about a car length away" from Mr. May, Defendant Laughlin claimed he "couldn't see his hands[,]" and he could not see the flashlight. (**Ex. B**, 107:23–108:4). Mr. May did not move and kept his hands at his side. (**Ex. U**, 68:1–10).

Defendant Laughlin claims that Mr. May was "not complying with the orders given[,]" and was "not showing me his hands, he's not getting on the ground, and he was backing up, toward the fence line." (**Ex. B**, 110:24–111:14). Mr. May's body was facing Deputy Laughlin as he began allegedly "backing up" towards the fence line. (**Ex. B**, 111:19–22). At this point, even though he had no information whatsoever about any gun, Defendant Laughlin feared that Mr. May posed a potential threat of a "gun in his waistband." (**Ex. B**, 112:3–9). Defendant Laughlin, however, conceded that he never saw a gun on Mr. May's person; rather, Defendant Laughlin feared: "He's an unsearched suspect who *could* have a weapon." (**Ex. B**, 112:10–15) (emphasis added). By his own admission, Defendant Laughlin had *no specific information* of any weapons that Mr. May might have possessed. (**Ex. B**, 112:16–18). Mr. May never attempted to flee; Defendant Laughlin never saw Mr. May turn to face the fence as if he were going to try to climb it or jump over it. (**Ex. B**, 114:15–17).

Importantly, before Defendant Laughlin sent *Riggs* to bite and hold Mr. May, he conceded that he would not have been justified in using intermediate force, such as a Taser, on Mr. May, because Mr. May *did not pose an immediate threat*. (**Ex. B**, 126:25–127:9). When asked what *immediate* threat Mr. May posed when Defendant Laughlin sicced *Riggs* on him for the second time, Defendant Laughlin could only

identify potential threats and Mr. May's alleged failure to comply with his alleged order to "show hands and surrender," based on the possibility that he might be carrying the "tools of" the burglar's trade—crowbars, screwdrivers, and "weaponry"—that he never saw in May's empty hands. (**Ex. B**, 103:20–104). Defendant Laughlin conceded, however, that these are merely a "*potential* threat". (**Ex. B**, 104:7–11). Indeed, when asked whether he had any facts that Mr. May posed a *specific* threat, Defendant Laughlin conceded: "I wasn't aware if—it was no—*I was not aware of any specific weapon* he may have had on him as a level of threat towards me." (**Ex. B**, 104:12–19). In fact, Defendant Laughlin had no specific information that Mr. May was armed. (**Ex. Z**, 92:4–6). Nor did he see Mr. May make any threatening movements, say anything threatening, or throw anything. No deputy ever observed any weapons on Mr. May. (**Ex. J**, 41:10–18; **Ex. Z**, 92:7–19). Defendant Laughlin never saw Mr. May holding any construction-site tools or debris as a weapon. (**Ex. B**, 125:8–19).

Defendant Laughlin claimed he was concerned that Mr. May "*might* escape" if he waited any longer to release Riggs. (**Ex. B**, 103:14–16). Yet the crime under suspicion was not serious or violent. Defendant Laughlin also claimed that Mr. May's "hands were tucked by his waistband and he had—I remember he had, like, a baggy shirt on that concealed his hands pretty good." (**Ex. B**, 108:7–9).

### D. Defendant Laughlin deploys *Riggs* for the second time, and this time he bites and holds Mr. May, who ends up on the ground face first, flailing his legs in pain.

Defendant Laughlin commanded *Riggs* again to "*Fass!*" while only "a couple steps" from Mr. May. (**Ex. B**, 114:18–22; 111:23–25). Mr. May testified they were within 50 yards away. (**Ex. L**, 79:19–80:3). As *Riggs* ran back to the three men, Mr. May and Ms. Coster heard—only once—some "loud, very guttural" words, possibly German. (**Ex. L**, 76:19–25; 77:1–4; 78:15–17; **Ex. V**, 26:5–13). Because the words were "very loud, guttural[,]" Mr. May "assumed it was an attack command," because he saw *Riggs* "spring into action" and run to him faster than before. (**Ex. L**, 75:17–19; 77:11–17). In less than a minute from *Riggs'* bumping him on the right arm, *Riggs* returned and bit Mr. May on the right leg while Mr. May was standing up. (**Ex. U**, 68:14–17; 72:5–9). The first English words Mr. May heard—"get on the ground—he heard while he was standing up with *Riggs* "on [his] leg[.]" (**Ex. L**, 74:20–75:8; 78:18–79:1). Mr. May thought he was already "heading [to the ground] anyway, because of the way the dog had [his] leg."

With *Riggs* latched to his right leg, Mr. May either fell down to the ground, or Defendant Laughlin

