1
2
3
4
5
6
7

8    UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA

10    San Francisco Division

11

12    RICHARD EARL MAY,                         Case No. 16-cv-00252-LB

13                    Plaintiff,

14            v.                                **SUMMARY-JUDGMENT
                                                ORDER**
15    SAN MATEO COUNTY, et al.,                 Re: ECF No. 60 62

16                    Defendants.

17                        **INTRODUCTION**

18        This is a false-arrest and excessive-force case under 42 U.S.C. § 1983 and the Fourth

Amendment. Plaintiff Richard Earl May was arrested after entering fenced-off private property, at

19    night, while searching for his neighbor's cat. During the arrest, a San Mateo County police dog bit

20    him.[1] Mr. May has sued the arresting officers — defendants Chris Laughlin and Eric Michel —

21    and the County of San Mateo. The parties have all moved for summary judgment.[2] The parties

22    have consented to magistrate jurisdiction. The court held a hearing on these motions on March 30,

23    2017.[3] For the reasons given below, the court partly grants and partly denies the parties' motions.

24

25

26    _____

[1] *See generally* 1st Am. Compl. – ECF No. 44. Record citations refer to material in the Electronic Case
File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

27    [2] ECF Nos. 60, 62.

28    [3] ECF No. 76.

**STATEMENT**

**1. The Incident**

The material facts in this case are mostly undisputed. On January 1, 2015, at roughly 11:00 at night, plaintiff Richard Earl May entered a construction site in Half Moon Bay. The site was private property, was fenced off, and bore *Keep Out* signs. A video-surveillance system protected the site. Mr. May climbed over the seven- or eight-foot fence to enter the site. Then 62 years old, Mr. May was with his neighbor, a woman aged 73. They were looking for her cat.[4] But good deeds sometimes get punished. In Sacramento, a private security company was monitoring the property over the video feed. An employee saw Mr. May and his neighbor moving about the property and alerted the police.[5]

The police dispatcher in turn radioed a possible commercial burglary in progress.[6] While units responded — among whom were the individual defendants, Deputy Laughlin and Deputy Michel — the dispatcher conveyed the following information received from the security firm: Two or possibly three suspects were crossing back and forth over the fence and were stacking unidentified objects near the fence.[7] A third person was seen moving between buildings, "possibly."[8] One person wore plaid and another black.[9] Deputy Laughlin did not recall dispatch "mentioning anyone actually stealing anything," only that they were stacking property near the fence.[10]

Seven deputies responded to the call, though they arrived at different times. Three deputies — including Deputy Laughlin, his canine partner, Riggs, and Deputy Michel — entered the site. While these deputies investigated inside the property, others spread out along the outside of the

---

[4] For the preceding sentences, *see* Sanchez Dep. – ECF No. 61-1 at 5 (pp. 43–44); May Dep. – ECF No. 65-2 at 3–5; Laughlin Dep. – ECF No. 65-3 at 4–5.

[5] *See* Laughlin Dep. – ECF No. 61-2 at 21–22 (pp. 75–78).

[6] Sanchez Dep. – ECF No. 61-1 at 5 (pp. 43–44).

[7] Laughlin Dep. – ECF No. 61-2 at 21 (pp. 75–76).

[8] *Id.* at 22 (pp. 78–79).

[9] *E.g., id.*

[10] *Id.* at 22 (p. 79).

fence to form a loose perimeter around the site.[11] Deputies Laughlin and Michel soon came upon a man fitting the description that they had received from police dispatch. It was Mr. May. When they first saw him, the deputies were approximately 75 to 100 yards away.[12] Deputy Laughlin testified that at this point, he announced: "Sheriff's canine, stop right there, show me your hands, get on the ground or you're going to get bit by the dog."[13] He does not know if Mr. May heard him.[14] Mr. May says he did not. The defendants assume at summary judgment that no warning was given.[15]

We now reach a disputed fact of some significance. Deputy Laughlin has explained that, when they were still roughly 100 yards away from Mr. May, after he gave the "Sheriff's canine" warning, he saw Mr. May "back into the shadows towards the fence."[16] Mr. May has testified that, at this time, he thought he was going to talk to what he thought were security guards; he "put a hand on the fence," "just to be comfortable," and "just was waiting."[17] Officer Laughlin, however, thought that Mr. May might be trying to flee.[18] He "lost visual" on Mr. May and "sent the dog."[19] Riggs ran to Mr. May but did not bite him. The dog "nudged" his arm without causing injury.[20] Riggs then returned to the deputies.

By now Deputies Laughlin and Michel and a third, Deputy Sanchez, had closed the distance to Mr. May. Deputy Laughlin gave Mr. May one or two more warnings to get on the ground or Riggs would bite.[21] Mr. May was now "a few steps" from the fence, "about a car length away from"

---

[11] *See id.* at 25 (pp. 89–90); Michel Dep. – ECF No. 61-5 at 4–5, 7.

[12] Laughlin Dep. – ECF No. 61-2 at 27 (p. 97); Sanchez Dep. – ECF No. 61-1 at 8 (p. 59).

[13] Laughlin Dep. – ECF No. 61-2 at 27–28 (pp. 100–01).

[14] *Id.* at 28 (p. 101).

[15] ECF No. 62 at 21.

[16] Laughlin Dep. – ECF No. 61-2 at 28 (p. 101).

[17] May Dep. – ECF No. 65-2 at 9.

[18] *See* Laughlin Dep. – ECF No. 61-2 at 28 (pp. 101–03).

[19] *Id.*

[20] May Dep. – ECF No. 62-2 at 20–22.

[21] Laughlin Dep. – ECF No. 61-2 at 29 (p. 107).