pulled him to the ground by his arm. (**Ex. L**, 79:15–18, 82:9–14; **Ex. B**, 114:18–115:1; **Ex. R**, 84:20–85:4). Mr. May was not "resistive[,]" and Defendant Laughlin recalled "just being able to pull him to the ground pretty easy." (**Ex. B**, 116:14–16). Within seconds of *Riggs* biting him, Mr. May ended up on his stomach, with *Riggs* "chewing" on his leg. (**Ex. R**, 85:4–12; **Ex. U**, 72:1–4). In a "blur," *Riggs* bit Mr. May multiple times on his right leg, and on his left leg (leaving two to three puncture wounds). (**Ex. U**, 70:25–71:20, 72:10–23; **Ex. R**, 92:14–15). *Riggs* continued to bite Mr. May, because *Riggs* is "a bite-and-hold dog." (**Ex. B**, 116:17–23). It was "extremely painful," and Mr. May was moving around because of the pain, as he would later tell Defendant Laughlin at the substation. (**Ex. U**, 71:20–25; **Ex. B**, 151:5–10). *Riggs* thrashed Mr. May's right leg around. (**Ex. L**, 82:15–17). The pain was "so intense." (**Ex. U**, 88:21–22). Lying on his stomach, with *Riggs* attached to his leg, Mr. May was in "automatic mode" and "not really sure what [he] was doing." (**Ex. L**, 73:5–15). Mr. May "was struggling to get away," "or just to get him off my—off from biting my leg[.]" (**Ex. L**, 73:18–20). Mr. May shook his leg to try to shake the dog off, moving it "to and fro" and "back and forth trying to get him to let go." (**Ex. L**, 82:18–21; 73:24–74:8). Defendant Laughlin even admitted: "it looked like he was trying to pull away from the dog, to break free of the dog's hold." (**Ex. B**, 117:24–118:4). It is undisputed that Mr. May never used his arms or hands to try to strike, punch, grab, or to otherwise try to hurt *Riggs*, and that Defendant County trains its canine handlers to expect a person to react as Mr. May did and not interpret this as willful resistance.

### E. Defendant County trains its canine handlers that Mr. May's involuntary reaction in flailing around while *Riggs* bit him does not constitute willful resistance.

Defendant County trains its canine handlers that, due to the pain and fear, suspects who are being bit by a police service canine will flail around—which a canine handler should not interpret as volitional resistance. (**Ex. Y**, 33:16–34:7). Defendant Michel, a canine handler, agreed that "[p]eople will flail about" when getting bitten by a police canine. (**Ex. R**, 92:24–93:2). Deputy Sanchez agreed that it is pretty common for people to try to pull away or squirm when bitten. (**Ex. T**, 90:12–16).[6] As *Riggs* was "attached to his leg," Defendant Laughlin claims that Mr. May was "just kicking at the dog and kind of

---

[6] Defendant Laughlin agreed that getting bitten by a police dog hurts and causes fear, but he *denied* having been trained that persons who are being bitten by a police canine will flail around from the pain and panic of the bite. (**Ex. B**, 72:9–17; 73:2–10).

moving all around[,]" and he commanded Mr. May to "[p]ut your arms out." (**Ex. B**, 117:18–23; 115:1–2).

Defendant Laughlin commanded him to "stop fighting" *Riggs*. (**Ex. L**, 80:8–12; **Ex. R**, 99:25–100:4). Defendant Michel claimed "seeing [Mr.] May use his other leg *to kick at Riggs*." (**Ex. R**, 92:17–18). Yet, he conceded that someone could "involuntarily swing at or try to kick at the dog because of the bite." (**Ex. R**, 94:15–95:8). *Riggs* was not injured. (**Ex. B**, 131:14–22).

Defendant Laughlin stood there while Riggs attacked and repeatedly bit Mr. May, refusing to call off his dog, and prolonging the attack. Defendants claim *Riggs* bit Mr. May for 15–20 seconds. (**Ex. B**, 117:5–17; **Ex. R**, 99:4–9). To Mr. May, the bite seemed to last a long time, for minutes. (**Ex. L**, 81:23–25). Finally, Defendant Laughlin commanded *Riggs* to "*Aus*," or stop biting; got *Riggs* off of Mr. May; and moved back several feet. (**Ex. B**, 119:6–11).

### F. Defendant County's training and policies require a canine handler to disengage the canine as soon as the person has been subdued, and Defendant Michel admitted his duty to intervene.

Defendant County's training and policy requires its canine handlers to call off the dog as soon as the suspect has complied or is subdued. (**Ex. B**, 70:3–8; Canine Manual, §5-01, p. 2 (Doc. 62-24)). Deputies are trained that a person's flailing against being bitten is not intentional resistance. (**Ex. Y**, 34:4–7). If an officer is not sure if a suspect is willfully resisting—or merely flailing around in pain and fear—the officer may call the dog off, especially where, as here, the officer has backup. (**Ex. Y**, 34:8–13). Defendant Laughlin justified not calling off *Riggs* after Mr. May fell to the ground for two reasons: (1) Mr. May was allegedly kicking or fighting the dog; and (2) he would not put his arms out in front of him to search him for weapons. (**Ex. B**, 116:25–117:4). Mr. May disputes that; he was in shock. (**Ex. U**, 71:20–25).

It is undisputed that no one intervened while Mr. May was getting bitten on the ground, despite the duty to do so. As Defendant Michel conceded repeatedly at his deposition, his POST training and the law required him to intervene to stop unconstitutional force. (**Ex. R**, 19:21–26:16; **Ex. CC**, POST LD 20, pp. 6-7, 6-8). Defendant Michel failed to intervene, despite standing 5'-10' away—far enough that, as he admitted, Mr. May couldn't have injured him. (**Ex. R**, 99:16–24).

Once Defendant Laughlin called off *Riggs*, he ordered Defendant Michel to handcuff Mr. May, which he did without difficulty while Mr. May while still face down on the ground. (**Ex. B**, 119:10–18; **Ex. R**, 100:2–7; **Ex. U**, 83:14–17). Despite his alleged prior concern for Mr. May possibly having a gun in

his waistband, Defendant Laughlin never conveyed this concern to Defendant Michel before he searched him, and Defendant Michel found no weapons or burglary tools on him. (**Ex. B**, 120:2–18–121:5, 130:14–17; **Ex. R**, 100:9–12; **Ex. U**, 85:9–15; **Ex. Z**, 87:5–16; **Ex. T**, 87:2–7). No one ever connected Mr. May with any stolen items, either. (**Ex. Z**, 87:17–20). Sometime after Mr. May had been bitten, a deputy checked his criminal history, finding nothing other than an ancient DUI. (**Ex. B**, 136:19–137:6; **Ex. Z**, 88:21–89:1).