Deputy Laughlin.[22] According to Deputy Laughlin, Mr. May was not complying with his orders to show his hands and get on the ground, and he was "backing up towards the fence line."[23] (During this whole encounter, though, the deputy only ever saw Mr. May "standing up and moving slowly."[24]) The deputy was concerned that Mr. May might be armed.[25] He now deployed Riggs a second time, giving the command to "bite and hold."[26] The dog ran to Mr. May and bit his leg.[27] Deputy Laughlin pulled Mr. May to the ground. When Deputy Laughlin believed Mr. May was complying (by not "fighting" and "kicking at the dog"), he called Riggs off the bite.[28] Deputy Laughlin estimated that the bite lasted 15 to 20 seconds.[29] Mr. May said it seemed like "minutes."[30]

Apart from the dispute over whether he moved away from the police, and whether he moved in a way that suggested he was trying to flee, there has been no suggestion that Mr. May resisted the deputies. Indeed, Deputy Laughlin testified that, once Riggs had bitten him, Mr. May was not "resistive."[31] He struggled while Riggs was biting him but even the defendants recognize that this happens in such situations.

Deputy Laughlin took Mr. May to the emergency room roughly two hours later.[32] Mr. May's bite wounds were — as the defendants' Rule 30(b)(6) witness on use of force characterized them

---

[22] *Id.*

[23] *Id.* at 30 (p. 111).

[24] *Id.* at 34 (pp. 125–26).

[25] *Id.* at 30 (p. 112).

[26] *Id.* at 8, 30–31 (pp. 24, 111, 114–15).

[27] *Id.* at 31 (pp. 114–15).

[28] *Id.* at 31–32 (pp. 116–17).

[29] *Id.* at 32 (p. 117).

[30] May Dep. – ECF No. 61-12 at 6 (p. 81).

[31] Laughlin Dep. – ECF No. 61-2 at 31 (p. 116).

[32] *See id.* at 47 (pp. 179–80).

— "pretty severe."[33] The wounds required at least six medical visits during 2015; by December 2015, his leg was "swelling" again and was still "pretty bad."[34]

Deputy Laughlin cited Mr. May for two misdemeanors: trespass and "resisting, obstructing, or delaying" a law-enforcement officer.[35] The San Mateo district attorney declined to press charges.[36]

### 2. The Claims and Motions

Mr. May brought this suit against Deputy Laughlin, Deputy Michel, and the County of San Mateo. He sues for false arrest and excessive force under the Fourth Amendment and 42 U.S.C. § 1983. He would impose municipal-entity liability on the County under *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978). He brings claims under California law for false arrest and under the state's Bane Act (Cal. Civ. Code § 52.1). For the latter claims he would hold the County vicariously liable under Cal. Gov't Code § 815.2. He has moved for summary judgment on all these claims.[37]

In their own Rule 56 motion, the defendants seek summary judgment on all Mr. May's federal claims. The defendants argue that they did not falsely arrest Mr. May, that they did not use excessive force in arresting him, and that they are qualifiedly immune from liability on both these theories. The County seeks summary judgment on the *Monell* claim.[38]

### SUMMARY-JUDGMENT LAW

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

[33] Duri Dep. – ECF No. 61-10 at 6 (p. 47).

[34] May Dep. – ECF No. 61-12 at 7–8 (pp. 119–22).

[35] Laughlin Dep. – ECF No. 61-2 at 42 (pp. 158–59).

[36] ECF No. 61-17.

[37] *See generally* 1st Am. Compl. – ECF No. 44; Pl. Mot. – ECF No. 60. Mr. May has also brought claims for negligence and assault and battery, but he has not sought summary judgment on those.

[38] The relatively contained facts pertinent to the *Monell* claim are set forth in that part of the Analysis. *Infra*, Analysis, Part 6.

law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'").

If the moving party meets its initial burden, the burden then shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence, and it draws all inferences in the light most favorable to the non-moving party. *E.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir. 1991).

**ANALYSIS**

**1. False Arrest — Probable Cause**

The court grants the defendants summary judgment on the false-arrest claim. Considering all that Deputy Laughlin knew, and taking into view the "totality of the circumstances," a prudent person could think that there was a "fair probability" that crime was afoot and that Mr. May was involved. Deputy Laughlin had probable cause to arrest Mr. May.

**1.1 Governing Law**

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012) (quoting *Dubner v. City & Cnty. of San Francisco,* 266 F.3d 959, 964 (9th Cir. 2001)). "Probable cause exists when there is a *fair probability or substantial chance* of criminal activity." *Id.* (quoting *United States v. Patayan Soriano,* 361 F.3d 494, 505 (9th Cir. 2004) (quoting in turn *United States v. Bishop,* 264 F.3d 919, 924 (9th Cir. 2001)) (internal quotation omitted in *Lacey*) (emphasis added). "It is well-settled that 'the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search.'" *Id.* (quoting *Bishop,* 264 F.3d at 924).

"Probable cause exists when police have knowledge at the moment of arrest of facts and circumstances based on reasonably trustworthy information that would warrant a belief by a reasonably prudent person that the person arrested has committed a criminal offense." *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002) (citing *Beck v. Ohio,* 379 U.S. 89, 91 (1964); *United States v. Buckner,* 179 F.3d 834, 837 (9th Cir. 1999)). "In general, we must ask whether 'a prudent person would believe [that Mr. May] had committed a crime.'" *Lacey*, 693 F.3d at 918 (quoting *Dubner,* 266 F.3d at 966). "The evidence need support 'only the probability, and not a prima facie showing, of criminal activity,' *Illinois v. Gates,* 462 U.S. 213, 235 (1983), and such evidence need not be admissible, but only legally sufficient and reliable. *Franks v. Delaware,* 438 U.S. 154, 165 (1978)." *Franklin*, 312 F.3d at 438 (parallel citations omitted).