Seconds after Mr. May was in handcuffs, Defendant Laughlin saw Ms. Coster with Deputy Sanchez, about 20' away. (**Ex. B**, 129:1–8; 173:11–174:1). Deputy Sanchez had seen a person wearing all black move in front of him, shined his flashlight on her, ran up, and handcuffed her. (**Ex. T**, 70:25–72:8). Defendant Laughlin admitted he could not see Ms. Coster's hands, and that the mere inability to see her hands would *not* have allowed him to send a dog to bite and hold her. (**Ex. B**, 129:17–130:7).

Defendant Laughlin had arrested Mr. May only for second-degree commercial burglary, a "property crime" chargeable as a misdemeanor or felony, and he admitted he lacked probable cause to arrest him for anything else. (**Ex. B**, 126:4–12; 121:24–122:25). Then, Defendant Michel escorted Mr. May to the front of the construction site while Deputies Sanchez, King and Laughlin, with *Riggs*, searched the remainder of the buildings for the possible third suspect. (**Ex. B**, 119:23–120:1). Mr. May had difficulty walking, and Defendant Michel assisted him to stand and walk. (**Ex. U**, 86:16–17; 87:25–88:13). Ms. Coster saw Mr. May handcuffed and sitting on the sidewalk after the incident, and she could see an expression on his face that he was in pain. (**Ex. V**, 28:22–29:3). During the drive from the construction site to the substation, Mr. May described how, with his hands cuffed behind him, he was having difficulty finding a comfortable position while sitting in the patrol car, and his pain would increase, on a pain scale of 1–10, from a 4–5/10 to an 8–9/10. (**Ex. U**, 92:20–93:10).

Defendants agree that Mr. May cooperated throughout the rest of the ordeal. (**Ex. B**, 132:4–9). At the substation, Mr. May "was very cooperative;" during the interrogation he was "polite and cordial." (**Ex. B**, 143:5–7; 149:21–24). During their respective interrogations, Mr. May and Ms. Coster both told Defendant Laughlin that they were on the site to look for her lost cat, and he believed them. (**Ex. B**, 151:11–14; 153:17–22). After transporting Mr. May to the hospital, Defendant Laughlin stayed for about 30 minutes, during which time Mr. May continued to be in handcuffs. (**Ex. U**, 108:19–109:15). Right

before leaving, Defendant Laughlin put an "I Met Riggs" sticker on Mr. May's chest. (**Ex. U**, 109:16–110:16). Mr. May did not request the sticker. (**Ex. U**, 110:17–21). Mr. May understood that Defendant Laughlin was trying to downplay the situation's severity: "[t]rying to lighten up the situation." (**Ex. U**, 111:3–10). At the hospital, Mr. May underwent "a long painful procedure of cleaning each of the punctures" and received 7 stitches (**Ex. U**, 112:25–113:1; Dr. Houseman Decl. (Doc. 62-13)). Lieutenant Duri looked a pictures of Mr. May's injuries and declared them "pretty severe. A dog bite is a severe injury." (**Ex. Y**, 46:11–47:14).

The next morning, Ms. Coster saw Mr. May, and he was "a mess" and "in a lot of pain." (**Ex. V**, 31:7–15). After the incident, Mr. May was limping, and he told Ms. Coster that his leg still hurt and was very uncomfortable. (**Ex. V**, 106:11–20). Mr. May experienced pain while his injuries healed, and he could not stand or walk for six months. (**Ex. U**, 123:21–125:22).

### III.     STANDARD OF REVIEW

Please see Standard of Review in Plaintiff's related motion. (Doc. 60, p. 11).

"'Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Smith*, 394 F.3d at 701; *see also Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury.").

### IV. ARGUMENT

#### A.     Defendants Laughlin and Michel violated Mr. May's Fourth Amendment right to be free from a warrantless arrest without probable cause.

As more fully briefed in Plaintiff's Motion for Partial Summary Judgment, Defendant Laughlin lacked probable cause to effect Mr. May's warrantless arrest, even on the facts most favorable to Defendants. (*See* Docs. 60–61). This Court should therefore deny Defendants' motion for summary judgment as to Plaintiff's Fourth Amendment false arrest claim.

#### B.     Defendants Laughlin and Michel violated Mr. May's Fourth Amendment right to be free from excessive force by deploying *Riggs* to bite and by deciding to prolong the bite once Mr. May was already subdued on the ground.

Under the Fourth Amendment, police may use only such force that is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The essence of the *Graham* objective reasonableness analysis is that the *force* which was applied must be balanced against the *need* for that force: it is *the need for force* which is at the *heart* of the *Graham* factors." *Headwaters Forest Def. v. Cnty. of Humboldt (Headwaters II)*, 276 F.3d 1125, 1130 (9th Cir. 2002) (emphasis in original).

Under *Graham*, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. McPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (as amended). "Stated another way, we must balance the amount of force applied against the need for that force." *Id.* "Thus, where there is no need for force, *any* force used is constitutionally unreasonable." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417–418 (9th Cir. 2003) (emphasis in original); *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014).

"The amount of force used is permissible only when a strong government interest *compels* the employment of such force." *Tekle v. United States*, 511 F.3d 839, 844 (9th Cir. 2007) (emphasis in original). Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 398.