### 1.2 Analysis

The undisputed facts gave Deputy Laughlin probable cause to arrest Mr. May for either commercial burglary or criminal trespass. Consider everything that Deputy Laughlin knew at the time of the arrest. Deputy Laughlin found Mr. May inside the fenced perimeter of private commercial property. It was approximately 11:00 p.m. Dispatch had told Deputy Laughlin that there were two or maybe three people total on the property. These people had been seen stacking (unidentified) property near the fence. These facts would cause a "reasonably prudent person" to believe that there was at least a "fair probability" that crime was afoot and that Mr. May was involved. *See Franklin*, 312 F.3d at 438 ("prudent"); *Lacey*, 693 F.3d at 918 ("fair probability"); *could use a cite for "was involved"*

### 1.2.1   Probable cause does not require full *prima facie* proof

The plaintiff's responses do not persuade otherwise. To refute the notion that Deputy Laughlin had probable cause to arrest him, Mr. May parses too finely and demands too much. Mr. May effectively argues that, based on what Deputy Laughlin knew, he lacked conclusive proof of every element of some relevant crime.[39] For example, Mr. May argues that Deputy Laughlin did not know whether Mr. May or anyone else had actually entered a structure on the property (beyond breaching the perimeter fence) — entry being a necessary element of the crime of burglary.[40] He similarly argues that burglary requires the specific intent to commit a felony, and criminal trespass an intent to occupy the premises.[41] But, Mr. May insists, on the undisputed facts Deputy Laughlin was not thinking about, and possessed "no facts to establish," whether Mr. May held such intent.[42]

These arguments misapprehend the probable-cause standard. As the Supreme Court has explained: "The evidence need support 'only the probability, and *not a prima facie showing*, of

---

[39] *See* ECF 60 at 27–30.

[40] *Id.* at 27 (quoting Cal. Penal Code § 459).

[41] *Id.* at 27–29 (quoting Cal. Penal Code §§ 459, 602(m)).

[42] *See id.* at 19–20, 27 (burglary).

criminal activity . . . .'" *Franklin*, 312 F.3d at 438 (quoting *Illinois v. Gates,* 462 U.S. at 235)

(emphasis added); *accord, e.g., Chism v. Washington State,* 661 F.3d 380, 389 (9th Cir. 2011).

This indeed has long been the rule:

> As early as *Locke v. United States,* 7 Cranch 339, 348, 3 L.Ed. 364 (1813), Chief
> Justice Marshall observed, in a closely related context, that "the term 'probable
> cause,' according to its usual acceptation, means less than evidence which would
> justify condemnation . . . . It imports a seizure made under circumstances which
> warrant suspicion."

*Illinois v. Gates,* 462 U.S. at 235 (quoted in *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

### 1.2.2   Pre-arrest investigation

Mr. May also argues that Deputy Laughlin did not adequately investigate matters before

arresting him. On Mr. May's account, the information that Deputy Laughlin received from the

security company, by way of the police dispatcher, was "insufficient" to support a constitutional

arrest. "[C]learly established Ninth Circuit precedent," writes Mr. May, "requires law enforcement

officers to investigate to establish probable cause *before* arresting — especially where insufficient

details are relayed to the arresting officer."[43]

The Ninth Circuit "has held that ''[i]n establishing probable cause, officers may not solely rely

on the claim of a citizen witness that [s]he was a victim of a crime, but must independently

investigate the basis of the witness' knowledge or interview other witnesses.'" *Hopkins v.

Bonvicino*, 573 F.3d 752, 767 (9th Cir. 2009) (quoting *Arpin v. Santa Clara Valley Transp.

Agency,* 261 F.3d 912, 925 (9th Cir. 2001) (citing in turn *Fuller v. M.G. Jewelry,* 950 F.2d 1437,

1444 (9th Cir. 1991) (''[P]olice officers ha[ve] a duty to conduct an investigation into . . . [a]

witness'[s] report . . . .")). This is true even where the arresting officer has learned information

from other law-enforcement officials. *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283,

1293 n. 16 (9th Cir. 1999) ("Although a police officer is entitled to rely on information obtained

from fellow law enforcement officers, this in no way negates a police officer's duty to reasonably

inquire or investigate these reported facts.") (citation omitted).

---

[43] This paragraph: ECF No. 60 at 26–27; ECF No 71 at 12–14 (emphasis in original).

The court need not decide whether the information that Deputy Laughlin received was alone "sufficiently detailed," *Fuller*, 950 F.2d at 1443, to yield probable cause without further investigation or other corroboration. The court holds only that, under the "totality of the circumstances," Deputy Laughlin acted reasonably and constitutionally in arresting Mr. May. Deputy Laughlin had circumstantial corroboration that yielded probable cause. In his "pre-arrest investigation" argument, Mr. May loses sight of the broader rule that probable cause is assessed under all the circumstances known to the arresting officer. He focuses too narrowly on whatever of Deputy Laughlin's conduct can be described as explicitly investigative while disregarding the surrounding context. The latter, too, can "corroborate" witness reports to support probable cause. *Cf. Peng v. Hu*, 335 F.3d 970, 979 (9th Cir. 2003) (quoted at ECF No. 71 at 13–14).[44] Here, consistent with what the security company and police dispatcher had told him, Deputy Laughlin came upon Mr. May inside the fenced perimeter of private property, at 11:00p.m., matching the basic description that the security company had given. In conjunction with the information that Mr. May was not alone, this all gave Deputy Laughlin a reasonable belief to think that Mr. May was involved in something criminal. The circumstantial facts — one could almost say the "experiential" facts — that Deputy Laughlin directly perceived bolstered what the security company and police dispatcher had told him and yielded probable cause.