"First, it is necessary to assess the quantum of force used to arrest [Mr. May]. The three factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure[.]" *Chew*, 27 F.3d at 1441. In their moving papers, Defendants misstate the legal standard for the "quantum of force" by ignoring the *type* of force that a trained police canine like *Riggs* represents. To measure the quantum of force, a jury must consider both "'the type *and* amount of force inflicted.'" *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000)); Ninth Circuit Civil Jury Instruction 9.25, ¶5 ("the type and amount of force used.").

Because trained police dogs are capable of causing grievous injury, including death, as a matter of law, the "type" of force that a police dog presents is "intermediate force" and "the most severe force authorized short of deadly force," and in some circumstances, may even constitute deadly force. *Smith*,

394 F.3d at 702; 706; *see also Ledesma v. Kern Cnty.*, No. 1:14-cv-01634-DAD-JLT, 2016 U.S. Dist. LEXIS 156554, at * 28 (E.D. Cal. Nov. 10, 2016) (citing *Smith*, 394 F.3d at 701–02) ("Use of a trained police dog may be regarded as '*intermediate force*' or '*deadly force*,' depending on the factual circumstances in the case.") (emphasis added); *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1146 n.14 (E.D. Cal. 2016) (citing *Smith*, 394 F.3d at 705–07) ("Where a law enforcement officer uses a trained police dog, the level of force, *whether intermediate or deadly force*, is determined based upon the unique factual circumstances of the case.") (emphasis added).

Indeed, a trained police dog is classified as intermediate or deadly force because of its risk of such harm. *See Scott v. Harris*, 550 U.S. 372, 383 (2007) ("[I]n judging whether [Deputy Laughlin]'s actions were reasonable, we must consider the *risk* of bodily harm that [Laughlin]'s actions posed to respondent in light of the threat to the public that [Laughlin] was trying to eliminate.") (emphasis added); *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citing *Deorle*, 272 F.3d at 1280) ("In light of this weapon's *dangerous capabilities*, '[s]uch force, though less than deadly, . . . is permissible only when a strong governmental interest compels the employment of such force."). Indeed, to ignore the risk of serious injury by focusing exclusively on the actual injury that Mr. May sustained would run afoul of *Graham*'s mandate that the "reasonableness . . . be judged" prospectively and *not* "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Here, Defendants look solely to the actual consequences of the force used on Mr. May rather than on the risk inherent in the type of force that deploying a canine to bite and hold represents. Defendant County's 30(b)(6) witness acknowledged the high level of force that police canines pose, and that Mr. May's bites were "pretty severe." (**Ex. Y**, 16:16–17:7; 46:11–47:14). Sgt. Ramos agreed that Mr. May's bite wounds looked like multiple bites to him, and he characterized them as "moderate" and required medical care. (**Ex. Z**, 83:1–11; **Ex. P**). The Canine Unit Supervisor acknowledged that a police dog can cause death. (**Ex. Z**, 22:1–3). Defendant Laughlin agreed that a single dog-bite wound could be very severe in itself, and Defendant Michel conceded that a canine like *Riggs* could kill someone. (**Ex. B**, 71:7–9; **Ex. R**, 89:19–24). While dogs like *Riggs* are trained to bite an exposed body part, such as arms and legs, *Riggs* could have just as easily bitten Mr. May elsewhere, causing even more serious injuries, or death. (**Ex. R**, 98:17–99:3).

As to the amount of force used, the multiple puncture bites and leg wounds with resulting infections that Mr. May suffered support the conclusion that Defendant Laughlin used an intermediate, severe level of force on Mr. May. *See Rodriguez v. City of Modesto*, No. 1:10-CV-01370-LJO-MJS, 2015 U.S. Dist. LEXIS 46109, at *42 (E.D. Cal. Apr. 8, 2015) (citing *Chew*, 27 F.3d at 1441) ("By all accounts, the force of the trained police dog used to arrest Rodriguez was 'intermediate' and 'severe,' as it resulted in multiple puncture bites and wounds to his legs.").

Indeed, injuries caused by a use of force have relevance in balancing the level of intrusion to the individual against the governmental need for the force. *See Santos v. Gates*, 287 F.3d 846, 853–54 (9th Cir. 2002) (Where a takedown described by police as "merely assisting Santos to the ground" resulted in a fractured back, the Court found that "in light of his serious injury, the force used was both substantial and excessive."). Here, Defendants' use of a canine to attack Mr. May resulted in multiple puncture wounds causing intense pain, infection, and requiring multiple medical visits and six months to heal fully. (**Ex. U**, 119:7–128:11; **Ex. DD**, wound photo; **Ex. EE**, Medical Records). Use of "intermediate force," though less severe than deadly force, "nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161–62 (9th Cir. 2011) (citing *Smith*, 394 F.3d at 701–02).

### a. Defendant Laughlin lacked probable cause to arrest Mr. May for any crime, thereby tilting the "severity of the crime" factor in Mr. May's favor.

No force is either necessary or justified to effect an unlawful arrest. As more fully briefed in Plaintiff's Motion for Partial Summary Judgment, Defendants lacked any probable cause to effect Mr. May's warrantless arrest; consequently, Defendants had no right to use any force to accomplish an *unlawful* arrest. *See Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the *right* to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.") (emphasis added). If police have no right to arrest, they may not use force to accomplish the unlawful arrest. *Lolli, supra,* ("Thus, where there is no need for force, *any* force used is constitutionally unreasonable.") (emphasis in original); *Green, supra,* (same). The "severity of the crime" element does not favor Defendants. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015) ("Where officers are presented with circumstances indicating that no crime was committed, the 'severity of the crime at issue' factor is *necessarily diminished* as a justification for the use

of force—although, as our cases have held, the force used may still be reasonable if the other *Graham* factors taken together favor that conclusion.") (emphasis added).