The cases that the plaintiff cites on pre-arrest investigations are too factually different to offer more than general guidance. They confirm the important principle that the Fourth Amendment does not allow the police to "arrest now, and investigate later." *See Kanekoa v. City & Cnty. of Honolulu*, 879 F.2d 607, 612 (1989). But none of these cases suggests that, in this situation, Deputy Laughlin lacked probable cause to arrest Mr. May because he failed to more fully

---

[44] The *Peng* court wrote: "We are satisfied that [Deputy] Gage made a reasonable investigation under the circumstances before he arrested Peng. [A] factual dispute regarding a victim's complaint at the scene of an alleged domestic disturbance does not defeat probable cause if: 1) the victim's statements are sufficiently definite . . . ; and 2) the victim's complaint is corroborated by *either surrounding circumstances or* other witnesses." *Peng*, 335 F.3d at 979 (emphasis added). *Peng* is not identical to this case. Here, for instance, there is no "factual dispute" over key aspects of what Officer Laughlin learned from the security company — such as the presence of interlopers on private property, and Mr. May's basic physical description. The immediate point, though, is that "surrounding circumstances" affect what constitutes a reasonable pre-arrest investigation in assessing probable cause.

investigate the situation. The "strange circumstances" of *Lacey, supra*, for example, involved a sheriff carrying out a personal vendetta against two newspaper reporters. *See Lacey*, 693 F.3d at 907–10, 923–24. On a witness's "bare claim that a misdemeanor ha[d] been committed earlier in the day, without any information about exigent circumstances," and without further inquiring, the sheriff had had the reporters arrested "at their homes in the middle of the night." *Id.* at 923–24. The Ninth Circuit found this "objectively unreasonable." *Id.* at 924. The appeals court refused to dismiss the false-arrest claim and held that the sheriff was "not entitled to qualified immunity" on that claim. *Id.* at 924.

The Ninth Circuit's opening summary in *Hopkins, supra*, suggests how different that case is from this one. The *Hopkins* court wrote:

> On August 22, 2003, two San Carlos Police Officers broke into Bruce Hopkins' home. They did not have a warrant, nor did they have probable cause. All that they had was a statement from a third party that Hopkins had been involved in an extremely minor traffic incident, an incident so minor that it did not cause as much as a scratch on either of the vehicles involved, and that he appeared to have been drinking. Based on this information, the officers broke into Hopkins' home with their flashlights shining and their guns drawn. When they found Hopkins, they handcuffed him, removed him from his house, and placed him under arrest.

*Hopkins*, 573 F.3d at 759. More fully,

> The officers did not inspect Hopkins' car to see if the hood was still warm, which would have corroborated [the witness's] statement that the car had recently been driven, nor did they inspect the vehicle for any evidence of reckless driving or of alcohol consumption, such as open containers or an alcoholic odor. They did not ask [the reporting witness] any questions in order to gain information beyond her cursory and conclusory statements, such as whether she observed Hopkins driving erratically or at an abnormal speed. In short, the officers obtained no information whatsoever beyond [the witness's] brief statement.

*Id.* at 767. In that situation, the Ninth Circuit held that the defendant officers' merely accepting the witness's unelaborated report was "insufficient to support probable cause." *Id.*

The decision in *Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) does not translate into our case. *Motley* confirms the general rule that, "officers have an ongoing duty to make appropriate inquiries regarding the facts received or to further investigate if insufficient details are relayed." *Id.* at 1081. But *Motley* applies this rule in the context of parolee-residential searches. *Motley*

asked whether the police had adequate information that a parolee lived at a given address to warrant searching that place in connection with parole. *See id.* at 1080–82. (The *Motley* court held that the police did have probable cause so that their conduct was, to this extent, "objectively reasonable." *Id.*) It is hard to say how well *Motley* speaks to the present context. Rules governing how the police may constitutionally search a *parolee's* residence depart somewhat from standard Fourth Amendment analysis. *See id.* at 1078–80 ("Generally, a condition of parole that permits warrantless searches provides officers with the limited authority to enter and search a house where the parolee resides . . . ."). At all lengths, nothing in *Motley* indicates that, in the situation that confronted him, Deputy Laughlin had to conduct a fuller investigation before he could reasonably conclude that there was a "fair probability" that criminal activity was underway.

Furthermore, in the cases that Mr. May cites in this area, the investigation (or the need to investigate) came after the alleged wrong was complete. After the events in question were over, a witness reported the crime to the police, who then conducted some form of overt investigation. This was the case in *Fuller*, for example, where a jewelry-store clerk told the police that two women (who had been in his store earlier in the day) had stolen a ring. The police did not immediately arrest the women. They first spoke with the women, with a second store employee, and with other witnesses. *Id.* at 1439–40. The Ninth Circuit held that, given this investigation, the police "reasonably believed that there was probable cause to arrest" the plaintiffs without a warrant and were thus immune from the § 1983 claim. *Id.* at 1443–45. So, too, in *Hopkins*, the police responded to a witness's report about a traffic incident that had happened earlier — and from which the suspect (the § 1983 plaintiff) had already returned home. *Hopkins*, 573 F.3d at 760–62.

Here, by contrast, Deputy Laughlin walked into a situation that was in progress. He was not rebuilding a sequence of events from witness reports — as in *Hopkins* or *Fuller*. He was instead immersed in the situation. Based on what he had learned from the security company and dispatcher, and given the facts that he witnessed, the court holds as a matter of law that Deputy Laughlin had probable cause to arrest Mr. May.

## 2. False Arrest — Qualified Immunity

Even if the court had reached the opposite conclusion, holding summarily that Deputy Laughlin lacked probable cause to arrest Mr. May, the court would still find the defendants immune from the false-arrest claim as a matter of law.

### 2.1 Governing Law

"The doctrine of qualified immunity assumes that police officers do not knowingly violate the law." *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). "An officer thus is presumed to be immune from any damages caused by his constitutional violation." *Id.* "Qualified immunity shields public officials from civil damages for performance of discretionary functions." *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009). "It is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)) (emphasis in original). Qualified immunity protects an officer from suit "when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Mueller*, 576 F.3d at 992 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004)). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mueller*, 576 F.3d at 992 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). "The standard is an objective one that leaves 'ample room for mistaken judgments.'" *Mueller*, 576 F.3d at 992 (quoting *Malley,* 475 U.S. at 343). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)).