Further, the nature of the crime provides no basis for Defendant Laughlin's use of force. Defendants concede that second-degree commercial burglary is a property crime. (**Ex. Y**, 49:4–6; **Ex. B**, 162:24–163:1; **Ex. K**, 66:25–67:2). Defendants claim that commercial burglary is a "violent felony" because "[i]t could turn violent." (**Ex. Z**, 40:14–20). The only "evidence" Defendants have proffered that commercial burglary is dangerous is based largely on dicta from *Frunz v. City of Tacoma*, 468 F.3d 1141, 1145 (9th Cir. 2006) (a Fourth Amendment "exigency" case not involving canines or, in fact, burglary), and Defendant Laughlin's speculation. At most, commercial burglary raises *potential* threats. *See Chew*, 27 F.3d at 1443 n.9 (citing *Tennessee v. Garner*, 471 U.S. 1, 21 (1985)) ("In *Garner*, the Court noted that the fact that 'an unarmed suspect has broken into a dwelling at night does not automatically mean that he is physically dangerous.' The Court also took notice of statistics showing that burglaries only rarely involve physical violence, and of the FBI's classification of burglary as a 'property' rather than a 'violent' crime.").

### b. No reasonable jury could find that Mr. May posed an immediate threat to Defendant Laughlin's or anyone's safety.

"The most important single element of the three specific [*Graham*] factors" is "whether the suspect poses an immediate threat to the safety of the officers or others." *Smith*, 394 F.3d at 702. Ninth Circuit precedent requires officers to base immediate threats on objective facts—not generalized fears for officer safety—and the potential threats and generalized concerns Defendant Laughlin testified about cannot, as a matter of law, constitute immediate threats. *See Deorle*, 272 F.3d at 1281 ("A simple statement by an officer that he fears for his safety or the safety of others is not enough; *there must be objective factors* to justify such a concern."); *Bryan*, 630 F.3d at 826 ("*the objective facts* must indicate that the suspect poses an immediate threat to the officer or a member of the public"); *Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007) (vague suspicions or *generalized concerns* that a person presents officer safety issues cannot justify a use of force); *Mattos v. Agarano*, 661 F.3d 433, 444, n.5 (9th Cir. 2011) (en banc) (explaining critical distinction between *potential threat* and *immediate threat*).

Indeed, Defendant Laughlin admitted he would not have been justified in using another form of intermediate force—such as a Taser—against Mr. May, "[b]ecause a Taser requires an immediate threat." (Laughlin Dep., 126:25–127:9). *See Bryan*, 630 F.3d at 825–26 (defining Taser as intermediate force).

Further, as a matter of law, Defendant Laughlin's generalized concerns about risks are of no avail. "A desire to resolve quickly *a potentially dangerous* situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Bryan*, 630 F.3d at 826 (citing *Deorle*, 272 F.3d at 1281); *see also Mattos*, 661 F.3d at 444 (where woman physically resisted order to get out of car during traffic stop, court refused to consider *possibility* that she could drive away as an immediate threat to justify intermediate force of Tasing her). Defendant Laughlin's speculation about what could (or could not) have been in Mr. May's waistband does not rise to the level of an immediate threat. *See Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1146 n.8 (W.D. Wash. 2007), *aff'd*, 301 F. App'x 704 (9th Cir. 2008) (holding that an officer's concern that plaintiff, wearing an untucked t-shirt obscuring his waistband, "might have a weapon hidden in the waistband of his pants" is "[a]n example of how defendants *stretch 'immediate threat' to encompass 'possible threat'*") (emphasis added).

No one alleges they ever saw Mr. May try to pull anything out of his waistband. Mr. May was simply standing frozen, with his arms at his sides. The record—and Defendants' own admissions—fail to show any basis for believing that Mr. May was armed or that he posed an immediate threat to anyone's safety; *See Chew*, 27 F.3d at 1441 (observing that "[t]he record does not reveal an articulable basis for believing that Chew was armed or that he posed an immediate threat to anyone's safety . . . [or] engaged in any threatening behavior during this time . . . a rational jury could easily find that Chew posed no *immediate* safety threat to anyone.") (emphasis in original). Even if Mr. May were walking away, Lt. Duri admitted: "just by walking away from an officer, no, that's not a threat." (**Ex. J**, 42:25–43:20). *See Fuller v. Cantrell*, No. C-03-5616 MMC (PR), 2005 U.S. Dist. LEXIS 37014, at *6–*8 (N.D. Cal. July 27, 2005) (quoting *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998) (denying summary judgment where plaintiff stood still and froze, and had otherwise surrendered, yet defendant canine handler released a dog to bite and hold him; accepting plaintiff's account, the officer's "conduct cannot, for purposes of summary judgment, be considered reasonable.")).

Defendants place too much stock in *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003), where that plaintiff had actually fled, had been armed, and was evading arrest; Mr. May was not known to be armed, and was just standing still. *See Fuller*, 2015 U.S. Dist. LEXIS 37014, at *11–12 (distinguishing *Miller* on this same basis). *See also French v. Carson City*, No. 3:13-cv-00209-HDM-WGC, 2015 U.S.