To determine whether Deputy Laughlin is immune from suit, the court must answer two questions. The court must consider "whether the official's conduct violated a constitutional right, and if so, whether that right was clearly established at the time of the event in question." *Mueller*, 576 F.3d at 993 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)); *accord, e.g., Pearson v. Callahan*, 555 U.S. 223, 232 (2009). It is not "mandatory" to address these two prongs in this order. *Pearson*, 555 U.S. at 232–36. Courts are to "exercise their sound discretion in deciding

which prong . . . should be addressed first in light of the particular circumstances of the case at hand." *Id.* at 236; *accord Mueller*, 576 F.3d at 993–94.

Facing "competing motions for summary judgment" on qualified immunity, moreover, the court reads disputed facts in the light most favorable to Mr. May. *See, e.g., Mueller*, 576 F.3d at 982, 994; *Blankenhorn v. City of Orange,* 485 F.3d 463, 477 (9th Cir. 2007) ("Where [material factual] disputes exist, summary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the nonmoving party.") (citing *Barlow v. Ground,* 943 F.2d 1132, 1136 (9th Cir. 1991)).

### 2.2 Analysis

For present purposes, we may assume that there was a false arrest and proceed to the second, "clearly established" prong of the qualified-immunity test. *Cf. Mueller*, 576 F.3d at 994 (finding a jury question on constitutional violation and skipping to "clearly established" issue). "The dispositive question in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. Put differently, "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092–93 (9th Cir. 2013) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mueller*, 576 F.3d at 994 (quoting *Saucier*, 533 U.S. at 201); *accord, e.g., Deorle v. Rutherford*, 272 F.3d 1272, 1278–79 (9th Cir. 2001) ("[T]he court must . . . determine whether the right violated was clearly established in a 'particularized . . . sense . . . .'").

The plaintiff argues that, at the time of his arrest, "[t]he Fourth Amendment right to be free from a warrantless arrest without probable cause was clearly established." (ECF No. 60 at 31) (quoting *Gasho*, 39 F.3d at 1438). That is plainly true. It is not, however, dispositive. Though this case is not factually complicated, the court does not think that the "clearly established" inquiry can be resolved with so broad a stroke. The court is especially disinclined to treat the issue so broadly

in light of the recent decision in *White v. Pauly*, 137 S. Ct. 548 (2017). The Court there drove home the "longstanding principle" that, in analyzing qualified immunity, "'clearly established law' should not be defined 'at a high level of generality.'" *Id.* at 552 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011)). If the courts deal too abstractly in this area, *White* explained, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Even reading the factual record in the light most favorable to Mr. May — meaning, specifically, those facts pertinent to the false-arrest claim — Deputy Laughlin's conduct was not so obviously outside the constitutional pale that only the "plainly incompetent or those who knowingly violate the law" would have done the same. *See Mueller*, 576 F.3d at 992 (quoting *Malley,* 475 U.S. at 341). The worst that can be said, even giving Mr. May the benefit of the doubt, is that by arresting Mr. May, Deputy Laughlin showed bad judgment. But the doctrine of qualified immunity protects such mistakes. *See id.* (quoting *Malley,* 475 U.S. at 343).

### 3. Excessive Force 1 — Basic Claim

#### 3.1 Governing Law

"The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn,* 485 F.3d at 481 n.12 (citing *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985)); *accord, e.g., Arpin*, 261 F.3d at 921 ("A claim against law enforcement officers for excessive force is analyzed under the Fourth Amendment's 'objective reasonableness' standard."). Section 1983 provides a private right of action for those whose federal constitutional or statutory rights are deprived under color of law. *See* 42 U.S.C. § 1983; *see generally, e.g., Monteilh v. Cnty. of Los Angeles*, 820 F. Supp. 2d 1081, 1089 (C.D. Cal. 2011).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at

stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations and quotations omitted). "Stated another way, we must 'balance the amount of force applied against the need for that force.'" *Bryan v. MacPherson*, 630 F.3d 805, 823–24 (9th Cir. 2010) (quoting *Meredith v. Erath,* 342 F.3d 1057, 1061 (9th Cir. 2003)). To do so, a court must evaluate the facts and circumstances of each particular case, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether she is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. "The 'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Bryan*, 630 F.3d at 826 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (*en banc*)). "A simple statement by an officer that he fears for his safety or the safety others is not enough; there must be objective factors to justify such a concern." *Id.* (quoting *Deorle*, 272 F.3d at 1281). "These factors, however, are not exclusive. Rather, [the court must] examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Id.* (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). "In some cases," for example, "the availability of alternative methods of . . . subduing a suspect may be a factor to consider." *Smith*, 349 F.3d at 701 (citing *Chew v. Gates*, 27 F.3d 1432, 1441 n. 5 (9th Cir. 1994)).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' *Johnson v. Glick*, [481 F.2d 1028, 1033 (2nd Cir. 1973], violates the Fourth Amendment." *Graham*, 490 U.S. at 396. This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.*

### 3.2 Analysis

A jury must resolve the excessive-force claim. The court can grant neither party summary

judgment on this claim. Though the key facts are mostly undisputed, they are not entirely, and a jury could reasonably draw different conclusions from them. A jury might look at the facts and decide that using Riggs was excessive; equally, the same jury could view those facts and find that deploying Riggs to "bite and hold" Mr. May was permissible. From the undisputed material facts the court cannot say that only one conclusion follows. The excessive-force claim thus cannot be decided as a matter of law.

The use of a police dog is certainly subject to Fourth Amendment excessive-force analysis. *E.g., Watkins v. City of Oakland, Cal.,* 145 F.3d 1087, 1093 (9th Cir. 1998) ("We . . . hold that the . . . use of the police dog is subject to excessive force analysis . . . .") (quoting *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)). "Use of a trained police dog may be regarded as 'intermediate force' or 'deadly force,' depending on the factual circumstances in the case." *Ledesma v. Kern Cnty.*, 2016 WL 6666900, *10 (E.D. Cal. Nov. 10, 2016); *see Maney v. Garrison*, 2017 WL 937460, *8 (4th Cir. Mar. 9, 2017) ("[A] bite from a police canine is a significant use of force."). The use may or may not be constitutional. *See Watkins*, 145 F.3d at 1092–93 (in qualified-immunity analysis; "Oakland's 'bite and hold' policy did not violate clearly established law concerning the use of excessive force . . .") (discussing *Chew v. Gates,* 27 F.3d 1432 (9th Cir. 1994)).