Dist. LEXIS 13992, at *18, n.6 (D. Nev. Feb. 4, 2015) (quoting *Miller*, 340 F.3d at 965) (distinguishing

*Miller* because there officers had "some indication the plaintiff could be armed and the plaintiff had

actually fled from the officers and was in an area that the plaintiff knew well but the officers did not[,]" and

observing that "[there is no evidence . . . the plaintiff in this case could have been armed, nor had he fled[;]

consequently, plaintiff could not have 'generat[ed] surprise, aggression, and death' in the same way as the

*Miller* plaintiff.)  Moreover, *Miller* was decided after a trial—not on summary judgment—so the court had

"all the relevant facts and was able to resolve disputed issues of material fact, which at this stage the court

cannot do."  *French*, 2015 U.S. Dist. LEXIS, at *18, n.6.

### c.    Mr. May was neither resisting arrest nor fleeing: he was either standing still, moving slowly, failing to obey Defendant Laughlin's alleged commands, or moving his legs in pain while being bitten.

According to Mr. May, he stood still the entire time, because he thought that Defendants were going

to come talk to him, and he was going to explain to them that he was there to rescue a cat.  Even on

Defendants' best version of the facts, Mr. May was only ever moving his body slowly, which does *not*

warrant the intermediate, potentially deadly force used, especially given the total lack of other factors

favoring the use of force.

Furthermore, even assuming Defendant Laughlin did command Mr. May repeatedly to "show

hands,"—and Mr. May heard him and failed to comply—bedrock Ninth Circuit law holds that such mere

non-compliance with an officer's orders is not "active resistance" justifying severe, injurious force.  *See*

*Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) ("In prior cases, we have recognized that *a*

*failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance*

*nor justifies the application of a non-trivial amount of force*.  We have so held even when the extent of the

resistance was substantially greater[.]") (emphasis added; collecting cases).  Mr. May's instinctive,

primordial reaction to getting bit by *Riggs*—moving his legs to make it stop—cannot constitute willful

resistance, just as the SMCSO trained its deputies.  Mr. May endured an "extremely painful" experience.

(**Ex. U**, 71:20–25).  Mr. May's resistance was involuntary, not willful "kicking the dog."  *See French*, 2015

U.S. Dist. LEXIS 13992, at *19–20 (denying summary judgment because "[a] question of fact exists as to

the degree to which plaintiff resisted arrest, even under defendants' version of events," where "[a] jury

could conclude the plaintiff's conduct was in fact relatively mild and perhaps even passive rather than

threatening.").

### d. Defendant Laughlin's failure to warn Mr. May before releasing *Riggs* to attack him weighs in favor of finding a Fourth Amendment violation.

Clearly established Ninth Circuit law required Defendant Laughlin to warn Mr. May *before* he used potentially deadly force on him. *See Deorle*, 272 F.3d at 1284 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and [ ] the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."); *Glenn*, 673 F.3d at 876 (holding that warning should have been given immediately before use of force; earlier warnings were inadequate). An officer's failure to warn of the imminent use of force weighs in favor of finding a constitutional violation. *Hesterberg v. United States*, 71 F. Supp. 3d 1018, 1031 (N.D. Cal. 2014) (citing *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013)). For this very reason, as discussed *supra*, Defendant San Mateo County required its canine handlers both to make the canine announcement-warning *audibly* and to take steps to ensure the suspect actually heard it. A rational jury could easily find that Defendant Laughlin failed to properly warn. Defendants' reliance on *Conerly v. Flores*, No. 4:15-cv-04079-KAW, 2016 U.S. Dist. LEXIS 162822, at *15–16 (N.D. Cal. Nov. 23, 2016) is unpersuasive; that case dealt not with whether plaintiff heard a warning before the use of force, but whether he heard a command to stop. Similarly unpersuasive is Defendants' reliance on *Mighell v. City of Edmonds*, No. C14-285-RSM-MAT, 2015 U.S. Dist. LEXIS 26610, at *19 (W.D. Wash. Jan 22, 2015); there, the court did not address the warning requirement, but whether plaintiff resisted arrest by failing to heed an officer's command. Nor does *McKay v. City of Hayward*, 949 F. Supp. 2d 971, 979–982 (N.D. Cal. 2013) support Defendants; there, the court found a violation of rights on the plaintiff's facts, including the officers' failure to warn, so any precedential value it has favors Mr. May, because it actually put Defendant deputies on notice that a failure to warn is unreasonable.

### e. Defendants Laughlin and Michel had less intrusive alternatives to using *Riggs* against Mr. May, a visibly older man.

Police officers also must consider less intrusive alternatives to the force that was used as a part of the "totality of the circumstances." *Smith*, 394 F.3d at 701; *Deorle*, 272 F.3d at 1282. *See also* Ninth Cir. Model Civil Jury Instr. 9.25. The inquiry is whether Defendants "could have altered their tactics to bring them in compliance with their own training, which would have minimized the degree of force applied or

eliminated the need for force altogether." *Nelson*, 685 F.3d at 882. Here, Defendants had less intrusive alternatives to the high level of force deployed on this sixty-two-year-old, non-threatening man suspected of a non-violent property crime. The County's 30(b)(6) witness described them, as discussed *supra*, at pp. ___. Further, they out-numbered him, out-equipped him, and they were all physically larger and stronger. Mr. May could not easily flee the construction site still surrounded by the high fence, and four deputies were on the perimeter. This was not an instance where officers had to make "split-second judgments" in "rapidly evolving" circumstances. *Garner*, 471 U.S. at 20 (deadly force standard does not require officers to make "impossible, split-second evaluations of unknowable facts"; *see also Chew*, 27 F.3d at 1443 ("Chew was trapped . . . There was time for deliberation and consultation with superiors.").