The court cannot decide as a matter of law whether deploying Riggs was excessive. The key facts here are mostly undisputed. Different juries could review those facts, run them through the *Graham* analysis, and reach different, basically reasonable conclusions. The principal disputed fact — maybe the only key disputed fact — involves Mr. May's movement while the police officers stood before him. *Did Mr. May move? Did he remain still? Did he move toward the fence? Did his movement suggest that he was trying to flee?* A jury must hear testimony to resolve this point. How they view this fact will almost surely affect how they view Deputy Laughlin's decision to deploy Riggs. The court thus denies both parties summary judgment on the excessive-force claim.

### 4. Excessive Force 2 — Qualified Immunity

Much the same holds for the related qualified-immunity analysis. It is not possible to look at the undisputed material facts of this case and conclude that only one answer must follow. The dispute over Mr. May's behavior in the officers' presence increases the indeterminacy. The court thus denies both parties summary judgment on qualified immunity.

Again, in assessing qualified immunity the court reads disputed facts favorably to Mr. May. *See, e.g., Mueller*, 576 F.3d at 982, 994; *Blankenhorn*, 485 F.3d at 477 ("Where [material factual] disputes exist, summary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the nonmoving party.") (citing *Barlow v. Ground,* 943 F.2d 1132, 1136 (9th Cir. 1991)). So, "assuming without deciding" that Mr. May's constitutional rights were violated, the court must "determine whether those rights were clearly established." *Id.* at 994–95. Put differently, assuming for the sake of analysis that the force used was excessive, the court "must determine whether . . . made a 'reasonable mistake[] as to the legality of [his] actions.'" *Deorle*, 272 F.3d at 1285 (quoting *Saucier*, 533 U.S. at 206). On "the defense of qualified immunity . . . , the [c]ourt considers only the facts that were knowable to the defendant officers." *White*, 137 S.Ct. at 550.

Viewed in this light, the issue almost goes to Mr. May as a matter of law. Well before the events in question, Ninth Circuit precedent had established that police officers cannot constitutionally meet passive or mild resistance with "non-trivial" force. *See, e.g., Gravelet-Blondin*, 728 F.3d at 1093 ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008.") (discussing cases). The established constitutional framework embodies a principle of proportionate response. *See Blankenhorn*, 485 F.3d at 477 ("Even where some force is justified, the amount actually used may be excessive.") (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). Given the situation that Deputy Laughlin confronted, and what he knew about that situation, and assuming (in Mr. May's favor) that the plaintiff was *not* trying to flee, one almost concludes that Mr. May should gain summary judgment against the assertion of qualified immunity. On the other hand, this is not a case in which the police set their dog "on a handcuffed arrestee who has fully surrendered and is

completely under control." *See Watkins*, 145 F.3d at 1093 (quoting *Mendoza*, 27 F.3d at 1362).

Ultimately, the court thinks that this case remains on the bubble and that the qualified-immunity issue, too, must be given to a jury. The court cannot say as a matter of law that it was "sufficiently clear [to] a reasonable official" that he could not use a bite-and-hold police dog to arrest Mr. May. In other words, using Riggs in this way, in these circumstances, was not "'so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional." *See Mendoza,* 27 F.3d at 1361 (quoting *Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir. 1993)).

### 5. Excessive Force 3 – Deputy Michel & Ancillary Liability

The plaintiff also contends that Deputy Michel is liable for excessive force because he did not intervene to stop, and was himself an "integral participant" in, Deputy Laughlin's use of force.[45] The court disagrees.

First, Deputy Michel was not an integral participant in deploying Riggs. The only evidence is that Deputy Laughlin had control of the police dog, that he set Riggs on Mr. May, and that he then called him off. There is no proof, there is no suggestion, that Deputy Michel had any input into Deputy Laughlin's decision to deploy Riggs; nor is there any indication that Deputy Michel controlled Riggs before, during, or after the dog's deployment.

Second, this is not a case in which Deputy Michel can be held liable for not intervening in Deputy Laughlin's use of Riggs. On a close and extended review of a relatively developed record, this court has concluded that a jury question exists on whether Deputy Laughlin used excessive force. Even on such a record and such a review, the court could not decide that he had used improper force as a matter of law. The court has also held that, even if he did use excessive force, a jury may decide that Deputy Laughlin is immune from liability because his actions fall into the realm of poor judgment and mistake. It seems impracticable at best to expect that, in the heat of the situation, Deputy Michel should have reached a different and *surer* conclusion (that deploying

---

[45] ECF No. 66 at –29.

Riggs would be excessive) than this court has made given more time and a detached perspective. Expecting Deputy Michel to reach that decision — and holding him liable for not having done so — would also abrade the leniency inherent in the rules of qualified immunity. In some situations it will be obvious that police conduct is unconstitutional, and an officer can rightly be expected to intervene to stop a colleague from persisting in malfeasance. The law contemplates such situations. *E.g., United States v. Koon*, 34 f.3d 1416, 1447 n.25 (9th Cir. 1994). But this is not such a case. To hold Deputy Michel responsible for not intervening in a case like this would invite frank dysfunction into day-to-day policing.

### 6. Municipal Liability – *Monell*

#### 6.1 Governing Law

The plaintiff's sole federal claim against the County of San Mateo is for liability under *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978).

Liability against a government entity starts from the premise that there is no *respondeat superior* liability under § 1983; *i.e.*, no entity is liable simply because it employs a person who has violated a plaintiff's rights. *See, e.g., Monell*, 436 U.S. at 691; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Local governments can be sued directly under § 1983 only if the public entity maintains a policy or custom that results in a violation of plaintiff's constitutional rights. *Monell*, 436 U.S. at 690–91. To impose *Monell* entity liability under § 1983 for a violation of constitutional rights, a plaintiff must show that: (1) the plaintiff possessed a constitutional right of which he or she was deprived; (2) the municipality had a policy; (3) this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) the policy is the moving force behind the constitutional violation. *See Plumeau v. School Dist. # 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). The Ninth Circuit has explained how a policy may be proved:

> There are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either

delegated that authority to, or ratified the decision of, a subordinate."