Further, a jury may consider whether Defendant Laughlin reasonably should have known that Mr. May was susceptible to an increased risk of harm from the use of force. *Mattos,* 661 F.3d at 445; *Winterrowd*, 480 F.3d at 1186. Before using force, a deputy should take into account a person's physical prowess and age. (**Ex. Y**, 34:22–25; 35:18–20). Although Defendant Laughlin testified that he could not tell what age Mr. May was, a jury could disbelieve him and find that Mr. May was readily observable as a sixty-two-year-old man. (**Ex. B**, 105:17–19). Mr. May's visibly apparent old age weighs against finding any governmental need to use force. (**Ex.___**, Photo of Mr. May).

### C. Defendant Michel's Liability stems from: (1) his failure to intervene to stop Defendant Laughlin's use of excessive force; and (2) his integral participation in providing backup, handcuffing, and searching Mr. May.

First, "[p]ursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994) *aff'd in part, rev'd in part,* 518 U.S. 81 (1996); *see also Cunningham v. Gates,* 229 F.3d 1271, 1289–90 (9th Cir. 2000) (recognizing officers' duty to intercede where they have a "realistic opportunity" to stop a rights violation); *see also Fuller*, 2005 U.S. Dist. LEXIS 37014, at *13–14 (denying summary judgment to officers at the scene of a canine attack because they could have had a realistic opportunity to intercede). Here, Defendants Laughlin and Michel acknowledged having been trained on the duty to intervene. (**Ex. B**, 39:22–40:1; **Ex. R**, 19:21–26:16). Such intervention could take the form of one deputy telling the canine handler to get the dog off the person. (**Ex. Z**, 30:8–12). Despite standing nearby, Defendant Michel never intervened in either canine deployment, nor in the prolonged bite,

despite what a jury could find was his opportunity to do so.  *McKay*, cited by Defendants, actually supports finding liability here: there, in denying summary judgment in an excessive force claim, the court held that an officer "had a realistic opportunity to intervene."  *McKay*, 949 F. Supp. 2d at 982.

Second, Defendant Michel was an "integral participant" in these violations of Plaintiff's rights by providing backup, handcuffing, and searching Mr. May.  *Blankenhorn*, 485 F.3d at 481, n.12.

> ### D.  Defendants Laughlin and Michel do not have qualified immunity for their violation of Mr. May's clearly established rights.

Please see the qualified immunity standards and cases related to unlawful arrest set forth in Plaintiff's related motion.  (Doc. 60, pp. 18–20).

Recently, the Supreme Court reversed a finding of qualified immunity to police officers, because the Fifth Circuit "failed to view the evidence at summary judgment in the light most favorable to [the Plaintiff], and for "failing to credit evidence that contradicted some of its key factual conclusions."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

To overcome qualified immunity, the exact same violation need not have been previously held unlawful; rather, the contours of the right must be sufficiently clear so that, in light of preexisting law, the unlawfulness of the actions is apparent.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  A defendant is not entitled to qualified immunity merely because no prior case prohibits the precise conduct at issue.  *Young*, 655 F.3d at 1167; *Deorle*, 272 F.3d at 1285–86.  "[A]ny requirement that facts of previous cases be "materially similar" to the case at issue is a "rigid gloss on the qualified immunity standard" that is "not consistent with our cases."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  The "salient question" is whether the state of the law at the time gave the defendant "fair warning" that his alleged conduct was unconstitutional.  *Tolan*, 134 S. Ct. at 1866 (citing *Id.*).

Since 1994, it has been clearly established that the well-known excessive-force analysis applies to canines.  *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994).  Defendants are not entitled to qualified immunity on these facts—releasing a canine on a non-violent person and then allowing the attack to continue while he was on the ground.  *See Chew*, 27 F.3d at 1471 (disputed issues of fact precluded grant of qualified immunity where police officers released a K-9 in response to a hiding defendant who did not appear violent); *Watkins*, 145 F.3d at 1090; 1093 (affirming denial of qualified immunity to a canine officer who ordered a man "recoiling from the dog's bite" to show his hands, because "it was clearly established

that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation.").

Additionally, when an officer violates a policy or training of his department, he is on notice that his conduct is unreasonable and is not entitled to qualified immunity. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (police department's "training materials" relevant to whether force was unlawful and whether a reasonable officer would have been on notice); *Headwaters II*, 276 F.3d at 1131 (no qualified immunity where officers violated regional and statewide police protocol); *Young*, 655 F.3d at 1162, n. 7, 1168, n.9 (qualified immunity denied in part based on defendant's violation of California POST training standards).

Before deploying a dog to apprehend someone under the County's "bite and hold" policy, SMCSO K-9 Manual, §5-01, required deputies to have probable cause to arrest for a "serious or violent felony" **and** to believe that the person posed an "immediate threat of death or serious bodily harm." (*See, supra*, at pp. 5–6; **Ex. Y**, 26:12–27:10). Defendant Laughlin violated that clear rule. Even in the face of testimony from the County's 30(b)(6) witness and others that that rule was mandatory, Defendants are reduced to legalistic argument that it was only a suggestion. (Doc. 62, pp. 21–22).

And, as Defendant County's 30(b)(6) witness agreed, it was clearly established – and trained to SMCSO deputies – that a person being bitten will flail against the bite. *Kerr*, 875 F.2d at 1550. To demonstrate the lawfulness of some of Defendants' policies, Defendants argue in their MSJ that the SMCSO K-9 Manual, §5-01, required officers to disengage the bite "immediately" under such circumstances. (Doc. 62, p. 22). Thus, Defendants Laughlin and Michel were on notice of the need to immediately stop *Riggs* from biting Mr. May who was harmlessly flailing in pain and fear.