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting *Ulrich v. City and Cnty. of San Francisco,* 308 F.3d 968, 984-85 (9th Cir. 2002)). The practice or custom must consist of more than "random acts or isolated events" and instead, must be the result of a "permanent and well-settled practice." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir. 1988) *overruled on other grounds by Bull v. City and Cnty. of San Francisco,* 595 F.3d 964 (9th Cir. 2010); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Thus, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless" there is proof that the incident "was caused by an existing, unconstitutional municipal policy . . . ." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985).

### 6.2 Analysis

The plaintiff has not raised a triable *Monell* claim. Mr. May offers two grounds for such liability. First, he argues that the County "does not keep bite-ratio statistics — the percentage of how many times a dog is deployed versus how many times he is deployed and bites."[46] Second, he contends that the County "failed to properly supervise the Canine Unit, leading to the violation of [his] rights."[47] Here, Mr. May suggests that the department has effectively delegated policymaking authority to Gary Ramos, the Training and Compliance Sergeant for the K-9 Unit, who simply rubber-stamps police-dog bites.[48] These theories do not raise a genuine dispute of material fact on the plaintiff's *Monell* claim.

#### 6.2.1   Bite ratios

The record evidence is undisputed on the issue of "bite ratios" and whether the County maintains them. The record shows that the County does keep the relevant information, the component data that can yield any dog's bite ratio. The County records whenever a dog is

---

[46] ECF No. 66 at 31.

[47] *Id.* at 31–32.

[48] *See id.* at 32.

deployed. It also records whenever a dog bites. What the County does not do is combine those data points into a "bite ratio." Nor does the County actively track this information — meaning that the County does not regularly review its deployment and bite statistics. (And, of course, because it does not derive bite ratios, it does not track those.) If a given dog began to bite more frequently, someone would have to notice that that animal was appearing more regularly in use-of-force reports. It is undisputed, though, that the County does maintain the component data (deployments and bites) and that an interested person could retrieve that information and calculate any police dog's bite ratio.[49]

On this record the plaintiff has not raised a triable *Monell* claim. The fatal lapse in Mr. May's *Monell* case is one of causation. The plaintiff has not calculated Riggs's bite ratio. (Though, again, it is undisputed that the necessary information is available.) Nor has he gone the logically necessary next step: showing that that ratio exceeds some threshold that indicates a problem. That indicates, more exactly, that the County should have taken corrective action, whether by revising its policy or by retraining this dog. Without such mediate information, it is merely speculative to say that the County's not tracking bite ratios caused Mr. May's injury. And causation is requisite to a *prima facie Monell* theory. *See, e.g., Plumeau*, 130 F.3d at 438 (policy must be "moving force" behind constitutional violation); *cf. Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1550–51 (11th Cir. 1989) (reversing judgment for municipal defendant where, among other things, evidence showed that department's "overall bite-ratio" was about 50% and that 85% of bites involved "non-violent felony or misdemeanor" arrests).

### 6.2.2   Failure to supervise – Delegation to Sergeant Ramos

The plaintiff's "failure to supervise" theory suggests that the County has wrongly delegated relevant policymaking authority to Sergeant Gary Ramos. According to Mr. May, Sergeant Ramos has been in "charge of the canine unit since 2009." His official title is, again, Training and

---

[49] This paragraph: Duri Dep. – ECF No. 67-8 at 10–11 (pp. 34–38); Ramos Dep. – ECF No. 67-9 at 16 (pp. 53–54).

Compliance Sergeant for the K-9 unit. During Sergeant Ramos's tenure, Mr. May argues, Riggs

has bitten seven times (including this incident). Sergeant Ramos "investigated *Riggs'* seven bites .

. . and found all but one lawful — despite Defendant Laughlin generally only describing facing a

potential threat" in these encounters. Furthermore, the sergeant's apprehension reports "are not

counter-signed by anyone else, and he has never had one rejected" by higher command. This

amounts to a "lack of supervision of the canine unit," in the opinion of Mr. May's expert. The

implication for *Monell* purposes is that Sergeant Ramos has effectively been given policymaking

authority and that his policy has been to rubber-stamp police-dog bites.[50]

The plaintiff gets the record wrong. First, to be accurate, the record shows that Riggs bit not

six but *three* times before he bit Mr. May.[51] (Obviously, the three bites that followed Mr. May's

cannot have embodied a policy that was the "moving force" behind Mr. May's injury.[52]) And in

one of those three earlier incidents, Sergeant Ramos found that Deputy Laughlin "did not comply"

with departmental policy.[53] The plaintiff also mistakes Sergeant Ramos's role. It is undisputed that

his reports go up a chain of command for review, ultimately by the department's professional-

standards division.[54] He testified that he has never had a report "rejected," but has had one sent

back in 2015 for further consideration.[55]

Finally in this vein, the plaintiff's discussion about Sergeant Ramos suffers from a partly

factual, partly logical weakness. Mr. May argues that the County "cannot escape liability for the

consequences of its established and ongoing departmental policy regarding the use of force simply

[50] This paragraph: ECF No. 66 at 32.

[51] Apprehension Reports – ECF No. 67-16 at 2–23.

[52] The plaintiff's characterization of these encounters is also questionable. Mr. May describes and
downplays the biting incidents as involving "only . . . potential threat[s]." (ECF No. 66 at 32.) The
records themselves show something subtly different. Of the three bites that preceded Mr. May's, one
involved a suspect who was "actively resisting and fighting the deputies," while in another Riggs
apprehended a suspect "who had just threatened to kill a family member and who was potentially
armed, [and] dangerous." (EC No. 67-16 at 2, 4.) This is admittedly something of a side note. Given
Rule 56's mandate to view facts favorably to the non-moving Mr. May, the court has not considered
this particular item in its operative analysis.