###### E. A reasonable jury could find *Monell* liability against Defendant County.

Recognized paths to *Monell* liability include: (1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or have a needed policy; and (3) a final policy-maker's involvement in, or ratification of, the conduct underlying the violation of rights. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010). "To prevail at trial [on a claim based on an unconstitutional custom or policy, the plaintiff] need not prove the policy unconstitutional. Rather, he need only show that the *specific use of force* (i.e., [Laughlin's] decision to

release [*Riggs*]) violated the Constitution, and that [County] policy *caused* the unconstitutional application of force in this instance." *Chew*, 27 F.3d at 1444, n. 12.

Defendant County's Canine Unit, in deliberate indifference to the public's safety, does not keep bite-ratio statistics—the percentage of how many times a dog is deployed versus how many times he is deployed and bites—nor has it ever investigated how other departments use bite ratios to manage their canine teams. (**Ex. Z**, 53:19–21, 54:1–6, 10–12; **Ex. Y**, 35:23–25; 38:14–23). Instead, it keeps the deployment log for every deployment of a canine, as "more of a historical reference." (**Ex. Y**, 36:1–14; 36:25–37:4). No one from Defendant County reviews the number of bites for a given dog, even on a yearly basis. (**Ex. Y**, 37:5–17; 38:10–13). No one from Defendant County regularly monitors each dog to see if that dog is biting more frequently than other dogs. (**Ex. Y**, 37:18–38:13). Defendant County does not compile all the dog bites assessed to each dog. (**Ex. Y**, 38:2–9). This departure from generally accepted law enforcement standards, including as described by the International Association of Chiefs of Police (IACP) and the Los Angeles County Sheriff Department (LASD), constitutes deliberate indifference to the rights and safety of the public:

> The only adequate method of supervising canine units is to maintain statistics and
> bite ratios. The "best practices," and generally accepted standard, for all canine
> units is to maintain bite ratios for each canine team and the canine unit as a whole.
> The ratio is how many people did the dog find to how many people the dog bite.
> Based on my review of San Mateo County's documents and the depositions of current
> Canine Unit Sergeant Gary Ramos and the County's most knowledgeable
> witness concerning its policies, procedures, and training for use of police dogs (and
> former canine unit sergeant), Lt. Mark Duri, the San Mateo Sheriff's Department
> does not keep any records or statistics of bite ratios, and makes no systematic
> review of bite ratios. This falls below the generally accepted standard of care for a
> canine unit, and creates the foreseeable situation where problems in the training
> and handling of their canines are unaddressed, and people are needlessly injured by
> their canines, such as Mr. May.

**Ex. BB**, pp 41–43). *See Kerr*, 875 F.2d at 1551 ("Because a dog's responsiveness to its handler's commands may erode over time, police dogs need continual training to assure that they will perform responsibly. To ensure that misbehaving dogs receive prompt corrective training, a strict performance monitoring system is necessary. One indication of a misbehaving dog is a high ratio of bites to apprehensions (the bite-ratio).").

Defendant County also failed to properly supervise the Canine Unit, leading to the violation of

Plaintiff's rights. A policy-maker's ratification of the excessive force at issue will support municipal liability. *Clouthier, supra; see also Watkins*, 145 F.3d at 1093 (police chief liable for ratifying the use of excessive force by officers under his command by signing letter denying plaintiff's complaint when expert testimony showed that he should have disciplined the officers and established new police procedures).

Here, Sheriff Munks delegated authority to Sgt. Ramos to investigate canine bites: since 2009, Sgt. Ramos has been "in charge of our canine unit" as the canine training and compliance sergeant. (**Ex. Z**, 6:15; 8:6–7, 16–19; **Ex. B**, 31:13–15). The SMCSO officially delegates to Sgt. Ramos, the Canine Training and Compliance Sergeant, the duty to review every bite incident on behalf of the Canine Services Unit and the SMCSO. (Doc. 62-24, p. 19, Canine Services Unit Manual; **Ex. Z**, 9:22–10:2). Sgt. Ramos' duties include overseeing training, records keeping, and reviewing all canine deployments, including bites, to see if they are "good dog bites," within policy and the law. (**Ex. Z**, 9:14–11:2). "A city cannot escape liability for the consequences of established and ongoing departmental policy regarding the use of force simply by permitting such basic policy decisions to be made by lower level officials who are not ordinarily considered policymakers." *Chew*, 27 F.3d at 1445. *See also Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008) ("A municipality is also liable if a policymaking official delegates his or her discretionary authority to a subordinate, and the subordinate uses that discretion."). Sgt. Ramos investigated *Riggs*' seven bites, including of Plaintiff, and found all but one lawful—despite Defendant Laughlin generally only describing facing a potential threat. (**Ex. GG**, Apprehension Reports). Sgt. Ramos' Apprehension reports are not counter-signed by anyone else, and he has never had one rejected by the SMCSO. (**Ex. Z**, 12:21–13:1) Plaintiff's expert Ernest Burwell criticized Sgt. Ramos' "pattern and practices of lack of supervision of the canine unit." (**Ex. BB**, p. 37). Like the City of West Palm Beach, a jury could find Defendant San Mateo County and its canine supervisors "knew that the canine unit was operating in an unacceptable manner and that they failed to take remedial action, thus becoming deliberately indifferent to the constitutional rights" of the public and Mr. May. *Kerr*, 875 F.2d at 1557.

## V.        CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Plaintiff May respectfully requests that this Court deny Defendants' motion for partial summary judgment in its entirety.

Respectfully Submitted,

Dated:  March 2, 2017

HADDAD & SHERWIN LLP

/s/ T. Kennedy Helm

T. KENNEDY HELM
Attorneys for Plaintiff
Richard Earl May, Jr.