[53] ECF No. 67-16 at 9.

[54] Ramos Dep. – ECF No. 72-6 at 3–4.

[55] *See id.* at 5 (reconsider); Ramos Dep. – ECF No. 67-9 at 5–6 (pp. 12–13) (not rejected).

by permitting such basic policy decisions to be made by lower level officials who are not ordinarily considered policymakers."[56] Leave aside the question of whether Mr. May has raised a triable issue on whether Sergeant Ramos is effectively a "policymaker[]" rather than someone who is applying policy that is established elsewhere. There remains a problem with Mr. May's analytical predicate. Given the undisputed record in this area, the plaintiff has not raised a triable issue that a wrongful policy exists, never mind one that was in place before, and so could have been the "moving force" behind, Mr. May's injury. There can be no wrong — and no triable *Monell* claim — for the "consequences" of a policy that has not been triably proved or materially impugned, even if those consequences are said to flow from the decisions of a "lower level official[] who [is] not ordinarily considered [a] policymaker[]." *Chew*, 27 F.3d at 1445.

For these reasons, the court grants the Court summary judgment against the plaintiff's *Monell* claim. That claim is dismissed with prejudice.

### 7. Bane Act – Cal. Civ. Code § 52.1

Because a jury question exists on Mr. May's excessive-force claim under § 1983, a jury question also exists on his claim under California's Bane Act (Cal. Civ. Code § 52.1) and the related claim for vicarious liability against the County under Cal. Gov't Code § 815.2. The court denies the plaintiff an affirmative summary judgment on these claims. But, again, both claims will go to trial.

The Bane Act prohibits interference or attempted interference with a person's rights under federal or California law by "threats, intimidation, or coercion." *See* Cal. Civ. Code § 52.1.[57] In a

---

[56] ECF No. 66 at 32 (quoting *Chew*, 27 F.3d at 1445).

[57] The Bane Act provides in part:

> (a) If a person . . . interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual . . . . of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California . . . .

> (b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this

case like this one, the Rule 56 fate of the Bane Act claim tracks the fate of the § 1983 excessive-force claim. The allegedly excessive force used in what the court has concluded was otherwise a lawful arrest — the deployment of Riggs — suffices to undergird the Bane Act claim. The California Court of Appeal recently explained:

> The parties have not cited, and we have not found, a California case that addresses the precise question presented here: whether a Bane Act claim arises from excessive force or an unlawful search following a *lawful* arrest. However, the majority of federal district courts in California have held that "[w]here Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, ***there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force***." *Dillman v. Tuolumne County*[, 2013 WL 1907379, at \*21 (E.D. Cal., May 7, 2013)].

*Simmons v. Superior Court of San Diego Cnty.*, 7 Cal. App. 5th 1113, 1126 (2016) (citations omitted) (final emphasis added). The Ninth Circuit has similarly said:

> The district court erred in dismissing the Estate's § 52.1 claim . . . . The Estate won its excessive force claim under § 1983 at trial. The City defendants concede in their brief to us that ***a successful claim for excessive force under the Fourth Amendment provides the basis for a successful claim under § 52.1***. *See Cameron v. Craig,* 713 F.3d 1012, 1022 (9th Cir.2013) ("***[T]he elements of the excessive force claim under § 52.1 are the same as under § 1983.***"); *Bender v. Cnty. of L.A.,* 217 Cal. App. 4th 968, 159 Cal.Rptr.3d 204, 212–15 (2013).

*Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105–06 (9th Cir. 2014) (emphases added); *see also Brown v. City and Cnty. of San Francisco*, 2014 WL 1364931, at \*17 (N.D. Cal. Apr. 7, 2014) ("[The court finds persuasive the line of cases permitting Bane Act claims based on the same conduct as an underlying constitutional violation.").

The court is not awarding the plaintiff an affirmative summary judgment on his § 1983 excessive-force claim. That claim does raise a jury issue, however. The Bane Act claim, to the extent that it rests on the underlying excessive-force allegation, and the associated vicarious-

---

> state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, . . . injunctive relief, and other appropriate equitable relief . . . .

Cal. Civ. Code § 52.1(a)–(b).

liability claim under Cal. Gov't Code § 815.2, will thus both go to the jury as well.

### 8. False Arrest — California Law

The court denies Mr. May summary judgment on his California-law false-arrest claim.

Like the Bane Act claim — though even more clearly — the state-law arrest claim tracks the fate of its federal counterpart. *See Levin v. United Airlines*, 158 Cal. App. 4th 1002, 1017–19 (2008), *as modified* (Jan. 14, 2008) (applying Fourth Amendment probable-cause standards to California false-arrest claim); *Blankenhorn*, 485 F.3d at 486–87 (same). Because the court granted the defendants summary judgment on the federal false-arrest claim, it denies the plaintiff summary judgment on the California false-arrest claim and, of course, on the related vicarious-liability claim under Cal. Gov't Code § 815.2.[58]

### CONCLUSION

The court grants the defendants summary judgment on and dismisses with prejudice the false-arrest claim. The court denies the motion for summary judgment on the excessive-force claim as it relates to Deputy Laughlin, including on the related qualified-immunity defense. The court grants summary judgment to Deputy Michel on the excessive-force claim. The court dismisses the *Monell* claim with prejudice. The court denies the plaintiff's motion for summary judgment on the Bane Act, false-arrest, and associated vicarious-liability claims under California law.

This disposes of ECF Nos. 60 and 62.

**IT IS SO ORDERED.**

Dated: April 15, 2017

LAUREL BEELER
United States Magistrate Judge

---

[58] The defendants did not move for summary judgment on the California false-arrest claim. *See* ECF No. 62 at 7 ("Deputies Laughlin and Michel hereby move for summary judgment on Plaintiff's federal claims . . . .").