1   MICHAEL J. HADDAD (State Bar No. 189114)
    JULIA SHERWIN (State Bar No. 189268)
2   T. KENNEDY HELM (State Bar No. 282319)
    MAYA SORENSEN (State Bar No. 250722)
3   HADDAD & SHERWIN LLP
    505 Seventeenth Street
4   Oakland, California  94612
    Telephone: (510) 452-5500
5   Fax: (510) 452-5510
6
7   Attorneys for Plaintiff
    RICHARD EARL MAY, JR.
8

9                   UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12  RICHARD EARL MAY, JR.,              )
13  Individually,                       )   No. 3:16-cv-00252-LB
                                        )
14              Plaintiff,              )   Hon. Laurel Beeler
                                        )
15  vs.                                 )   **PLAINTIFF'S TRIAL BRIEF**
                                        )
16  SAN MATEO COUNTY, a public entity;  )   Trial Date: June 5, 2017
    SAN MATEO COUNTY SHERIFF'S          )   Time: 8:30 a.m.
17  DEPUTY CHRIS LAUGHLIN; DEPUTY       )   Place: Courtroom C, 15th Floor, USDC
    ERIC MICHEL; and DOES 1 through 10, )
18  individually, Jointly and Severally, )  Final Pretrial Conference: May 18, 2017
                                        )   Time: 1:30 p.m.
19              Defendants.             )
                                        )
20                                      )
                                        )
21                                      )
                                        )
22                                      )
                                        )
23                                      )
                                        )
24  _____)

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................iv

I.   CHRONOLOGICAL STATEMENT OF FACTS AND EVIDENCE ..................................1

    A.   San Mateo County Sheriff's Deputies—including Defendant Laughlin and Deputy Michel— respond to a report of two to three people, including a person in plaid and a person in black, jumping over the fence of a senior housing project construction site and stacking items near the fence. ....................................................................................................................................1

    B.   Defendant Laughlin sees a man in a plaid shirt (Mr. May) standing in the open about 100 yards away, holding a flashlight but no weapon, and not doing anything threatening............3

    C.   A rational jury could easily find that Defendant Laughlin failed to make an audible canine announcement-warning; failed to follow his training requiring him to station a deputy at the far side of the perimeter to ensure that the canine announcement-warning was audible; and failed to allow Mr. May enough time to comply. ...................................................................4

    D.   After allegedly seeing Mr. May begin to move into the shadows, Defendant Laughlin deploys *Riggs* for the first time to bite and hold Mr. May........................................................5

    E.   Pursuant to Defendant San Mateo County Sheriff's Office's Canine Services Unit  Manual, Defendant Laughlin could deploy Riggs to bite and hold someone whom Defendant Laughlin (1) reasonably believes to have committed a serious or violent felony; and (2) reasonably believes poses an immediate threat of death or serious bodily injury. ..................6

    F.   Despite Mr. May's not posing any immediate threat of death or serious bodily injury, Defendant Laughlin siccs *Riggs* to bite and hold Mr. May. ...................................................11

    G.   Defendant Laughlin refuses to call off *Riggs* once Mr. May is already on the ground, needlessly prolonging the attack. ...........................................................................................14

II.   LIABILITY ISSUES...................................................................................................20

    A.   Defendant Laughlin violated Mr. May's Fourth Amendment right to be free from excessive force. .........................................................................................................................................20

        1.   Defendant Laughlin used a potentially deadly type and amount of force by siccing *Riggs* to bite and apprehend Mr. May.......................................................................................22

        2.   Defendant Laughlin lacked probable cause to arrest Mr. May for any felony, including but not limited to second degree (commercial) burglary in violation of California Penal Code §§ 459–460, thereby tilting the "severity of the crime" factor in Mr. May's favor............25

3.   No reasonable jury could find that Mr. May posed an immediate threat to Defendant Laughlin's or anyone's safety. ...........................................................................31

4.   Mr. May was neither resisting arrest nor fleeing: he was either standing still, moving slowly, failing to obey Defendant Laughlin's alleged commands, or moving his legs in pain while being bitten. ...................................................................................33

5.   Defendant Laughlin's failure to warn Mr. May before releasing *Riggs* to attack him weighs in favor of finding a Fourth Amendment violation. .............................................34

6.   Defendants Laughlin and Michel had less intrusive alternatives to using *Riggs* against Mr. May, a visibly older man. ...................................................................................36

B.   Defendant Laughlin does not have qualified immunity for his violations of Mr. May's clearly established right. ...................................................................................37

1.   At or after trial, this Court must determine the purely legal question of whether the law was clearly established—and special interrogatories to the jury are improper where the jury's liability verdict necessarily implies facts that would render the Defendant's conduct unlawful under clearly established law. ...................................................................................38

2.   It was clearly established by the time of this incident that the use of excessive force, under the circumstances of this case, was unlawful. ...................................................................................41

a.   Mr. May's right to be free from excessive force by a police canine trained to bite and hold was clearly established. ...................................................................................43

3.   Qualified Immunity Cannot Apply to State Law Claims ...................................................................................45

C.   By siccing *Riggs* to bite and hold Mr. May, Defendant Laughlin violated Mr. May's rights under the Bane Act, incurring his own liability and that of San Mateo County. ...................................................................................45

D.   By violating Mr. May's Fourth Amendment Rights, Defendant Laughlin is also liable for the California torts of assault and battery. ...................................................................................48

E.   As to Mr. May's false arrest and imprisonment claim under California law, Defendant Laughlin bears the burden of proving that he had probable cause to continue Mr. May's arrest. ...................................................................................49

F.   Defendant Laughlin is also liable in negligence, and the County is vicariously liable. .........54

III.   OTHER LEGAL ISSUES ...................................................................................56

A.   No Comparative Fault for Intentional Torts ...................................................................................56

B.   Properly Disclosed Expert Testimony is Admissible in a Police Misconduct Case ...............57

IV.     DAMAGES ISSUES................................................................................................58

    A.     Compensatory Damages ................................................................................58

    B.     Punitive Damages ..........................................................................................58

    C.     Attorneys' Fees and Costs.............................................................................59

    D.     No Nominal Damages....................................................................................59

# TABLE OF AUTHORITIES

## Federal Cases

*A.D. v. California Highway Patrol*,
    712 F.3d 446 (9th Cir. 2013)............................................................................... passim

*A.K.H. v. City of Tustin*,
    837 F.3d 1005 (9th Cir. 2016)........................................................... 31, 32, 33

*Acosta v. City and County of San Francisco*,
    83 F.3d 1143(9th Cir. 1996), *cert. denied* 519 U.S. 1009 (1996)...................... 41, 45

*Acosta v. Hill*,
    504 F.3d 1323 (9th Cir. 2007)............................................................... 55

*Anderson v. Creighton*,
    483 U.S. 635 (1987)............................................................................ 42

*Ayuyu v. Tagabuel*,
    284 F.3d 1023 (9th Cir. 2002)............................................................. 40

*Azevedo v. City of Fresno*,
    No. 1:09-CV-375 AWI DLB,
    2011 U.S. Dist. LEXIS 10132 (E.D. Cal. Jan. 25, 2011)...................... 30

*Bass v. City of Fremont*,
    No. C12-4943 TEH,
    2013 U.S. Dist. LEXIS 32590 (N.D. Cal., Mar. 8, 2013)....................... 47

*Beaver v. City of Fed. Way*,
    507 F. Supp. 2d 1137 (W.D. Wash. 2007), *aff'd*, 301 F. App'x 704 (9th Cir. 2008)............... 32

*Beecham v. City of West Sacramento*,
    No. S-07-1115 JAM EFB,
    2008 U.S. Dist. LEXIS 85126 (E.D. Cal. Oct. 22, 2008)...................... 42

*Bingham v. City of Manhattan Beach*,
    341 F.3d 939 (9th Cir. 2003).............................................................. 53

*Blankenhorn v. City of Orange*,
    485 F.3d 463 (9th Cir. 2007)............................................................... 48

*Brinegar v. United States*,
    338 U.S. 160 (1949)........................................................................... 25

*Brown v. City & County of San Francisco*,
    No. C 11-02162 LB,

2014 U.S. Dist. LEXIS 48386 (N.D. Cal. Apr. 7, 2014) ......................................................... 46

*Bryan v. MacPherson,*
630 F.3d 805 (9th Cir. 2010) ................................................................................... passim

*Cameron v. Craig,*
713 F.3d 1012 (9th Cir. 2013) ............................................................................................ 46

*Chaudhry v. City of Los Angeles,*
751 F.3d 1096 (9th Cir. 2014) ............................................................................................ 46

*Chew v. Gates,*
27 F.3d 1432 (9th Cir. 1994) .................................................................................... passim

*Chudacoff v. University Medical Center of Southern Nevada,*
649 F.3d 1143 (9th Cir. 2011) ............................................................................................ 20

*Clappier v. Flynn,*
605 F.2d 519 (10th Cir. 1979) ............................................................................................ 56

*Collins v. Jordan,*
110 F.3d 1363 (9th Cir. 1997) ............................................................................................ 37

*Conerly v. Flores,*
No. 4:15-cv-04079-KAW,
2016 U.S. Dist. LEXIS 162822 (N.D. Cal. Nov. 23, 2016) .............................................. 35

*Crowe v. County of San Diego,*
608 F.3d 406 (9th Cir. 2010) ............................................................................................. 26

*Curley v. Klem,*
499 F.3d 199 (3d Cir. 2007) ....................................................................................... 40, 41

*D.V. v. City of Sunnyvale,*
65 F. Supp. 3d 782 (N.D. Cal. 2014) ................................................................................. 47

*Dang v. Cross,*
422 F.3d 800 (9th Cir. 2005) ....................................................................................... 58, 59

*Davis v. City of San Jose,*
No. 14-CV-02035 BLF,
2014 U.S. Dist. LEXIS 84641 (N.D. Cal. June 20, 2014) ................................................. 47

*Davis v. Mason County,*
927 F.2d 1473 (9th Cir. 1991) ............................................................................................ 57

*Deorle v. Rutherford,*
272 F.3d 1272 (9th Cir. 2001) .................................................................................. passim

*Detoy v. City & County of San Francisco*,
　　196 F.R.D. 362 (N.D. Cal. 2000) ....................................................................... 4

*Dillman v. Tuolumne County*,
　　No. 1:13-CV-00404 LJO SKO,
　　2013 U.S. Dist. LEXIS 65206 (E.D. Cal., May 7, 2013) ....................................... 47

*Drummond v. City of Anaheim*,
　　343 F.3d 1052 (9th Cir. 2003) ............................................................................ 43

*Ford v. Childers*,
　　855 F.2d 1271 (7th Cir. 1988) (en banc) ............................................................ 44

*French v. Carson City*,
　　No. 3:13-cv-00209-HDM-WGC,
　　2015 U.S. Dist. LEXIS 13992 (D. Nev. Feb. 4, 2015) ................................... 33, 34

*Frunz v. City of Tacoma*,
　　468 F.3d 1141 (9th Cir. 2006) ............................................................................ 29

*Fuller v. Cantrell*,
　　No. C-03-5616 MMC (PR),
　　2005 U.S. Dist. LEXIS 37014 (N.D. Cal. July 27, 2005) ...................................... 33

*Garcia v. County of Riverside*,
　　817 F.3d 635 (2016), *cert. denied sub. nom. Baca v. Garcia*, 137 S. Ct. 344 (2016) .............. 53

*Garlick v. County of Kern*,
　　167 F. Supp. 3d 1117 (E.D. Cal. 2016) ............................................................... 22

*Gasho v. United States*,
　　39 F.3d 1420 (9th Cir. 1994), *cert. denied*, 115 S. Ct. 2852 (1995) ................... 25, 28

*Gertz v. Robert Welch, Inc.*,
　　418 U.S. 323 (1974) ........................................................................................... 58

*Graham v. Connor*,
　　490 U.S. 386 (1989) .................................................................................. passim

*Gravelet-Blondin v. Shelton*,
　　728 F.3d 1086 (9th Cir. 2013) ............................................................................ 34

*Guillemard-Ginorio v. Contreras-Gomez*,
　　585 F.3d 508 (1st Cir. 2009) ............................................................................... 39

*Harlow v. Fitzgerald*,
　　457 U.S. 800, 815 (1982) ................................................................................... 37

*Hayes v. County of San Diego,*
    736 F.3d 1223 (9th Cir. 2013).................................................................................. 55

*Hazle v. Crofoot,*
    727 F.3d 983 (9th Cir. 2013).................................................................................... 59

*Headwaters Forest Defense v. County of Humboldt (Headwaters II),*
    276 F.3d (9th Cir. 2002).............................................................................. 20, 22, 43

*Hesterberg v. United States,*
    71 F. Supp. 3d 1018 (N.D. Cal. 2014) ..................................................................... 34

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ................................................................................................. 43

*Houghton v. South,*
    965 F.2d 1532 (9th Cir. 1992) .................................................................................. 37

*Illinois v. Gates,*
    462 U.S. 213 (1983) ................................................................................................. 25

*Johnson v. Bay Area Rapid Transit District,*
    724 F.3d 1159 (9th Cir. 2013) .................................................................................. 37

*Johnson v. County of San Diego,*
    No. 05-CV-02233-H (WMC),
    2007 U.S. Dist. LEXIS 66273 (S.D. Cal. Aug. 24, 2007) ........................................ 56

*Kennedy v. City of Ridgefield,*
    439 F.3d 1055 (9th Cir. 2006)................................................................................... 43

*Kennedy v. Los Angeles Police Department,*
    901 F.2d 702 (9th Cir. 1989)..................................................................................... 25

*Kerr v. West Palm Beach,*
    875 F.2d 1546 (11th Cir. 1989).............................................................................. 7, 44

*Keylon v. City of Albuquerque,*
    535 F.3d 1210 (10th Cir. 2008) ................................................................................ 41

*Larez v. City of Los Angeles,*
    946 F.2d 630 (9th Cir. 1991)..................................................................................... 57

*Liston v. County of Riverside,*
    120 F.3d 965 (9th Cir. 1997)..................................................................................... 22

*Lolli v. County of Orange*,
   351 F.3d 410 (9th Cir. 2003)...................................................................... 21

*M.H. v. County of Alameda*,
   90 F. Supp. 3d 889 (N.D. Cal. 2013) .......................................................... 47

*Mackey v. Meyer*,
   No. 15-55186,
   2017 U.S. App. LEXIS 517 (9th Cir. Jan. 11, 2017) .................................. 51

*Marks v. Clarke*,
   102 F.3d 1012 (9th Cir. 1996)..................................................................... 26

*Mateos-Sandoval v. County of Sonoma*,
   No. C11-5817 TEH,
   2013 U.S. Dist. LEXIS 104549 (N.D. Cal. July 25, 2013) ......................... 47

*Mattos v. Agarano*,
   661 F.3d 433 (9th Cir. 2011) (en banc) ........................................... 31, 32, 37

*McKay v. City of Hayward*,
   949 F. Supp. 2d 971 (N.D. Cal. 2013) ........................................................ 35

*McKenna v. Edgell*,
   617 F.3d 432 (6th Cir. 2010)....................................................................... 41

*McKenzie v. Lamb*,
   738 F.2d 1005 (9th Cir. 1984)..................................................................... 26

*Memphis Community School District v. Stachura*,
   477 U.S. 299 (1986)..................................................................................... 58

*Mendoza v. Block*,
   27 F.3d 1357 (9th Cir. 1994)....................................................................... 43

*Mighell v. City of Edmonds*,
   No. C14-0285 RSM,
   2015 U.S. Dist. LEXIS 28610 (W.D. Wash. Jan 22, 2015)................... 29, 30

*Miller v. Clark County*,
   340 F.3d 959 (9th Cir. 2003)....................................................................... 33

*Moreno v. Town of Los Gatos*,
   267 F. App'x. 665 (9th Cir. 2008) ............................................................... 45

*Nelson v. City of Davis*,
   685 F.3d 867 (9th Cir. 2012)................................................................. 34, 36

*Ortiz v. Jordan*,
   562 U.S. 180 (2011) ............................................................................................ 38

*Pearson v. Callahan*,
   129 S. Ct. 808 (2009) ......................................................................................... 37

*Pierce v. Multnomah County*,
   76 F.3d 1032 (9th Cir. 1996)............................................................................. 53

*Quezada v. County of Bernalillo*,
   944 F.2d 710 (10th Cir. 1991)........................................................................... 56

*Reeves v. Sanderson Plumbing Products*,
   530 U.S. 133 (2000) ........................................................................................... 42

*Robinson v. Solano County*,
   278 F.3d 1007 (9th Cir. 2002) (en banc).................................................... 48, 54

*Rodriguez v. City of Modesto*,
   No. 1:10-CV-01370-LJO-MJS,
   2013 U.S. Dist. LEXIS 172958 (E.D. Cal. Dec. 9, 2013)........................... 47

*Rodriguez v. City of Modesto*,
   No. 1:10-CV-01370-LJO-MJS,
   2015 U.S. Dist. LEXIS 46109 (E.D. Cal. Apr. 8, 2015)........................... 24

*Sanchez v. City of Fresno*,
   No. 1:12-CV-00428-LJO-SKO,
   2013 U.S. Dist. LEXIS 68561 (E.D. Cal. May 14, 2013)........................... 47

*Santos v. Gates*,
   287 F.3d 846 (9th Cir. 2002)........................................................................ 22, 23

*Saucier v. Katz*,
   533 U.S. 194 (2001) ...................................................................................... 38, 56

*Scott v. Harris*,
   550 U.S. 372 (2007) ...................................................................................... 23, 55

*Skeels v. Pilegaard*,
   No. C12-2175 TEH,
   2013 U.S. Dist. LEXIS 34302 (N.D. Cal. Mar. 12, 2013) ......................... 47

*Sloman v. Tadlock*,
   21 F.3d 1462 (9th Cir. 1994)........................................................................ 40, 41

*Smith v. City of Hemet*,
   394 F.3d 689 (9th Cir. 2005) (en banc)..................................................... passim

*Smith v. Wade*,
   461 U.S. 30 (1983) ................................................................................ 58, 59

*Tekle v. United States*,
   511 F.3d 839 (9th Cir. 2007)............................................................... 21, 43

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ............................................................................ passim

*Ting v. United States*,
   927 F.2d 1504, 1513 (9th Cir. 1991).......................................................... 54

*Tolan v. Cotton*,
   __U.S.__, 134 S.Ct. 1861, 1866 (2014) ............................................... 42, 43

*Torres v. City of Los Angeles*,
   548 F.3d 1197 (9th Cir. 2008), *cert. denied*, 129 S.Ct. 1995 (2009) ............ 39, 40, 41

*Tortu v. Las Vegas Metropolitan Police Department*,
   556 F.3d 1075 (9th Cir. 2009)............................................................... 38, 39

*United States v. Lopez*,
   482 F.3d 1067 (9th Cir. 2007)........................................................... 25, 26, 49

*United States v. Moore*,
   483 F.2d 1351 (9th Cir. 1973)..................................................................... 28

*United States v. Ortiz-Hernandez*,
   427 F.3d 567 (9th Cir. 2005), *cert. denied*, 127 S. Ct. 358 (2006) ................ 49

*United States v. Thornton*,
   710 F.2d 513 (9th Cir. 1983)....................................................................... 25

*Watkins v. City of Oakland*,
   145 F.3d 1087 (9th Cir. 1998)............................................................... 33, 43

*Winterrowd v. Nelson*,
   480 F.3d 1181 (9th Cir. 2007)............................................................... 31, 37

*Ybarra v. Illinois*,
   444 U.S. 85 (1979) ................................................................................... 26

*Young v. County of Los Angeles*,
   655 F.3d 1156 (9th Cir. 2011)............................................................. passim

# California Cases

*Bartosh v. Banning,*
  251 Cal. App. 2d 378 (1967) ................................................................. 57

*Bender v County of Los Angeles,*
  217 Cal. App. 4th 968 (2013) ........................................................... 45, 46

*Cervantez v. J.C. Penney Co.,*
  24 Cal. 3d 579 (1979) ........................................................................... 49

*Dillenbeck v. City of Los Angeles,*
  69 Cal. 2d 472 (1968) ........................................................................... *54*

*Edson v. City of Anaheim,*
  63 Cal. App. 4th 1269 (1998) ............................................................... 48

*Grudt v. City of Los Angeles,*
  2 Cal. 3d 575 (1970) ....................................................................... 54, 55

*Hayes v. County of San Diego ("Hayes II"),*
  57 Cal. 4th 622 (2013) ......................................................................... 55

*Heiner v. Kmart Corp.,*
  84 Cal. App. 4th 335 (2000) ................................................................ 56

*In re Gregory S.,*
  112 Cal. App. 3d 764 (1980) ................................................................ 52

*In re James D.,*
  43 Cal. 3d 903 (1987) ........................................................................... 53

*In re Muhammed C.,*
  95 Cal. App. 4th 1325 (2002) .............................................................. 51

*Jones v. Kmart Corp.,*
  17 Cal. 4th 329 (1998) ......................................................................... 45

*Levin v. United Air Lines, Inc.,*
  158 Cal. App. 4th 1002 (2008) ............................................................ 49

*Lugtu v. California Highway Patrol,*
  26 Cal. 4th 703 (2001) ......................................................................... 54

*McCleery v. City of Bakersfield,*
  170 Cal. App. 3d 1059 (1985) ............................................................. 57

*Mendoza v. City of West Covina*,
   206 Cal. App. 4th 702 (2012) ................................................................ 57

*Munoz v. City of Union City*,
   120 Cal. App. 4th 1077 (2004) .............................................................. 57

*Munoz v. Olin*,
   24 Cal. 3d 629 (1979) ........................................................................... 55

*North American Chemical Co. v. Superior Court*,
   59 Cal. App. 4th 764 (1997) ................................................................. 58

*Padilla v. Meese*,
   184 Cal. App. 3d 1022 (1986) .............................................................. 51

*People v. Elsey*,
   81 Cal. App. 4th 948 (2000) ................................................................. 29

*People v. Green*,
   228 Cal. App. 2d 437 (1964) ........................................................... 25, 26

*People v. Ingle*,
   53 Cal. 2d 407 (1960) ........................................................................... 53

*People v. Lewis*,
   274 Cal. App. 2d 912 (1969) ................................................................ 29

*People v. Montoya*,
   7 Cal. 4th 1027 (1994) .......................................................................... 29

*People v. Quiroga*,
   16 Cal. App. 4th 961 (1993) ................................................................. 52

*People v. Talley*,
   65 Cal. 2d 830 (1967) ........................................................................... 53

*People v. Welsch*,
   151 Cal. App. 3d 1038 (1984) .............................................................. 51

*People v. Wilkinson*,
   248 Cal. App. 2d Supp. 906 (1967) ..................................................... 17

*Pool v. City of Oakland*,
   42 Cal. 3d 1051 (1986) ......................................................................... 53

*Scofield v. Critical Air Medicine, Inc.*,
   45 Cal. App. 4th 990 (1996) ................................................................. 49

*Shoyoye v. County of Los Angeles*,
    203 Cal. App. 4th 947 (2012) ........................................... 46, 47, 48, 50

*Simmons v. Superior Court of San Diego County*,
    7 Cal. App. 5th 1113 (2016) ........................................... 46, 48

*Thomas v. Duggins Const. Co., Inc.*,
    139 Cal. App. 4th 1105 (2006) ........................................... 56

*Venegas v. County of Los Angeles*,
    153 Cal. App. 4th 1230 (2007) ........................................... 45, 53

*Venegas v. County of Los Angeles*,
    32 Cal. 4th 820 (2004) ........................................... 45, 46, 47, 50

*Whitton v. State of California*,
    98 Cal. App. 3d 235 (1979) ........................................... 54

**Federal Statutes**

42 U.S.C. § 1988 ........................................... 59

**California Statutes**

California Civil Code § 3294(a) ........................................... 59

California Civil Code § 3333 ........................................... 58

California Civil Code § 52.1 ........................................... 45, 46, 47, 53

California Civil Code § 52.1(b) ........................................... 45

California Civil Code § 52.1(h) ........................................... 59

California Government Code § 815.2 ........................................... 48, 54

California Government Code § 820(a) ........................................... 54

California Government Code § 820.4 ........................................... 53

California Penal Code § 148 ........................................... 7, 30

California Penal Code § 148(a) ........................................... 52

California Penal Code § 148(a)(1) ........................................... 17, 18, 30, 51

California Penal Code § 459 ........................................... 15, 25

California Penal Code § 460 ............................................................................................ 16

California Penal Code § 460(b) ....................................................................................... 15

California Penal Code § 602(l) ........................................................................................ 50

California Penal Code § 602(m) ................................................................... 17, 18, 30, 50

California Penal Code § 836(a)(1) .............................................................................. 51, 53

California Penal Code § 847 ............................................................................................ 53

**Federal Rules**

Federal Rule of Civil Procedure 50(a) ........................................................................... 38

Federal Rule of Civil Procedure 50(b) ........................................................................... 38

**Other Authorities**

Judicial Council of California Civil Jury Instructions "CACI" (2016) No. 400,
    Negligence—Essential Factual Elements ............................................................... 54

Judicial Council of California Civil Jury Instructions "CACI" (2016) No. 401,
    Basic Standard of Care .......................................................................................... 54

Judicial Council of California Civil Jury Instructions "CACI" (2016) No. 1400,
    No Arrest Involved—Essential Factual Elements .................................................. 49

Judicial Council of California Civil Jury Instructions "CACI" (2016) No. 1402,
    False Arrest Without Warrant—Affirmative Defense—Peace Officer—
    Probable Cause to Arrest ....................................................................................... 49

Judicial Council of California Criminal Jury Instructions "CALCRIM" (2016),
    No. 1700 (Burglary) ............................................................................................... 26

Judicial Council of California Criminal Jury Instructions, "CALCRIM" (2016),
    No. 1702 (Burglary—Intent of Aider and Abettor) .............................................. 26

Martin A. Schwartz, Fed. Judicial Ctr. (FJC), *Section 1983 Litigation* 158 (2014) ...... 39

Ninth Circuit Model Civil Jury Instruction 5.5 .............................................................. 59

Ninth Circuit Model Civil Jury Instruction 5.6 .............................................................. 59

Ninth Circuit Model Civil Jury Instruction 9.25 ............................................... 22, 36, 56

Ninth Circuit Model Civil Jury Instruction 9.34 ............................................................ 38

## I. CHRONOLOGICAL STATEMENT OF FACTS AND EVIDENCE

**A.** **San Mateo County Sheriff's Deputies—including Defendant Laughlin and Deputy Michel—respond to a report of two to three people, including a person in plaid and a person in black, jumping over the fence of a senior housing project construction site and stacking items near the fence.**

Shortly before 11:00 p.m. on January 1, 2015, San Mateo County dispatch advised its deputies of a possible, unconfirmed commercial burglary in progress.  (Declaration of T. Kennedy Helm[1], **Ex. A**, Sanchez Dep., 43:18–44:21).  "[T]he reporting party was a security firm that was monitoring the suspects via . . . a remote camera and . . . live video feed[,]" and an employee of the Jatagan Security provided "updates to dispatch" while Defendant Laughlin drove to the construction site.  (**Ex. B**, Laughlin Dep., 76:13–22; 78:1–9).  Dispatch informed responding deputies that the Jatagan employee had seen on the video: "two, possibly three, suspects . . . hopping back and forth over a perimeter fenc[e] and stacking items of property near the fence line."  (**Ex. B**, 75:23–76:1).  There was no information about what appeared to be stacked by the fence or why anything would be stacked there.  *Id*.  One of the people wore plaid, and one wore all black.  (**Ex. C**, CAD, p. 01880).  At some point, dispatch mentioned a third person possibly seen moving between buildings.  (**Ex. B**, 78:25–79:5).  Deputy Sanchez recalled dispatch mentioning three subjects within the fenced-in area moving objects back and forth.  (**Ex. A**, 43:14–44:3).

Importantly, dispatch never mentioned that the Jatagan employee had seen any of the people on the construction site actually steal anything; only that the people were stacking up "property" near the fence line, or moving boxes back and forth towards the fence.  (**Ex. B**, 79:9–14; **Ex. A**, 45:16–21).  Indeed, at about the time of 22:56:49 on the dispatch recording, while en route to the construction site, Deputy Sanchez can be heard asking dispatch: "Do we know what they're taking or where they're moving?"  (Doc. 65-7, p. 3:4–5).  Dispatch answered: "They *haven't taken anything yet* because they're trying to make entry."  (*Id.*, p. 3:6–7 (emphasis added)).  The responding deputies had no specific information that any of the three people were armed or violent.  (**Ex. B**, 79:15–18; **Ex. A**,

---

[1] Unless otherwise noted, exhibits A–Q are attached to the previously filed Declaration of T. Kennedy Helm in Support of Plaintiff's Motion for Partial Summary Judgment (Doc. 61).  Exhibits R–GG are attached to the Supplemental Declaration of T. Kennedy Helm in Support of Plaintiff's Response in Opposition to Defendants' Motion for Partial Summary Judgment (Doc. 67).

48:11–15; 48:23–49:2; **Ex. R**, Michel Dep., 83:17–24) (*see also* **Ex. C**, CAD, p. 01880, "UNK IF VIOLENT"). Instead, Defendant Laughlin could only identify "potential" threats and generalized concerns about the people who could be inside the construction site. (**Ex. B**, 79:19–80:2).

At his deposition, Deputy Laughlin admitted his lack of confidence in the Jatagan employee's information that he received, via dispatch, about this alleged in-progress commercial burglary. (**Ex. B**, 78:19–22). Deputy Laughlin lacked familiarity with Jatagan, having never spoken to any of its employees. (**Ex. B**, 78:15–17). Nor did Defendant Laughlin know how sure the Jatagan Security employee was in even seeing somebody on the video moving boxes and stacking them near a fence. (**Ex. B**, 77:17–21). Moreover, Defendant Laughlin himself possessed no independent knowledge about criminal activity at this construction site, having neither responded to a commercial burglary there, nor heard that the site had a history of commercial burglaries. (**Ex. B**, 76:4–9, 90:7–8; **Ex. K**, 65:4–9). Consequently, Defendant Laughlin acknowledged that, when he arrived at the construction site, he needed to investigate to ascertain whether a commercial burglary was occurring or had occurred. (**Ex. B**, 78:23–24; 80:10–15). Defendant Laughlin, and Deputies Michel, Sanchez, De Martini, and King all agree that dispatch provided them information about only a *possible* commercial burglary in progress. (**Ex. B**, 80:10–13; **Ex. A**, 44:14–21; **Ex. D**, De Martini Dep., 7:21–23; **Ex. E**, King Dep., 18:25–19:06).

Defendant Laughlin, and Deputies Sanchez and Michel all arrived on scene between 11:00—11:01 p.m. (**Ex. C**, CAD p. 01880; **Ex. A**, 94:17–95:7). All were trained and well-armed.[2] Deputies King and De Martini set up a perimeter to prevent the people from escaping. (**Ex. R**, 64:4–13; **Ex. B**, 176:14–19). Deputy Zeugin staged in nearby Lesley Gardens, near the construction site's perimeter fence, and stayed there. (**Ex. S**, Zeugin Dep., 8:23–24; 9:3–21; 13:20–25). Sergeant Loubal also stood at the perimeter by Leslie Gardens. (**Ex. N**, Loubal Dep., 14:25–15:6).

---

[2] Defendant Laughlin, 5'10", 230 lbs., carried an asp (collapsible baton); a taser, and a gun; he was wearing a bullet-proof vest, and was carrying a small flashlight. (**Ex. B**, 23:11–19; 26:20–27:8). Deputy Michel, 290 lbs, 6'6," a weightlifter trained in the martial art *Aikido*, wore a bullet-proof vest and carried his firearm, handcuffs, OC spray, an asp, and a flashlight. (**Ex. R**, 15:17–24; 16:6–12; 66:24–67:11; 68:7–9). Deputy Sanchez carried his duty weapon with extra magazines, his Asp, and his Taser. (**Ex. A**, 41:22–42:6).

Deputy Michel, 6' 6," 290 lbs., pulled down a section of fence so the deputies could enter.  (**Ex. F**, Michel Dep., 15:17–24; 70:3–14).  Defendant Laughlin and Deputy Michel went to the left (north), and Deputy Sanchez went to the right (south).  (**Ex. B**, 92:1–5).  It was nighttime, and the construction site was dimly lit in some areas and dark in others.  (**Ex. B**, 77:22–25).  At this point, Defendant Laughlin only wanted to *detain* whomever he found to fill out the sketchy information he had received from Jatagan Security via dispatch:

> Q: What was your intention at that time?
> A: To try to see what the security personnel were describing.  They were giving us updates, but their positioning was—**I remember it was kind of confusing.**
> Q: Was your plan to either arrest or detain any person that you found inside of that fence?
> A: **My intention at that time was to get clarity as to what was going on, most likely detain the persons inside and see what they were doing.**

(**Ex. B**, 92:1–14) (emphases added).  Defendant Laughlin realized he needed to investigate further, "to get more statements and clarify exactly what people were doing before I'm going to book them into the county jail for any kind of charges."  (**Ex. B**, 92:24–93:4).

**B.    Defendant Laughlin sees a man in a plaid shirt (Mr. May) standing in the open about 100 yards away, holding a flashlight but no weapon, and not doing anything threatening.**

Before deputies did any investigation, Deputy Sanchez saw a person in an "open area," wearing a "gray and white checkered shirt, moving between the fence or moving in the area, in the open area." (**Ex. A**, 59:9–11).  The man in plaid (Mr. May) was about 75–100 yards away.  (**Ex. A**, 59:9–11; **Ex. B**, 97:16–21).  Deputy Sanchez could not see anything in Mr. May's hands, and Mr. May was not doing anything threatening.  (**Ex. T**, 59:12–18; 69:11–17).  Although Deputy Sanchez had his duty weapon out, he pointed it to the ground because, as he agreed, there was *no threat*.  (**Ex. T**, 62:18–63:17).  Deputy Sanchez got Defendant Laughlin's and Deputy Michel's attention.  (**Ex. A**, 60:4–5).  Defendant Laughlin saw the man in the plaid shirt, holding a flashlight, standing in dim light out in the open, between one of the rear buildings and the fence line.  (**Ex. B**, 95:6–96:16).  Defendant Laughlin could not see any weapons in his hands or anywhere else.  (**Ex. B**, 95:8–15; **Ex. K**, 67:19–25, 68:9–12).  Mr. May neither said anything threatening, nor made any threatening gestures to Defendant Laughlin.  (**Ex. B**, 106:12–19).  After observing the man for seconds, Defendant Laughlin put *Riggs* in the down position.  (**Ex. B**, 96:24–97:21).  Defendant Laughlin intended to detain the man by ordering

him to stop, show hands, and get on the ground so that he could be "detained for the burglary offense." (**Ex. B**, 97:22–98:3).

    **C.**    **A rational jury could easily find that Defendant Laughlin failed to make an audible canine announcement-warning; failed to follow his training requiring him to station a deputy at the far side of the perimeter to ensure that the canine announcement-warning was audible; and failed to allow Mr. May enough time to comply.**

    While still about 100 yards away (the length of a football field) from Mr. May, Defendant Laughlin put *Riggs* in the down position and *claims* he made one unamplified canine announcement-warning: "Sheriff's canine, stop right there, show me your hands, get on the ground or you're going to get bit by the dog." (**Ex. B**, 97:10–12, 16–21; 100:25–101:8). Defendant Laughlin conceded that he did not know if the man (Mr. May) heard this canine warning, and he knew that sometimes it can be difficult for a person to hear the canine announcement-warning. (**Ex. B**, 101:9–10; 103:3–6; 127:10–13). Indeed, Mr. May never heard one. (**Ex. U**, 58:11–18; 67:17–25; 81:15–18). Nor did Sharon Coster. (**Ex. V**, 23:17–24; 26:19–27:5; 69:8–11; **Ex. J**, Duri Dep., 41:19–22; 42:17–24). Nor did Deputies Zeugin, King, DeMartini, and Sgt. Loubal. (**Ex. O**, Zeugin Dep., 10:13–15; **Ex. W**, King Dep., 14:11–18; **Ex. N**, 14:22–24; **Ex. X**, De Martini Dep., 10:7–8). Defendant County requires its canine handlers to give audible and understandable canine announcement warnings.

    Lieutenant Mark Duri, Defendant San Mateo County's Rule 30(b)(6) witness[3] regarding training, policies and procedures for canine deployments and canine uses of force, as well as Sgt. Gary Ramos, the County's current Canine Unit Commander, confirm that the County requires canine handlers to give *audible* warnings, whenever possible, so that the canine handler is confident the suspect heard it. (**Ex. Y**, 29:17–24; **Ex. Z**, Ramos Dep., 53:16–18, 52:6–8; **Ex. B**, 71:10–23). According to Defendant County, "[w]arnings must be loud, clear, and documented *being heard at the far side of the building/area*." (**Ex. Y**, 30:11–15; **Ex. Z**, 52:16–53:9) (emphasis added). Defendant County trains its canine handlers to position someone at the far side of the building or area to ensure

---

[3] As its 30(b)(6) witness (and "PMK," Person Most Knowledgeable"), Lt. Duri's testimony binds Defendant County. *See, e.g., Detoy v. City & County of San Francisco*, No. C 99-3072 CRB (JL), 196 F.R.D. 362, 365 (N.D. Cal. 2000) (a 30(b)(6) witness's testimony is "binding" on City).

that the suspect *actually heard* the canine warning.  (**Ex. Y**, 30:19–24).  Defendant Laughlin agreed that, pursuant to Defendant County's policy and practice, a canine handler will "have somebody *move to a far side of a perimeter to see if they can hear an announcement*."  (**Ex. B**, 127:14–23) (emphasis added).  Or, Defendant County trains that its canine handlers may have someone move to a position to ensure the warning was heard, or radio to deputies holding the perimeter to ask if they have heard the canine warning.  (**Ex. Y**, 30:25–31:9).  Defendants' PMK explains that canine handlers are so trained for the suspect's safety *and because the law requires such a warning*.  (**Ex. Y**, 31:13–17).

Defendant Laughlin did not follow this training.  (**Ex. J**, 42:7–16).  Before sending *Riggs* for the first time to bite and hold Mr. May, Defendant Laughlin did not try to have someone move to a far side of the perimeter to see if the person could hear the announcement.  (**Ex. B**, 127:24–128:3).  None of the deputies working with Deputy Laughlin documented that they could hear, from the far side of the construction yard, Deputy Laughlin's canine warning to Mr. May.  (**Ex. Z**, 78:10–14).

Moreover, a warning must give the person a reasonable amount of time to comply to avoid getting bitten.  (**Ex. B**, 71:24–72:7).  Yet, Deputy Laughlin waited only 5–30 seconds before sending *Riggs* to bite Mr. May.  (**Ex. B**, 101:16–102:6).

> **D.**   **After allegedly seeing Mr. May begin to move into the shadows, Defendant Laughlin deploys *Riggs* for the first time to bite and hold Mr. May.**

After allegedly giving the first canine announcement-warning, Defendant Laughlin claims that Mr. May "[p]retty much right away" began to move into the shadows, right next to the fence line; as soon as Mr. May did so, and Deputy Laughlin lost sight of him, Deputy Laughlin ordered *Riggs* to *FASS!* or bite him.  (**Ex. B**, 101:11–15, 102:7–17; **Ex. J**, 41:2–9).  Defendant Laughlin "took him moving back into the shadows as *basically being disobedient of the command* and trying to go toward the fence, which was described by the reporting parties as an entrance/exit."  (**Ex. B**, 102:22–103:2).  Sgt. Ramos agreed that Mr. May's alleged turning towards the fence constituted a potential threat at most.  (**Ex. Z**, 92:25–93:23).  Defendant Laughlin admitted that he never saw Mr. May's body in any other posture other than standing up and moving slowly.  (**Ex. B**, 125:24–126:1).  At this point, Deputy Sanchez still had not seen any evidence of a burglary.  (**Ex. A**, 65:19–24).  Defendant Laughlin, and Deputies Michel and Sanchez followed behind as *Riggs* bounded towards Mr. May.

Mr. May tells it differently.  As he and Ms. Coster were leaving with *Domino*, Ms. Coster's cat

they had been trying to rescue, Mr. May heard a commotion behind him, turned around, and saw, at the very far end of the construction site, about 100 yards away, three people in dark clothes walking side by side towards him.  (**Ex. U**, 53:9–11; 54:2–4, 11–16).  He assumed they were security.  (**Ex. U**, 60:6–9).  Mr. May stood near the fence, with his hands at his side, thinking he was going to "stay right here and talk to them" and that they were going to ask him "what the heck" he was doing there, and he could explain himself.  (**Ex. U**, 56:6–9; 55:6–11; 57:25–58:3). While standing and waiting, he may have put his hand on the fence to lean on to be comfortable.  (**Ex. U**, 56:14–18; 60:12–61:3).  The construction site was "pretty well lit"; although there were some shadows, streetlights and other lights illuminated the construction site, which earlier had enabled Mr. May to climb the scaffolding outside of the unfinished structure to try to get *Domino* down.  (**Ex. U**, 56:19–25; 57:1–4).  Defendant Laughlin claimed the lighting around Mr. May was dim.  (**Ex. B**, 95:18–20).  As the three individuals approached Mr. May, none of them said anything, and Mr. May did not say anything, either—although it was possible Mr. May just did not hear.  (**Ex. U**, 58:4–18; **Ex. T**, 66:10–17).

Then, Mr. May saw what he thought was a guard dog running towards him, and he thought to himself: "Don't move." (**Ex. U**, 62:12–15; 63:18–20).  *Riggs* ran up to Mr. May, who was standing with his arms at his sides, and nudged his right arm with his nose.  (**Ex. U**, 64:13–25).  Mr. May did not react, and he stood there; "Don't move" was his only thought.  (**Ex. U**, 65:1–6).  Mr. May did not hear any of the three men say anything, and Mr. May did not say anything to them.  (**Ex. U**, 65:18–66:8). Then, *Riggs* ran back towards the three men, who were now closer to Mr. May.  (**Ex. U**, 66:22–67:16).

E.  **Pursuant to Defendant San Mateo County Sheriff's Office's Canine Services Unit Manual, Defendant Laughlin could deploy Riggs to bite and hold someone whom Defendant Laughlin (1) reasonably believes to have committed a serious or violent felony; and (2) reasonably believes poses an immediate threat of death or serious bodily injury.**

Defendant San Mateo County's 30(b)(6) witness Lieutenant Duri explained that, in sending a dog to find and bite, the canine handler effectively turns over control to the dog about how severely the resulting injury will be.  (**Ex. Y**, 17:18–22).  Experienced in viewing police dog bites, Lt. Duri agrees that a police canine bite is a high level of force.  (**Ex. Y**, 17:1–18:3).  Indeed, Sgt. Ramos, Canine Unit Supervisor, agrees that police dog bites can cause very severe injuries—even death.  (**Ex. Z**, 22:1–3).

Both agree that "'[d]eployment of a police canine constitutes the use of a high level of force that should be reserved for situations that justify this response alternative." (**Ex. Y**, 16:16–25; **Ex. Z**, 21:17–25; **Ex. AA**, IACP Whitepaper).  Lt. Duri agreed that the bite-and-hold training *Riggs* had can cause serious injury, due in part to the natural reaction of a person to escape the bite, and he specifically agreed with this statement from *Kerr v. West Palm Beach*, 875 F.2d 1546, 1550 (11th Cir. 1989):

> Under the bite and hold method of training, a dog seeks to subdue a suspect by biting his arm or leg; if, however, the dog has no access to such an appendage, the dog will bite the suspect on any available area of his body. Upon being bitten by a dog, a suspect usually attempts to free himself; the dog, however, is trained to maintain his hold on the suspect until ordered to release the suspect by its handler. Thus, if the dog should lose his hold as a result of the suspect's attempts to free himself, the dog will seek to reestablish it. As a result, suspects often suffer serious injury from multiple bites received during the course of an apprehension.

(**Ex. Y**, 32:18–33:15).  Therefore, SMCSO Policy § 5-01 limits canine use; as Lt. Duri explained, the policy exists because of "*the severity of using the dog*."  (**Ex. Y**, 28:20–29:16) (emphasis added). Specifically, § 5-01 provides:

> Deploying a canine to search for, or attempt apprehension of a suspect constitutes use of force. As such, it is subject to General Order 5-01 as well as this manual.  Canine teams shall only use that degree of force that is reasonably necessary to apprehend or secure a suspect.  A canine may be deployed to locate and apprehend a suspect if the handler reasonably believes that the individual has committed, or threatened to commit, a serious or violent felony <u>and</u> any of the following conditions exist:
>
> > 1. There is a reasonable belief that the individual poses an immediate threat of death or serious bodily harm to the public, another officer or to the handler.
> > 2. The individual is physically resisting or threatening to resist arrest, and such resistance would likely result in death or serious bodily injury to the public, another officer, or to the handler, and the use of the canine reasonably appears necessary to overcome such resistance.
> > 3. The individual is believed concealed in an area where entry by any means reasonably available, other than a canine, would pose a threat to the safety of the public, another officer, or to the handler.

(**Ex. G**).  Section 5-01 limits canine use to arresting a serious or violent suspect.  (**Ex. Z**, 26:4–7).

First, a canine handler must have probable cause to believe that the person has committed or threatened to commit a serious or violent felony.  (**Ex. J**, 22:3–6; **Ex. B**, 68:1–5; **Ex. Z**, 41:12–42:6). Probable cause for a misdemeanor—such as trespass or a violation of California Penal Code §148—

will not suffice, as these crimes lack the severity to justify a canine's high level of force.  (**Ex. Z**, 26:8–10; 41:3–11; 87:25–88:9).  Further, a canine handler may only deploy his dog to bite to effectuate a serious felony *arrest—not* to effect a simple investigatory detention for any crime.  (**Ex. J**, 22:7–21; **Ex. B**, 68:7–12; **Ex. Z**, 26:12–27:2).  Defendant Laughlin also agreed that the manual does not allow him to send his dog to bite someone whom Defendant Laughlin is just going to briefly detain to investigate if the person is committing a crime.  (**Ex. B**, 68:7–12).  Nor may a canine handler deploy a dog to bite someone who has merely failed to comply with the canine handler's commands, according to Laughlin's Canine Unit supervisor, Sgt. Ramos.  (**Ex. Z**, 47:11–16; 90:18–22).  Defendant Laughlin admitted that he deployed *Riggs* on Mr. May for failure to comply with his commands, testifying that "*disobedience to simple orders . . . got him [May] bit by a dog.*"  (**Ex. B**, 144:24–145:1) (emphasis added).  Indeed, Sgt. Ramos agreed that Mr. May's alleged disobedience to Defendant Laughlin's commands would not suffice to send a dog to bite him.  (**Ex. Z**, 101:13–23).  Nor may a dog be deployed to apprehend someone merely for climbing over a fence of a commercial construction area and failing to heed a recorded warning announcement.  (**Ex. Z**, 59:14–23).

Deputy Laughlin agreed that this manual required him, when he decides whether to deploy his dog to bite someone, to have probable cause that the person is committing a serious or violent felony.  (**Ex. B**, 67:20–68:5).  Defendant Laughlin had been trained that "[p]robable cause for arrest is a set of facts that would cause a person of ordinary care and prudence to entertain an honest and strong belief that the person to be arrested is guilty of a crime."  (**Ex. B**, 47:2–11) (citing POST Learning Domain 15, p. 4-3 (**Ex. H**)).  He further agreed that probable cause exists "when, under all the circumstances known to the officer at the time, there is a fair probability that the person has committed a crime."  (**Ex. B**, 45:17–21).  Deputy Laughlin agreed that any time he arrests someone, he needs to know the elements of the Penal Code crime for which he is arresting the person, and he must have probable cause for the elements of the crime.  (**Ex. B**, 50:21–25; 51:1–6).  He acknowledged that, to enforce the commercial burglary law (or any law), he needed to know the crime's elements.  (**Ex. B**, 83:2–16).  He agreed that to lawfully arrest for commercial burglary, he needed probable cause that: (1) the person had entered some sort of building or structure with (2) the intent to commit petty or grand theft.  (**Ex. B**, 86:12–20; 87:3–13).  This is essentially what police officers in California are trained in the police

academy:

> **For the crime of burglary to be complete, it must be shown that the burglar entered the building or structure for the purpose of committing grand theft, petty theft, or some other felony offense (e.g., assault, rape, mayhem, arson, murder, et cetera).  Without this specific intent, the individual may have committed a different crime, such as unauthorized entrance or trespass, *but* not burglary.**

(**Ex. I**, POST Learning Domain 6, p. 1-30 (emphasis in original)).

Defendant Laughlin knew that probable cause to arrest for burglary requires some evidence that a person entered a building or structure with the intent to steal or commit a felony.  (**Ex. B**, 168:8–13).  Yet Defendant Laughlin admitted that, before sending *Riggs* to bite Mr. May, Defendant Laughlin had no specific information that the man in the plaid shirt had ever entered any building or structure on the construction site:

> Q: So you had no specific information that Mr. May had ever entered any building or structure on that site before you sent the dog over to bite him; is that right?
> A: That's correct.

(**Ex. B**, 169:5–8).  Deputy Laughlin admitted that when he first saw Mr. May, he was standing *outside* of any structure; that he never saw the man in the plaid shirt enter any building, and that he could not remember if the CAD later mentioned that the man in the plaid shirt ever entered a building.  (**Ex. B**, 99:14–16; 100:15–23).  Similarly, when Deputy Sanchez saw Mr. May, he was not in any building.  (**Ex. A**, 68:18–20).  Indeed, at no point did Deputy Laughlin—or anyone else—ever see the man in the plaid shirt go inside any of the buildings on the construction site.  (**Ex. B**, 93:22–94:7; 100:15–23; 171:23–172:23; **Ex A**, 78:15–23; **Ex. J**, Duri Dep., 44:18–45:3; **Ex. K**, Ramos Dep., 63:15–23; 65:15–19; 74:7–10; 76:1–11).

Defendant Laughlin also knew he needed probable cause to believe that the person's **intent, *while inside the building*,** was to steal or to commit a felony.  (**Ex. B**, 94:8–13; 167:4–168:1, 8–13).  Indeed, Defendant Laughlin agreed that he had learned, beginning at the police academy, that to establish probable cause for burglary, he needed facts regarding entry and felonious intent: that the person "entered the building or structure for the purpose of committing . . . [a] felony offense."  (**Ex. I**, LD 6, p. 1-30); (**Ex. B**, 165:25–168:13).  Defendant Laughlin, however, ignored or refused to follow this training.  When asked whether he was aware of this basic training, including regarding the felonious intent element, to determine if he had probable cause to arrest Mr. May by ordering his dog

to bite and hold him, Deputy Laughlin testified: "Was that going through my head during the course prior to my deployment?  Absolutely not." (**Ex. B**, 165:25–166:25).

At the moment Defendant Laughlin sicced *Riggs* to bite and hold Mr. May, Defendant Laughlin believed he had probable cause to arrest him for commercial burglary.  (**Ex. B**, 98:4–15).  Defendant Laughlin based his probable-cause determination on the following facts:

> Q: . . . [A]t the moment that you ended up releasing the dog to apprehend him.
> A: Yes.
> Q: Did you have probable cause to arrest him?
> A: Yes.
> Q: What was that based on?
> A: It's based on the reporting party's information.  Obviously I don't have time to verify that.  It's an in-progress burglary.  That's based on my observations of a person dressed in dark clothing with a flashlight standing near a point of entrance/exit.
> ---
> Q: And what was the information . . . conveyed to you by dispatch that you are saying formed part of your probable cause to arrest for commercial burglary at that point?
> A: So the call, as I remember, was two to three—two, possibly three, suspects seen entering over a fence into the commercial lot, and then picking up items and stacking them near the fence line . . . That right there leads me to believe, in my mind, that there's a good chance a commercial burglary is occurring.

(**Ex. B**, 99:3–13; 100:1–14).

In addition to a "serious or violent felony," § 5-01 requires a canine handler to articulate— *before* deploying the canine to bite and hold—facts to establish one of the three enumerated elements.  (**Ex. Y**, 26:12–27:10; **Ex. Z**, 36:12–37:16; **Ex. B**, 65:16–66:16; 66:17–24; 67:20–25; 68:14–22).  It is undisputed that (3) did not apply here, because Mr. May was never concealed or hiding.  (**Ex. Z**, 90:24–91:2).  Therefore, Defendant Laughlin had to show, under § 5.01, that he had probable cause to believe that Mr. May had committed a serious or violent felony *and* posed an immediate threat of death or serious bodily injury.  (**Ex. Z**, 91:6–14; 101:24–102:5; **Ex. B**, 67:2–68:22).  The immediate threat of death or serious bodily harm must be contemporaneous and specific to the suspect.  (**Ex. Y**, 28:2–19; **Ex. Z**, 45:7–13; 46:19–22).  Generalized circumstances do not pose an "immediate threat."  (**Ex. Y**, 28:8–11; **Ex. Z**, 47:6–10).  Indeed, the canine handler needs *probable cause* to believe that the person also poses an immediate threat of death or serious bodily harm to someone.  (**Ex. Z**, 43:17–25; 44:1– 7).  Defendant Laughlin was so trained on this "immediate threat" requirement.  (**Ex. B**, 69:12–22).

Moreover, the SMCSO requires canine handlers to consider *alternatives* before deploying their

1   canines.  (**Ex. B**, 59:19–23).  For example, a canine handler who sees a non-threatening person

2   standing motionless may just call off the dog.  (**Ex. J**, 21:4–9).  Or, a canine handler may command the

3   dog to "*gib laut*" or audibly bark, while on leash, as a "show of force" to intimidate the suspect into

4   complying.  (**Ex. B**, 25:9; **Ex. Z**, 27:3–12).  Or, a canine handler may keep the dog on leash while

5   approaching the suspect and continuing to give commands. (**Ex. Z**, 89:21–25).  Defendant Laughlin

6   did none of these.  Other alternatives existed.  (**Ex. BB**, Burwell Rule 26 Report, p. 14).

7   **F.      Despite Mr. May's not posing any immediate threat of death or serious bodily
        injury, Defendant Laughlin siccs *Riggs* to bite and hold Mr. May.**

8           Defendant Laughlin claims that after he called *Riggs* back he gave Mr. May two more orders:

9   "Show hands, get on the ground, the dog is going to bite you."  (**Ex. B**, 107:12–14).  At this point,

10  Defendant Laughlin was "about a car length away" from Mr. May, "a lot closer," and Defendant

11  Laughlin could see Mr. May standing "a few steps away from the fence line."  (**Ex. B**, 107:15–22; **Ex.

12  R**, 83:25–84:7).  Despite standing "about a car length away" from Mr. May, Defendant Laughlin

13  claimed he "couldn't see his hands[,]" and he could not see the flashlight.  (**Ex. B**, 107:23–108:4).  Mr.

14  May did not move and kept his hands at his side.  (**Ex. U**, 68:1–10).  From that close distance, a jury

15  could find that Defendant Laughlin must have seen that Mr. May was an older man, standing passively

16  with his hands at his sides, while holding a flashlight.

17          Defendant Laughlin claims that Mr. May was "not complying with the orders given[,]" and was

18  "not showing me his hands, he's not getting on the ground, and he was backing up, toward the fence

19  line."  (**Ex. B**, 110:24–111:14).  Mr. May's body was facing Deputy Laughlin as he began allegedly

20  "backing up" towards the fence line.  (**Ex. B**, 111:19–22).  At this point, even though he had no

21  information whatsoever about any gun, Defendant Laughlin says he feared that Mr. May posed a

22  potential threat of a "gun in his waistband."  (**Ex. B**, 112:3–9).  Defendant Laughlin, however,

23  conceded that he never saw a gun on Mr. May's person; rather, Defendant Laughlin feared: "He's an

24  unsearched suspect who *could* have a weapon."  (**Ex. B**, 112:10–15) (emphasis added).  By his own

25  admission, Defendant Laughlin had *no specific information* of any weapons that Mr. May might have

26  possessed.  (**Ex. B**, 112:16–18).  Mr. May never attempted to flee; Defendant Laughlin never saw Mr.

27  May turn to face the fence as if he were going to try to climb it or jump over it.  (**Ex. B**, 114:15–17).

28          Importantly, before Defendant Laughlin sent *Riggs* to bite and hold Mr. May, he conceded that

he would not have been justified in using intermediate force, such as a Taser, on Mr. May, because Mr. May *did not pose an immediate threat*.  (**Ex. B**, 126:25–127:9).  When asked what *immediate* threat Mr. May posed when Defendant Laughlin sicced *Riggs* on him for the second time, Defendant Laughlin could only identify potential threats and Mr. May's alleged failure to comply with his alleged order to "show hands and surrender," based on the possibility that he might be carrying the "tools of" the burglar's trade—crowbars, screwdrivers, and "weaponry"—that he never saw in May's empty hands.  (**Ex. B**, 103:20–104).  Defendant Laughlin conceded, however, that these are merely a "*potential* threat".  (**Ex. B**, 104:7–11).  Indeed, when asked whether he had any facts that Mr. May posed a *specific* threat, Defendant Laughlin conceded: "I wasn't aware if—it was no—*I was not aware of any specific weapon* he may have had on him as a level of threat towards me."  (**Ex. B**, 104:12–19).  Defendant Laughlin never saw Mr. May holding any construction-site tools or debris as a weapon.  (**Ex. B**, 125:8–19).  No deputy ever observed any weapons on Mr. May.  (**Ex. J**, 41:10–18; **Ex. Z**, 92:7–19).

Defendant Laughlin claimed he was concerned that Mr. May "*might* escape" if he waited any longer to release Riggs.  (**Ex. B**, 103:14–16).  Yet the crime under suspicion was not serious or violent.  Defendant Laughlin also claimed that Mr. May's "hands were tucked by his waistband and he had—I remember he had, like, a baggy shirt on that concealed his hands pretty good."  (**Ex. B**, 108:7–9).  Defendant Laughlin claims he gave Mr. May one to two more orders: "'Show hands, get on the ground, the dog is going to bite you.'"  (**Ex. B**, 107:11–14).  Mr. May never heard any warning, or anything other than some command in a foreign language, before the dog attacked him.  (**Ex. L**, May Dep., 76:3–77:17; 78:15–79:1).  Neither did Sharon Coster, standing about 20 feet away from May, or other officers nearby.  (**Ex. M**, Coster Dep., 23:17–24; **Ex. E**, King Dep., 14:11–18; **Ex. N**, Loubal Dep., 14:22–15:7; **Ex. O**, Zeugin Dep., 10:13–15).

As *Riggs* ran back to the three men, Mr. May and Ms. Coster heard—only once—some "loud, very guttural" words, possibly German.  (**Ex. L**, 76:19–25; 77:1–4; 78:15–17; **Ex. V**, 26:5–13).  Defendant Laughlin commanded *Riggs* again to "*Fass!*" while only "a couple steps" from Mr. May.  (**Ex. B**, 114:18–22; 111:23–25).  Mr. May testified they were within 50 yards away.  (**Ex. L**, 79:19–80:3).  Defendant Laughlin claimed that Mr. May was standing a few steps away from the fence line,

about a car length away from Deputy Laughlin.  (**Ex. B**, 107:15–22).  Mr. May was "backing up

towards the fence line" away from Deputy Laughlin, but with Mr. May's body facing Deputy

Laughlin.  (**Ex. B**, 111:2–22).  Defendant Laughlin never saw Mr. May do anything other than

"standing up and moving slowly."  (**Ex. B**, 125:24–126:1).  Because the words were "very loud,

guttural[,]" Mr. May "assumed it was an attack command," because he saw *Riggs* "spring into action"

and run to him faster than before.  (**Ex. L**, 75:17–19; 77:11–17).  Upon giving this second *FASS*

command, *Riggs* ran and attacked Mr. May, biting his right leg.  (**Ex. B**, 114:18–22).  In less than a

minute from *Riggs*' bumping him on the right arm, *Riggs* returned and bit Mr. May on the right leg

while Mr. May was standing up.  (**Ex. U**, 68:14–17; 72:5–9).  The first English words Mr. May

heard—"get on the ground—he heard while he was standing up with *Riggs* "on [his] leg[.]"  (**Ex. L**,

74:20–75:8; 78:18–79:1).  Mr. May thought he was already "heading [to the ground] anyway, because

of the way the dog had [his] leg."  (**Ex. U**, 75:15–16).

      With *Riggs* latched to his right leg, Mr. May either fell down to the ground, or Defendant

Laughlin pulled him to the ground by his arm.  (**Ex. L**, 79:15–18, 82:9–14; **Ex. B**, 114:18–115:1; **Ex.

R**, 84:20–85:4).  Defendant Laughlin claims that he ran up to Mr. May, grabbed his arm, pulled him to

the ground, and began commanding him to put his arms out.  (**Ex. B**, 114:24–115:2).  Mr. May was not

"resistive[,]" and Defendant Laughlin recalled "just being able to pull him to the ground pretty easy."

(**Ex. B**, 116:14–16).

      Within seconds of *Riggs* biting him, Mr. May ended up on his stomach, with *Riggs* "chewing"

on his leg.  (**Ex. R**, 85:4–12; **Ex. U**, 72:1–4).  In a "blur," *Riggs* bit Mr. May multiple times on his right

leg, and on his left leg (leaving two to three puncture wounds).  (**Ex. U**, 70:25–71:20, 72:10–23; **Ex. R**,

92:14–15).  *Riggs* continued to bite Mr. May, because as Defendant Laughlin explained, *Riggs* is "a

bite-and-hold dog, so he's going to bite and hold that position until I command him off."  (**Ex. B**,

116:17–23).

      It was "extremely painful," and Mr. May was moving around because of the pain, as he would

later tell Defendant Laughlin at the substation.  (**Ex. U**, 71:20–25; **Ex. B**, 151:5–10).  *Riggs* thrashed

Mr. May's right leg around.  (**Ex. L**, 82:15–17).  The pain was "so intense."  (**Ex. U**, 88:21–22).  Lying

on his stomach, with *Riggs* attached to his leg, Mr. May was in "automatic mode" and "not really sure

what [he] was doing." (**Ex. L**, 73:5–15). Mr. May was struggling "just to get him off my—off from biting my leg[.]" (**Ex. L**, 73:18–20). Mr. May shook his leg to try to shake the dog off, moving it "to and fro" and "back and forth trying to get him to let go." (**Ex. L**, 82:18–21; 73:24–74:8). Defendant Laughlin even admitted: "it looked like he was trying to pull away from the dog, to break free of the dog's hold." (**Ex. B**, 117:24–118:4). It is undisputed that Mr. May never used his arms or hands to try to strike, punch, grab, or to otherwise try to hurt *Riggs*, and that Defendant County trains its canine handlers to expect a person to react as Mr. May did and not interpret this as willful resistance.

Defendant County trains its canine handlers that, due to the pain and fear, suspects who are being bit by a police service canine will flail around—which a canine handler should not interpret as volitional resistance. (**Ex. Y**, 33:16–34:7). Deputy Michel, a canine handler, agreed that "[p]eople will flail about" when getting bitten by a police canine. (**Ex. R**, 92:24–93:2). Deputy Sanchez agreed that it is pretty common for people to try to pull away or squirm when bitten. (**Ex. T**, 90:12–16).[4] As *Riggs* was "attached to his leg," Defendant Laughlin claims that Mr. May was "just kicking at the dog and kind of moving all around[,]" and he commanded Mr. May to "[p]ut your arms out." (**Ex. B**, 117:18–23; 115:1–2).

Defendant Laughlin commanded him to "stop fighting" *Riggs*. (**Ex. L**, 80:8–12; **Ex. R**, 99:25–100:4). Deputy Michel claimed "seeing [Mr.] May use his other leg *to kick at Riggs*." (**Ex. R**, 92:17–18). Yet, he conceded that someone could "involuntarily swing at or try to kick at the dog because of the bite." (**Ex. R**, 94:15–95:8). *Riggs* was not injured. (**Ex. B**, 131:14–22).

### G. Defendant Laughlin refuses to call off *Riggs* once Mr. May is already on the ground, needlessly prolonging the attack.

Defendant Laughlin stood there while Riggs attacked and repeatedly bit Mr. May, refusing to call off his dog, and prolonging the attack. Defendant County's training and policy requires its canine handlers to call off the dog as soon as the suspect has complied or is subdued. (**Ex. B**, 70:3–8; Canine Manual, §5-01, p. 2 (Doc. 62-24)). Deputies are trained that a person's flailing against being bitten is

---

[4] Defendant Laughlin agreed that getting bitten by a police dog hurts and causes fear, but he *denied* having been trained that persons who are being bitten by a police canine will flail around from the pain and panic of the bite. (**Ex. B**, 72:9–17; 73:2–10).

not intentional resistance.  (**Ex. Y**, 34:4–7).  If an officer is not sure if a suspect is willfully resisting—

or merely flailing around in pain and fear—the officer may call the dog off, especially where, as here,

the officer has backup.  (**Ex. Y**, 34:8–13).  Defendant Laughlin justified not calling off *Riggs* after Mr.

May fell to the ground for two reasons: (1) Mr. May was allegedly kicking or fighting the dog; and (2)

he would not put his arms out in front of him to search him for weapons.  (**Ex. B**, 116:25–117:4).  Mr.

May disputes that; he was in shock.  (**Ex. U**, 71:20–25).

Defendants claim *Riggs* bit Mr. May for 15–20 seconds.  (**Ex. B**, 117:5–17; **Ex. R**, 99:4–9).  To

Mr. May, the bite seemed to last a long time, for minutes.  (**Ex. L**, 81:23–25).  Finally, Defendant

Laughlin commanded *Riggs* to "*Aus*," or stop biting; got *Riggs* off of Mr. May; moved back several

feet; and told Deputy Michel to handcuff him.  (**Ex. B**, 119:6–12).  Deputy Michel handcuffed Mr.

May without difficulty while Mr. May while still face down on the ground.  (**Ex. B**, 119:10–18; **Ex. R**,

100:2–7; **Ex. U**, 83:14–17).  Despite his alleged prior concern for Mr. May possibly having a gun in

his waistband, Defendant Laughlin never conveyed this concern to Deputy Michel before he searched

him, and Deputy Michel found no weapons or burglary tools on him.  (**Ex. B**, 120:2–18–121:5,

130:14–17; **Ex. R**, 100:9–12; **Ex. U**, 85:9–15; **Ex. Z**, 87:5–16; **Ex. T**, 87:2–7).  No one ever connected

Mr. May with any stolen items, either.  (**Ex. Z**, 87:17–20).  Sometime after Mr. May had been bitten, a

deputy checked his criminal history, finding nothing other than an ancient DUI.  (**Ex. B**, 136:19–137:6;

**Ex. Z**, 88:21–89:1).

Defendant Laughlin admits he was the arresting officer.  (**Ex. B**, 122:20–21).  By the time Mr.

May was on the ground, he was under arrest for "commercial burg[,]" in violation of California Penal

Code § 460(b).  (**Ex. B**, 121:24–122:12, 22–25).   Penal Code § 460(b) is second degree commercial

burglary as defined by §§ 459 and 460(b), a property crime.  *Id.*  Defendant Laughlin had no crime in

mind other than Penal Code §§ 459, 460 for which to arrest Mr. May.  (**Ex. B**, 126:4–12).  Defendant

Laughlin admitted he lacked probable cause to arrest him for anything else.  (**Ex. B**, 126:4–12;

121:24–122:25).

Seconds after Mr. May was in handcuffs, Defendant Laughlin saw Ms. Coster with Deputy

Sanchez, about 20' away.  (**Ex. B**, 129:1–8; 173:11–174:1). Deputy Sanchez had seen a person

wearing all black move in front of him, shined his flashlight on her, ran up, and handcuffed her.  (**Ex.**

**T**, 70:25–72:8).  Defendant Laughlin admitted he could not see Ms. Coster's hands, and that the mere inability to see her hands would *not* have allowed him to send a dog to bite and hold her.  (**Ex. B**, 129:17–130:7).

Then, Deputy Michel escorted Mr. May to the front of the construction site while Deputies Sanchez, King and Laughlin, with *Riggs*, searched the remainder of the buildings for the possible third suspect.  (**Ex. B**, 119:19–120:1).  Mr. May had difficulty walking, and Deputy Michel assisted him to stand and walk.  (**Ex. U**, 86:16–17; 87:25–88:13).  It is undisputed that no third suspect was ever found.  Defendant Laughlin did not investigate to see if a commercial burglary had occurred.  (**Ex. B**, 130:18–21).  Deputy Sanchez later investigated, but found no evidence that either Mr. May or Ms. Coster had stacked up anything anywhere.  (**Ex. A**, 79:24–80:21).  The deputies found no stolen property stacked up to haul away as Jatagan Security had implied.  (**Ex. B**, 174:8–14).

Ms. Coster saw Mr. May handcuffed and sitting on the sidewalk after the incident, and she could see an expression on his face that he was in pain.  (**Ex. V**, 28:22–29:3).  During the drive from the construction site to the substation, Mr. May described how, with his hands cuffed behind him, he was having difficulty finding a comfortable position while sitting in the patrol car, and his pain from his wounds would increase, on a pain scale of 1–10, from a 4–5/10 to an 8–9/10.  (**Ex. U**, 92:20–93:10).

At about 12:02 a.m., Defendant Laughlin pulled the case number "SOS 15-00012," and listed two charges: [Cal. Penal Code §§] "460" and an additional charge: "148."  (**Ex. C**, CAD, p. 01883).  Defendants agree that Mr. May cooperated throughout the rest of the ordeal.  (**Ex. B**, 132:4–9).  At the substation, Mr. May "was very cooperative;" during the interrogation he was "polite and cordial." (**Ex. B**, 143:5–7; 149:21–24).

Defendant Laughlin spent some of the following two hours interrogating Mr. May and Ms. Coster at the Half Moon Bay Substation, audio recording both.  After *Mirandizing* Mr. May, Defendant Laughlin lied to him, stating: "When you enter into someone's private property that's fenced in, it's going to count as commercial burglary, ok?"  (**Ex. B**, 146:25–147:4).  **Defendant Laughlin admitted that entering on someone's fenced-in property does not count as commercial burglary, conceding "[w]e discussed the elements of burglary.  I'm aware there's more**

**elements."**  (**Ex. B**, 148:8–21).  Defendant Laughlin also "might have" lied to Ms. Coster during her interrogation, falsely telling her that the reason for the fencing around the site was because "numerous people have burglarized it."  (**Ex. B**, 152:18–24).  When asked why he would have told her that, Defendant Laughlin testified:

> Q: Well, assuming that's what you told her, if you think you might have and there's a recording of it, why would you have told her numerous people had burglarized it when you've told us you had no information of any prior burglaries there?
> A: Maybe it was a ruse.  Maybe I was trying to get a statement out of her.  Maybe I was trying to get her to admit to stacking the items near the fence line as described.  I couldn't tell you.
> Q: What's a ruse?
> A: It's just a—I guess you can call it misinformation to try to get a statement out of somebody.
> Q: It's a lie, right?
> A: Don't know if I call it a lie.  I just call it misinformation.  That's what I call it.   You can call it what you want.

(**Ex B.**, 152:25–153:16).  During their respective interrogations, Mr. May and Ms. Coster both told Defendant Laughlin that they were on the site to look for her lost cat, and he believed them.  (**Ex. B**, 151:11–14; 153:17–24).  Defendant Laughlin agreed, as he wrote in his report, that at the conclusion of his investigation, he "found little evidence of a commercial burglary having occurred."  (**Ex. B**, 174:2–7).

Before taking Mr. May to the hospital, Defendant Laughlin cited him for two misdemeanors: trespass, in violation of California Penal Code § 602(m); and resisting, obstructing, or delaying a law enforcement officer in the lawful performance of his duties, in violation of California Penal Code § 148(a)(1).  (**Ex. B**, 158:13–20).  California Penal Code § 602 provides that "every person who willfully commits a trespass by any of the following acts is guilty of a misdemeanor: . . .(m) [e]ntering and occupying real property or structures of any kind without the consent of the owner, the owner's agent, or the person in lawful possession."  Cal. Penal Code § 602(m).  Like burglary, this too is a specific-intent crime, requiring proof of the arrestee's intent to occupy the real property or structure—as a squatter would.  *See People v. Wilkinson*, 248 Cal. App. 2d Supp. 906, 908 (1967) (holding that Cal. Penal Code § 602(m), then numbered 602(l), required the specific "inten[t] to remain permanently, or

1   until ousted, or in fact for any longer than just one night's sleeping out encampment.")[5].

2       Although Defendant Laughlin claimed to know the elements of § 602 (m) from having arrested

3   people under this section before, when he cited Mr. May for trespass in violation of § 602(m), he failed

4   to review the statute to make sure that he had probable cause for the arrest.  (**Ex. B**, 159:18–160:6).

5   California POST trains officers as follows regarding trespass: "[t]he crime of entering and occupying

6   real property occurs when a person does not obtain the consent of the owner, the owner's agent, or the

7   person in lawful possession before entering."  (**Ex. I**, POST LD 6, p. 3-4).  As Defendant Laughlin

8   agreed, POST teaches that trespass requires entering *and* occupying real property.  (**Ex. B**, 163:20–23).

9   POST defines "occupation" as "when a person exercises physical control over the land where the land

10  is possessed and enjoyed.  Subjects must actually use, control, and possess the property *over a period*

11  *of time*, or until they are asked to leave to satisfy the crime elements.  Transient, non-continuous

12  possession is not considered occupation."  (**Ex I**, POST LD 6, p. 3-5).  Defendant Laughlin agreed that

13  this definition of occupation comported with his basic police academy training.  (**Ex. B**, 164:14–16).

14  Yet he testified:

15      Q: Did you forget that an element of trespass was occupation when you cited him for it?
        A: **I don't know what I was thinking.**  I was thinking of trespass.

16      Q: And did you realize that when you signed this ticket citing him for trespass, that you
           were asking the district attorney to institute criminal charges against him?

17      A: Yes.

18  (**Ex. B**, 165:16–19) (emphasis added).

19      Defendant Laughlin also knew that § 148(a)(1) required that Mr. May's resistance be willful.

20  (**Ex. B**, 158:21–159:8).  And, he knew that § 148(a)(1) required the officer to be acting lawfully at the

21  time.  (**Ex. B**, 158:21–159:8).

22      Although Mr. May was in cuffs at 11:03 a.m.—only *two minutes* after officers radioed in their

23  arrival on scene—Defendant Laughlin did not transport him to the San Mateo Medical Center

24  ("CHOPE") emergency room until 1:14 a.m., about two hours later.  (**Ex. C**, CAD, p. 01883; **Ex. B**,

    179:25–180:2).  After transporting Mr. May to the hospital, Defendant Laughlin stayed for about 30

25

26

27  _____

28  [5] In 2003, the California legislature amended § 602, renumbering 602(l) to 602(m) without changing
    its substance.  2003 Cal. Legis. Serv. Ch. 805 (S.B. No. 993).

minutes, during which time Mr. May continued to be in handcuffs.  (**Ex. U**, 108:19–109:15).  Right before leaving, Defendant Laughlin put an "I Met Riggs" sticker on Mr. May's chest.  (**Ex. U**, 109:16–110:16).  Mr. May did not request the sticker.  (**Ex. U**, 110:17–21).  Mr. May understood that Defendant Laughlin was trying to downplay the situation's severity: "[t]rying to lighten up the situation."  (**Ex. U**, 111:3–10).

Mr. May's bite wounds were serious.  (**Ex. J**, Duri Dep., 46:11–47:14; **Ex. P**, Plaintiff's bite wound photos).  At the hospital, Mr. May underwent "a long painful procedure of cleaning each of the punctures" and received 7 stitches (**Ex. U**, 112:25–113:1; Dr. Houseman Decl. (Doc. 62-13)).  Lieutenant Duri looked at pictures of Mr. May's injuries and declared them "pretty severe.  A dog bite is a severe injury."  (**Ex. Y**, 46:11–47:14).  The wounds required multiple doctor visits during 2015, and about a year to fully heal.  (**Ex. L**, May Dep., 119:19–122:21)

The next morning, Ms. Coster saw Mr. May, and he was "a mess" and "in a lot of pain."  (**Ex. V**, 31:7–15).  After the incident, Mr. May was limping, and he told Ms. Coster that his leg still hurt and was very uncomfortable.  (**Ex. V**, 106:11–20).  Mr. May experienced pain while his injuries healed, and he could not stand or walk for six months.  (**Ex. U**, 123:21–125:22).

The San Mateo County District Attorney declined to file any charges against Mr. May.  (**Ex. Q**, San Mateo County Deputy District Attorney Jacquelyn Gauthier's memo to Defendant Laughlin, 01/22/2015).

On April 15, 2017, this Court granted in part and denied in part the parties' cross-motions for summary judgment.  (Doc. 78).  The following claims are going to trial:

| Claims against Defendant Laughlin | |
|---|---|
| | • § 1983 Fourth Amendment excessive force claim[6] |
| | • Assault and Battery (state law claim) |
| | • Bane Act, California Civil Code § 52.1 (state law claim) |
| | • False arrest (state law claim) |

---

[6] The Court dismissed Plaintiff's Fourth Amendment unlawful arrest claim with prejudice.  (Doc. 78, p. 26).  However, the Court subsequently granted Plaintiff's motion for reconsideration, limited to "whether the evidence gave Deputy Laughlin probable cause to think that Mr. May intended to steal.  (Or, more broadly but perhaps more exactly put, that he intended to commit a felony.)"  (Doc. 82, 2:3–5).

| | |
|---|---|
| | • Negligence (state law claim) |
| Claims against Defendant San Mateo County | • Assault and Battery (vicarious liability under California Government Code § 815.2) |
| | • Bane Act, California Civil Code § 52.1 (vicarious liability under California Government Code § 815.2) |
| | • False Arrest (vicarious liability under California Government Code § 815.2) |
| | • Negligence (vicarious liability under California Government Code § 815.2) |

## II. LIABILITY ISSUES

### A. Defendant Laughlin violated Mr. May's Fourth Amendment right to be free from excessive force.

"To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011). The parties have stipulated that Defendant Laughlin acted under color of law during his encounter with Plaintiff May. (*See* Joint Proposed Pretrial Order, Doc. 103, 2:19). Therefore, Plaintiff May need only prove that Defendant Laughlin deprived him of his Fourth Amendment right to be free from an unreasonable seizure.

Under the Fourth Amendment, police may use only such force that is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The essence of the *Graham* objective reasonableness analysis is that the *force* which was applied must be balanced against the *need* for that force: it is *the need for force* which is at the *heart* of the *Graham* factors." *Headwaters Forest Def. v. Cnty. of Humboldt (Headwaters II)*, 276 F.3d 1125, 1130 (9th Cir. 2002) (emphasis in original).

Under *Graham*, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (as amended). "Stated another way, we must balance the amount of force applied against the need for that force." *Id.*

"Thus, where there is no need for force, *any* force used is constitutionally unreasonable." *Lolli*

*v. Cnty. of Orange*, 351 F.3d 410, 417–418 (9th Cir. 2003) (emphasis in original); *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) ("Where [the governmental interests at stake] do not support a need for force, 'any force used is constitutionally unreasonable.'") (citing *Lolli*, *supra.*). "The amount of force used is permissible only when a strong government interest *compels* the employment of such force." *Tekle v. United States*, 511 F.3d 839, 844 (9th Cir. 2007) (emphasis in original).

Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 398. The en banc Ninth Circuit explains: "[t]he most important single element of the three specific factors" is "whether the suspect poses an immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc).

However, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). In particular, "objective facts must indicate that the suspect poses an *immediate threat* to the officer or a member of the public." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (emphasis added). Moreover, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Id.* at 826 (citing *Deorle*, 272 F.3d at 1281).

Police officers also must consider less intrusive alternatives to the force that was used as a part of the "totality of the circumstances." *Smith*, 394 F.3d at 701. In addition, "warnings should be given, when feasible, if the use of force may result in serious injury, and [ ] the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle*, 272 F.3d at 1284.

**"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."** *Smith*, 394 F.3d at 701 (emphasis added) (citing *Santos v. Gates*, 287

F.3d 846, 853 (9th Cir. 2002); *see also Liston v. Cnty. of Riverside,* 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.")); *see also Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury.").

### 1. Defendant Laughlin used a potentially deadly type and amount of force by siccing *Riggs* to bite and apprehend Mr. May.

"First, it is necessary to assess the quantum of force used to arrest [Mr. May].  The three factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure[.]"  *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).  To measure the quantum of force, a jury must consider both "'the type *and* amount of force inflicted.'"  *Deorle*, 272 F.3d at 1279 (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000)); *see also* Ninth Circuit Model Civil Jury Instruction 9.25, ¶5 ("the type and amount of force used.").

No Ninth Circuit case holds that the use of a police dog categorically does *not* constitute deadly force.  *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (en banc) specifically held "while we have not in any of our prior cases found the use of police dogs constituted deadly force, **we have *never* stated that the use of such dogs *cannot* constitute such force**."  *Id.* at 707 (emphasis added; footnote and citations omitted).  The *en banc* Court in *Smith* remanded the case for the jury to decide whether, under the facts of that case, the dog bite should be considered deadly force under the standard announced in *Smith*.  *Id.*

A rational jury could conclude that *Riggs* constituted the deadly "type" of force.  As this Court held, "[u]se of a trained police dog may be regarded as 'intermediate force' or deadly force,' depending on the factual circumstances in the case.'"  (*See* Doc. 78, 17:10–12) (quoting *Ledesma v. Kern Cnty.*, No. 1:14-cv-01634-DAD-JLT, 2016 U.S. Dist. LEXIS 156554, at * 28 (E.D. Cal. Nov. 10, 2016)); *see also Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1146 n.14 (E.D. Cal. 2016) (citing *Smith*, 394 F.3d at 705–07) ("Where a law enforcement officer uses a trained police dog, the level of force, whether intermediate or deadly force, is determined based upon the unique factual circumstances

of the case.") (emphasis added).

Indeed, a trained police dog is classified as intermediate or deadly force because of its *risk* of such harm. *See Scott v. Harris*, 550 U.S. 372, 383 (2007) ("[I]n judging whether [Deputy Laughlin]'s actions were reasonable, we must consider the *risk* of bodily harm that [Laughlin]'s actions posed to respondent in light of the threat to the public that [Laughlin] was trying to eliminate.") (emphasis added); *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citing *Deorle*, 272 F.3d at 1280) ("In light of this weapon's *dangerous capabilities*, '[s]uch force, though less than deadly, . . . is permissible only when a strong governmental interest compels the employment of such force.").

Indeed, to ignore the risk of serious injury by focusing exclusively on the actual injury that Mr. May sustained would run afoul of *Graham*'s mandate that the "reasonableness . . . be judged" prospectively and *not* "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In arguing that *Riggs* does not constitute a high level of force, Defendants employ 20/20 hindsight, focusing on the actual consequences of the force used on Mr. May rather than on the risk inherent in the type of force that deploying a canine to bite and hold represents. Defendant County's 30(b)(6) witness acknowledged the high level of force that police canines pose, and that Mr. May's bites were "pretty severe." (**Ex. Y**, 16:16–17:7; 46:11–47:14). Sgt. Ramos agreed that Mr. May's bite wounds looked like multiple bites to him, and he characterized them as "moderate" and required medical care. (**Ex. Z**, 83:1–11; **Ex. P**). The Canine Unit Supervisor acknowledged that a police dog can cause death. (**Ex. Z**, 22:1–3). Defendant Laughlin agreed that a single dog-bite wound could be very severe in itself, and Deputy Michel conceded that a canine like *Riggs* could kill someone. (**Ex. B**, 71:7–9; **Ex. R**, 89:19–24). While dogs like *Riggs* are trained to bite an exposed body part, such as arms and legs, *Riggs* could have just as easily bitten Mr. May elsewhere, causing even more serious injuries, or death. (**Ex. R**, 98:17–99:3).

Injuries caused by a use of force have relevance in balancing the level of intrusion to the individual against the governmental need for the force. *See Santos*, 287 F.3d at 853–54 (Where a takedown described by police as "merely assisting Santos to the ground" resulted in a fractured back, the Court found that "in light of his serious injury, the force used was both substantial and excessive."). As to the amount of force used, the multiple puncture bites and leg wounds with resulting infections

that Mr. May suffered would support a jury's conclusion that Defendant Laughlin used at least an intermediate, severe level of force on Mr. May.  *See Rodriguez v. City of Modesto*, No. 1:10-CV-01370-LJO-MJS, 2015 U.S. Dist. LEXIS 46109, at *42 (E.D. Cal. Apr. 8, 2015) (citing *Chew*, 27 F.3d at 1441) ("By all accounts, the force of the trained police dog used to arrest Rodriguez was 'intermediate' and 'severe,' as it resulted in multiple puncture bites and wounds to his legs.").

Yet, Defendants maintain that "[t]he force used in this case was, at most, moderate."  (Doc. 62, p. 8:27).

Defendants' police practices expert, Brad Smith, testified in this case that whether or not the use of a police dog to bite someone is a high level of force "depends on the dog itself, how much damage is actually done."  (Doc. 93, **Ex. N**, Brad Smith Dep., 80:3–4).  Mr. Smith testified that an officer should know the severity of the wound his dog is likely to cause based on the dog's "past history:"

> He might [know] based on the past history of his dog.  I've talked to several handlers that, you know, know that the dog just likes to bite clothing, or he doesn't, you know, get a real good, firm grip on the suspect, so they just know what the damage is going to be.  So they're basing that off on prior history.

(Doc. 93, **Ex. N**, Smith Dep., 82:25–83:8).  Deputy Laughlin's knowledge of "how much damage [Riggs has] actually done" to other people therefore is relevant to Laughlin's knowledge of the level of force *Riggs* posed to Mr. May.  The photographs of *Riggs'* other bites—particularly the *Riggs*/Laughlin bites of which Deputy Laughlin was aware before he ordered *Riggs* to bite Mr. May—therefore will assist the jury in determining Plaintiff's Fourth Amendment excessive force claim.

Here, Defendants' use of a canine to attack Mr. May resulted in multiple puncture wounds causing intense pain, infection, and requiring multiple medical visits and six months to heal fully.  (**Ex. U**, 119:7–128:11; **Ex. DD**, wound photo; **Ex. EE**, Medical Records).  Use of "intermediate force," though less severe than deadly force, "nonetheless present[s] a significant intrusion upon an individual's liberty interests."  *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161–62 (9th Cir. 2011) (citing *Smith*, 394 F.3d at 701–02).

1

2. **Defendant Laughlin lacked probable cause to arrest Mr. May for any felony, including but not limited to second degree (commercial) burglary in violation of California Penal Code §§ 459–460, thereby tilting the "severity of the crime" factor in Mr. May's favor.**

2

3

4

Defendant Laughlin lacked probable cause to arrest Mr. May for second-degree commercial burglary because he had no facts establishing Mr. May's specific intent to commit a felony inside a

5

structure.  As this Court held in its summary judgment order, "probable cause does not require

6

"conclusive proof of every element of some relevant crime."  (Doc. 78, p. 8).  Nevertheless, "when

7

specific intent is a required element of the offense, **the arresting officer must have probable cause**

8

**for that element** in order to reasonably believe that a crime has occurred."  *Gasho v. United States*, 39

9

F.3d 1420, 1428 (9th Cir. 1994) (citing *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 705 (9th Cir.

10

1989).[7]  *See also United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (following *Gasho*).

11

"Specific intent is an essential element of burglary."  *People v. Green*, 228 Cal. App. 2d 437,

12

439 (1964) (citing Cal. Penal Code § 459).  The *Gasho* Court explained this rule in the context of the

13

general rule that probable cause is not a rigid legal test:

14

15

16

17

18

The Supreme Court has insisted that probable cause analysis cannot rest on "rigid legal rules" but rather must rest on a "commonsense" approach that is "practical" and "nontechnical." *Illinois v. Gates,* 462 U.S. 213, 230, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983). We are mindful of this approach. In requiring probable cause for specific intent when specific intent is an element of the crime, we are not subjecting our probable cause analysis to "rigid legal rules." We believe it is a matter of common sense that before arresting a person for taking property in the custody of Customs, an officer should reasonably believe that the person intends to steal.

19

*Gasho*, 39 F.3d at 1429.

20

It is also clearly established that probable cause must be based on facts particular to the person

21

22

23

[7] The whole quote in context is as follows:

24

25

26

27

Because probable cause must be evaluated from the perspective of "prudent men, not legal technicians," *Brinegar v. United States*, 338 U.S. 160, 176, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949), an officer need not have probable cause for every element of the offense.  *United States v. Thornton,* 710 F.2d 513, 515 (9th Cir. 1983). However, when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred.  *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 705 (9th Cir. 1989).

28

*Gasho*, 39 F.3d at 1428.

to be arrested.  *See Marks v. Clarke*, 102 F.3d 1012, 1027 (9th Cir. 1996) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (emphasis added by *Marks* panel) ("'Where the standard is probable cause, a search or seizure of a person must be supported by *probable cause particularized with respect to that person*.'"); *see also Crowe v. Cnty. of San Diego*, 608 F.3d 406, 439 (9th Cir. 2010) ("[T]he Supreme Court and this Court have both long held that probable cause must be particularized with respect to the person to be searched or seized.") (citations omitted)).   "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.'"  *Lopez*, 482 F.3d at 1067 (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984)).

The elements for the crime of burglary, according to the Cal Crim Jury Instructions are: 1. The defendant entered a (building/room within a building/ locked vehicle/structure/ ); [AND] **2. When (he/she) entered a (building/room within the building/ locked vehicle/structure/ ), (he/she) intended to commit (theft/ [or, insert one or more felonies]** ). [AND] [3A. The value of the property taken or intended to be taken was more than $950] [OR] [3B. The structure that the defendant entered was a noncommercial establishment] [OR] [3C. The structure was a commercial establishment that the defendant entered during non-business hours.].  Judicial Council of California Criminal Jury Instructions "CALCRIM" (2016), 1700 (Burglary) (Cal. Penal Code § 459) (emphasis added).[8]  Thus, "[s]pecific intent is an essential element of burglary."  *People v. Green*, 228 Cal. App. 2d 437, 439 (1964).

Deputy Laughlin agreed that, to enforce the commercial burglary law (or any law), he needed to know the crime's elements.  (**Ex. B**, 83:2–16).  He agreed that to lawfully arrest for commercial burglary, he needed probable cause that: (1) the person had entered some sort of building or structure with (2) the intent to commit petty or grand theft.  (**Ex. B**, 86:12–20; 87:3–13).  This is essentially

---

[8] Even the crime of Aiding and Abetting Burglary requires specific intent:

> To be guilty of burglary as an aider and abettor, the defendant must have known of the perpetrator's unlawful purpose and must have formed the intent to aid, facilitate, promote, instigate, or encourage commission of the burglary before the perpetrator finally left the structure.

Judicial Council of California Criminal Jury Instructions, "CALCRIM" (2016), 1702 (Burglary—Intent of Aider and Abettor)

1    what police officers in California are trained in the police academy:

2        **For the crime of burglary to be complete, it must be shown that the burglar entered the
         building or structure for the purpose of committing grand theft, petty theft, or some other
3        felony offense (e.g., assault, rape, mayhem, arson, murder, et cetera).  Without this
         specific intent, the individual may have committed a different crime, such as
4        unauthorized entrance or trespass,** *but* **not burglary.**

5    (Doc. 61, **Ex. I**, POST Learning Domain 6, p. 1-30 (italics in original)).  Defendant Laughlin admitted

6    that entering on someone's fenced-in property does not count as commercial burglary, conceding "[w]e

7    discussed the elements of burglary.  I'm aware there's more elements."  (**Ex. B**, 148:8–21).  Defendant

8    Laughlin knew that probable cause to arrest for burglary requires some evidence that a person entered

9    a building or structure with the intent to steal or commit a felony.  (**Ex. B**, 168:8–13).  Yet Defendant

10   Laughlin admitted that, before sending *Riggs* to bite Mr. May, Defendant Laughlin had no specific

11   information that the man in the plaid shirt had ever entered any building or structure on the

12   construction site:

13       Q: So you had no specific information that Mr. May had ever entered any building or
            structure on that site before you sent the dog over to bite him; is that right?

14       A: That's correct.

15   (**Ex. B**, 169:5–8).

16       As this Court found in its summary judgment order, Defendant Laughlin had ***no facts*** that

17   ***anyone*** ever entered any structure or building on the construction site.  (Doc. 78, p. 2:13-17).

18   Moreover, Deputy Laughlin also had no facts that while in a building, Mr. May, or anyone else,

19   intended to commit theft or another felony.  *Id*.  Defendant Laughlin acknowledged that, when he

20   arrived at the construction site, he needed to investigate to ascertain whether a commercial burglary

21   was occurring or had occurred.  (**Ex. B**, 78:23–24; 80:10–15).[9]  He received no further information

22   before sending his dog to bite and apprehend Mr. May for commercial burglary.  (**Ex. B**, 92:1–14).

23   Deputy Laughlin stated simply that his factual basis for arresting Mr. May was "based on the reporting

24

25   ───────────────────────

26   [9] Defendants Laughlin, Michel, and Deputies Sanchez, De Martini, and King all agree that dispatch
     provided them information about only a *possible* commercial burglary in progress.  (Doc. 61, **Ex. B**,
27   80:10–13; **Ex. A**, 44:14–21; **Ex. D**, De Martini Dep., 7:21–23; **Ex. E**, King Dep., 18:25–19:06).

28

party's information.  ·Obviously I don't have time to verify that.·  It's an in-progress burglary.·  That's

based on my observations of a person dressed in dark clothing with a flashlight standing near a point of

entrance/exit.  (**Ex. B**, 99:9–16).  He confirmed that he saw Mr. May "Outside of the structure."  *Id.*

     **"'Probable cause is lacking if the circumstances relied on are 'susceptible to a variety of credible interpretations not necessarily compatible with nefarious activities.'"**  *Gasho*, 39 F.3d at 1432 (quoting *United States v. Moore*, 483 F.2d 1351, 1363 (9th Cir. 1973)) (emphasis added).

     Defendant Laughlin claims that the following facts "would lead a reasonable officer to infer [felonious] intent[:]" (1) "that it was 11:00 p.m.[;]" (2) "that the suspects had crossed a security fence bearing signage warning people of video surveillance and admonishing them to 'Keep Out;' (3) that the suspects were stacking items along the fence; and (4) that, based on Defendant Laughlin's experience and training, construction sites are common targets of commercial burglary.  (Doc. 65, p. 8:10–14).  None of these facts establishes either element of § 459.  Instead, these facts are "susceptible to a variety of credible interpretations not necessarily compatible with nefarious activities[,]" *Gasho*, 39 F.3d at 1432, including (arguably) a petty thief (but not a felonious commercial burglar), or (arguably) a trespasser, or a homeless person entering the site looking for shelter, or teenagers exploring at night—or a person looking for a cat.  As a result, probable cause for the specific intent felony, commercial burglary, was lacking.

     Further, even if a jury were permitted to find that there was probable cause to arrest Mr. May for second degree commercial burglary, the nature of that crime provides no basis for Defendant Laughlin's use of force.  Defendants concede that second-degree commercial burglary is a property crime.  (**Ex. Y**, 49:4–6; **Ex. B**, 162:24–163:1; **Ex. K**, 66:25–67:2).  Defendants claim that commercial burglary is a "violent felony" because "[i]t could turn violent."  (**Ex. Z**, 40:14–20).  At most, commercial burglary raises *potential* threats.  *See Chew*, 27 F.3d at 1443 n.9 (citing *Tennessee v. Garner*, 471 U.S. 1, 21 (1985)) ("In *Garner*, the Court noted that the fact that 'an unarmed suspect has broken into a dwelling at night does not automatically mean that he is physically dangerous.'  The Court also took notice of statistics showing that burglaries only rarely involve physical violence, and of the FBI's classification of burglary as a 'property' rather than a 'violent' crime.").

No case holds that second-degree commercial burglary is an inherently dangerous felony. *Frunz v. City of Tacoma*, 468 F.3d 1141 (9th Cir. 2006), which Defendants have relied on, was an appeal of a jury verdict against defendant officers for effecting a warrantless entry of plaintiffs' home. *Frunz*, 468 F.3d at 1144. No burglary was at issue; the officers only knew a neighbor "suggested that unauthorized people may be in the house," but "also made clear that this was not a break-in by strangers." *Id.* The panel noted that "it was clear from the information available to the officers that they were dealing, at worst, with some sort of spousal property dispute." *Id.* at 1145. In dicta—without citing any authority—the panel added in passing: "Normally, when officers suspect a burglary in progress, they have no idea who might be inside and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance." *Id.* *Frunz* also was discussing first degree burglary in a dwelling rather than second degree commercial burglary. Defendants have also relied on selective quotations from *People v. Montoya*, 7 Cal. 4th 1027 (1994); the entire passage in context is as follows:

> 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder **will harm the occupants** in attempting to perpetrate the intend crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.' Section 459, in short, is aimed at the danger caused by the unauthorized entry itself.'

*Montoya*, 7 Cal. 4th at 1042 (quoting *People v. Gauze*, 15 Cal. 3d 709, 714 (1975) (quoting *People v. Lewis*, 274 Cal. App. 2d 912, 920 (1969)) (emphasis added)). The above-cited passage applies to residential burglaries of occupied dwellings; here, it is undisputed that there were no occupants at 1 Bloom Lane. For the same reason, *People v. Garcia*, 62 Cal. 4th 1116, 1125 (2016), which also concerned an occupied structure, does not apply to the facts of this case. Defendants have also cited *People v. Elsey*, 81 Cal. App. 4th 948, 959 (2000), which merely quotes *Montoya*. Finally, Defendants have relied on *Mighell v. City of Edmonds*, No. C14-0285 RSM, 2015 U.S. Dist. LEXIS 28610, at *3 (W.D. Wash. Jan 22, 2015), but that case did not hold that burglary is an inherently dangerous crime; rather, the court was merely summarizing Defendants' evidence on summary judgment:

> Once on the scene, Sergeant McClure made the decision to begin his investigation, without awaiting backup, in an effort to stop the burglary and catch the perpetrators. (Id.) Sergeant McClure also made the decision to get Dash out of the car with him because of heightened officer safety concerns associated with the type of crime he believed he was likely to encounter and because of the fact that there were no other officers to provide backup. (Id. at 2-3.)

**According to Sergeant McClure, nighttime commercial burglaries typically involve more sophisticated criminals who are more likely to be armed, are more likely to have assistance from other individuals, and are more likely to be prior felons with knowledge of how to thwart law enforcement. (Dkt. 31 at 2-3.) Commercial burglars are also more likely to carry tools such as pry bars, bolt cutters, and/or screwdrivers which can be used as weapons.** (Id. at 2.)

*Mighell*, 2015 U.S. Dist. LEXIS 28610, at *3 (emphasis added).  Also, *Mighell* is not binding on this Court.  Again, at most, second degree commercial burglary involves *potential* threats.

Should this Court grant Plaintiff's motion for reconsideration, and instruct the jury that Defendant Laughlin did not have probable cause to arrest Mr. May for commercial burglary, Defendant Laughlin will argue that he had probable cause to arrest Mr. May for trespass, in violation of California Penal Code § 602(m), or resisting arrest, in violation of California Penal Code § 148(a)(1).  However, **"the Ninth Circuit has found that misdemeanors, even multiple misdemeanors, that are not 'inherently dangerous or violent' do not justify a significant use of force."** [10] *Azevedo v. City of Fresno*, No. 1:09-CV-375 AWI DLB, 2011 U.S. Dist. LEXIS 10132, at *28–29 (E.D. Cal. Jan. 25, 2011) (**suspected burglary, trespass, squatting,** violation of Cal. Penal Code § 148, and motorcycle theft did not justify use of the Taser in dart mode) (citing *Bryan*, 630 F.3d at 828-29 & ns.11–12) (resisting an officer, failing to comply with a lawful order, and being under the influence of a controlled substance are minor misdemeanors that do not justify the use of intermediate force) (emphasis added)).  In fact, as Sergeant Ramos conceded, even if a canine handler has probable cause to arrest for a misdemeanor—such as trespass or a violation of California Penal Code §148—the handler may not deploy his police dog, because these crimes lack the severity to justify a canine's high level of force.  (**Ex. Z**, 26:8–10; 41:3–11; 87:25–88:9).

---

[10] The Ninth Circuit has explained that though the "crime's status as a misdemeanor or felony is not the key question" in evaluating the severity of the crime at issue, it "provides a rough proxy for the true object of the court's inquiry: whether a given offense indicates a suspect's potential dangerousness, immediate or otherwise, such that there is a heightened social interest in the use of force to apprehend or subdue that suspect."  *Young*, 655 F.3d at 1165, n.8 (citing *Tennessee v. Garner*, 471 U.S. 1, 14 (1985)).

### 3. No reasonable jury could find that Mr. May posed an immediate threat to Defendant Laughlin's or anyone's safety.

"The most important single element of the three specific [*Graham*] factors" is "whether the suspect poses an immediate threat to the safety of the officers or others." *Smith*, 394 F.3d at 702. Ninth Circuit precedent requires officers to base immediate threats on objective facts—not generalized fears for officer safety—and the potential threats and generalized concerns Defendant Laughlin testified about cannot, as a matter of law, constitute immediate threats. *See Deorle*, 272 F.3d at 1281 ("A simple statement by an officer that he fears for his safety or the safety of others is not enough; *there must be objective factors* to justify such a concern."); *Bryan*, 630 F.3d at 826 ("*the objective facts* must indicate that the suspect poses an immediate threat to the officer or a member of the public"); *Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007) (vague suspicions or *generalized concerns* that a person presents officer safety issues cannot justify a use of force); *Mattos v. Agarano*, 661 F.3d 433, 444, n.5 (9th Cir. 2011) (en banc) (explaining critical distinction between *potential threat* and *immediate threat*).

Also, last year in *A.K.H. v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016), the Ninth Circuit again explained **the important distinction between potential and immediate threats**. In *A.K.H.* police were looking for a gang member, wanted for stealing girlfriend's cell phone and hitting her with it, but who was not known to be armed. Officers approached the man from their car while he was walking in street. The passenger officer, driving behind and to the left of the man, saw something heavy in man's "hoodie" pocket. The officer drew his own gun and ordered the man to show his hands. The man quickly removed his right hand from his sweatshirt pocket in a dramatic arcing motion over his head. In response, the officer fired two shots, without warning, because he "believe[ed] that [the man] had a weapon and he was going to use that weapon on [him]." *A.K.H.*, 837 F.3d at 1008–09. The Court explained that "[t]he most important" factor is "whether the suspect posed an **immediate threat** to the safety of the officers or others." *Id.* at 1011 (citing *Mattos*, 661 F.3d at 441 and *Smith*, 394 F.3d at 702). "It is also clear in retrospect that Herrera posed no threat to the safety of the officers, as he in fact had no weapon; but the relevant question for purposes of qualified immunity is whether Officer Villarreal could reasonably have believed that Herrera posed such a threat. Viewing the evidence in the light most favorable to Plaintiffs, we conclude that he could not." *Id.* at 1011–12.

"Most important, viewing the facts in the light most favorable to Plaintiffs, **Officer Villarreal in this case had no more reason to suspect that Herrera was armed than did the officer in *Garner*. The officer in *Garner* stated that the suspect 'appeared to be unarmed' but that he 'could not be certain that was the case.' … The [*Garner*] Court explained, 'Restated in <u>Fourth Amendment</u> terms, this means [the officer] had no articulable basis to think Garner was armed.'  The same is true here."**  *Id*. at 1013 (emphasis added).

As a matter of law, Defendant Laughlin's generalized concerns about risks are of no avail.  "A desire to resolve quickly *a potentially dangerous* situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury."  *Bryan*, 630 F.3d at 826 (citing *Deorle*, 272 F.3d at 1281); *see also Mattos*, 661 F.3d at 444 (where woman physically resisted order to get out of car during traffic stop, court refused to consider *possibility* that she could drive away as an immediate threat to justify intermediate force of Tasing her).  Defendant Laughlin's speculation about what could (or could not) have been in Mr. May's waistband does not rise to the level of an immediate threat.  *See Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1146 n.8 (W.D. Wash. 2007), *aff'd*, 301 F. App'x 704 (9th Cir. 2008) (holding that an officer's concern that plaintiff, wearing an untucked t-shirt obscuring his waistband, "might have a weapon hidden in the waistband of his pants" is "[a]n example of how defendants *stretch 'immediate threat' to encompass 'possible threat'*") (emphasis added).

No one alleges they ever saw Mr. May try to pull anything out of his waistband.  Mr. May was simply standing frozen, with his arms at his sides.  The record—and Defendants' own admissions—fail to show any basis for believing that Mr. May was armed or that he posed an immediate threat to anyone's safety.  *See Chew*, 27 F.3d at 1441 (observing that "[t]he record does not reveal an articulable basis for believing that Chew was armed or that he posed an immediate threat to anyone's safety . . . [or] engaged in any threatening behavior during this time . . . a rational jury could easily find that Chew posed no *immediate* safety threat to anyone.") (emphasis in original).

Indeed, Defendant Laughlin admitted he would not have been justified in using another form of intermediate force—such as a Taser—against Mr. May, "[b]ecause a Taser requires an immediate threat."  (**Ex. B**, 126:25–127:9).  *See Bryan*, 630 F.3d at 825–26 (defining Taser as intermediate force).

Even if Mr. May were walking away, Lt. Duri admitted: "just by walking away from an officer, no, that's not a threat."  (**Ex. J**, 42:25–43:20).  *See Fuller v. Cantrell*, No. C-03-5616 MMC (PR), 2005 U.S. Dist. LEXIS 37014, at *6–*8 (N.D. Cal. July 27, 2005) (quoting *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998) (denying summary judgment where plaintiff stood still and froze, and had otherwise surrendered, yet defendant canine handler released a dog to bite and hold him; accepting plaintiff's account, the officer's "conduct cannot, for purposes of summary judgment, be considered reasonable.")).

Defendants have placed too much stock in *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003), where that plaintiff had actually fled, had been armed, and was evading arrest; Mr. May was not known to be armed, and was just standing still.  *See Fuller*, 2015 U.S. Dist. LEXIS 37014, at *11–12 (distinguishing *Miller* on this same basis).  *See also French v. Carson City*, No. 3:13-cv-00209-HDM-WGC, 2015 U.S. Dist. LEXIS 13992, at *18, n.6 (D. Nev. Feb. 4, 2015) (quoting *Miller*, 340 F.3d at 965) (distinguishing *Miller* because there officers had "some indication the plaintiff could be armed and the plaintiff had actually fled from the officers and was in an area that the plaintiff knew well but the officers did not[,]" and observing that "[there is no evidence . . . the plaintiff in this case could have been armed, nor had he fled[;] consequently, plaintiff could not have 'generat[ed] surprise, aggression, and death" in the same way as the *Miller* plaintiff).  Here, as in *Smith v. City of Hemet,* 394 F.3d at 702 and *A.K.H.*, *supra*, the deputies had no factual basis to believe that Mr. May was armed, as they admitted at their depositions.

The lack of **any** immediate threat that Mr. May posed weighs against finding that Defendant Laughlin had an interest justifying the significant, potentially deadly force used.

> ### 4.  Mr. May was neither resisting arrest nor fleeing: he was either standing still, moving slowly, failing to obey Defendant Laughlin's alleged commands, or moving his legs in pain while being bitten.

"Apart from the dispute over whether he moved away from the police, and whether he moved in a way that suggested he was trying to flee, there has been no suggestion that Mr. May resisted the deputies.  Indeed, Deputy Laughlin testified that, once Riggs had bitten him, Mr. May was not resistive."  (Doc. 78, 4:10–13).  According to Mr. May, he stood still the entire time, because he thought that Defendants were going to come talk to him, and he was going to explain to them that he

was there to rescue a cat.  Even on Defendants' best version of the facts, Mr. May was only ever moving his body slowly, which does *not* warrant the intermediate, potentially deadly force used, especially given the total lack of other factors favoring the use of force.

Furthermore, even assuming Defendant Laughlin did command Mr. May repeatedly to "show hands,"—and Mr. May heard him and failed to comply—bedrock Ninth Circuit law holds that such mere non-compliance with an officer's orders is not "active resistance" justifying severe, injurious force.  *See Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) ("In prior cases, we have recognized that **a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force**.  We have so held even when the extent of the resistance was substantially greater[.]") (emphasis added; collecting cases).  Mr. May's instinctive, primordial reaction to getting bit by *Riggs*—moving his legs to make it stop—cannot constitute willful resistance, just as the SMCSO trained its deputies.  Mr. May endured an "extremely painful" experience.  (**Ex. U**, 71:20–25).  Mr. May's resistance was involuntary, not willful "kicking the dog."  *See French*, 2015 U.S. Dist. LEXIS 13992, at *19–20 (denying summary judgment because "[a] question of fact exists as to the degree to which plaintiff resisted arrest, even under defendants' version of events," where "[a] jury could conclude the plaintiff's conduct was in fact relatively mild and perhaps even passive rather than threatening.").

### 5.  Defendant Laughlin's failure to warn Mr. May before releasing *Riggs* to attack him weighs in favor of finding a Fourth Amendment violation.

Clearly established Ninth Circuit law required Defendant Laughlin to warn Mr. May *before* he used potentially deadly force on him.  *See Deorle*, 272 F.3d at 1284 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and [ ] the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."); *Glenn*, 673 F.3d at 876 (holding that warning should have been given immediately before use of force; earlier warnings were inadequate).  An officer's failure to warn of the imminent use of force weighs in favor of finding a constitutional violation.  *Hesterberg v. United States*, 71 F. Supp. 3d 1018, 1031 (N.D. Cal. 2014) (citing *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013)).  For this very reason, as discussed *supra*, Defendant San Mateo County required its canine handlers both to make the canine announcement-warning *audibly* and to take steps to ensure the suspect actually heard it.  A rational

1    jury could easily find that Defendant Laughlin failed to properly warn Mr. May before subjecting him

2    to potentially deadly force.

3            Throughout this case, Defendants have conflated a command with a warning.  *Nelson v. City of*

4    *Davis*, *supra,* provides guidance on what constitutes a sufficient warning.  There, the panel applied the

5    *Graham* balancing test and concluded that the police's use of intermediate force—firing a pepper-

6    ball—at a partygoer at U.C. Davis, injuring him, was unreasonable under the Fourth Amendment.

7    *Nelson*, 685 F.3d at 883.  Crucial to the unreasonableness of the officer's use of intermediate force was

8    the officer's failure to give an explicit, verbal warning before firing.  The panel remarked that "there

9    [wa]s nothing in the record that indicate[d] that the group was told prior to the shooting how they

10   should comply with the dispersal orders . . . or that force would be used against them if they did not

11   behave in a particular manner."  *Nelson*, 685 F.3d at 882–83.  Therefore, the panel concluded, "the

12   failure to give sufficient warnings" weighed against the government's decision to use force against a

13   suspect and his friends.  *Id.* at 883.  In *Bryan*, the Court also explained the meaningful difference

14   between a command and a warning.  *Bryan*, 630 F.3d at 831.

15           Thus, the Ninth Circuit instructs that a sufficient warning tells the suspect, (1) immediately

16   preceding the use of force; (2) that the law enforcement officer will use a particular type of force; and

17   (3) what the suspect must do to avoid the use of that force.  *See Glenn, supra, Nelson, supra.  See also*

18   *Bryan*, 630 F.3d at 831 ("Here, it was feasible to give a warning that the use of force was ***imminent*** if

19   Bryan did not comply.  While a warning to Bryan may or may not have caused him to comply, there

20   was 'ample time to give that order or warning and no reason whatsoever not to do so.'") (emphasis

21   added) (citing *Deorle*, 272 F.3d at 1284)).

22           Therefore, Defendants' reliance on *Conerly v. Flores*, No. 4:15-cv-04079-KAW, 2016 U.S.

23   Dist. LEXIS 162822, at *15–16 (N.D. Cal. Nov. 23, 2016) is unpersuasive; that case dealt not with

24   whether plaintiff heard a warning before the use of force, but whether he heard a **command** to stop.

25   Similarly unpersuasive is Defendants' reliance on *Mighell v. City of Edmonds*, No. C14-285-RSM-

26   MAT, 2015 U.S. Dist. LEXIS 26610, at *19 (W.D. Wash. Jan 22, 2015); there, the court did not

27   address the warning requirement, but whether plaintiff resisted arrest by failing to heed an officer's

28   command.  Nor does *McKay v. City of Hayward*, 949 F. Supp. 2d 971, 979–982 (N.D. Cal. 2013)

support Defendants; there, the court found a violation of rights on the plaintiff's facts, including the officers' failure to warn, so any precedential value it has favors Mr. May, because it actually put Defendant deputies on notice that a failure to warn is unreasonable.

### 6. Defendants Laughlin and Michel had less intrusive alternatives to using *Riggs* against Mr. May, a visibly older man.

Police officers also must consider less intrusive alternatives to the force that was used as a part of the "totality of the circumstances." *Smith*, 394 F.3d at 701; *Deorle*, 272 F.3d at 1282. *See also* Ninth Circuit Model Civil Jury Instruction 9.25. The inquiry is whether Defendants "could have altered their tactics to bring them in compliance with their own training, which would have minimized the degree of force applied or eliminated the need for force altogether." *Nelson*, 685 F.3d at 882.

Here, Defendants had less intrusive alternatives to the high level of force deployed on this sixty-two-year-old, non-threatening man suspected of a non-violent property crime. The SMCSO requires canine handlers to consider *alternatives* before deploying their canines. (**Ex. B**, 59:19–23). For example, a canine handler who sees a non-threatening person standing motionless may just call off the dog. (**Ex. J**, 21:4–9). Or, a canine handler may command the dog to "*gib laut*" or audibly bark, while on leash, as a "show of force" to intimidate the suspect into complying. (**Ex. B**, 25:9; **Ex. Z**, 27:3–12). Or, a canine handler may keep the dog on leash while approaching the suspect and continuing to give commands. (**Ex. Z**, 89:21–25). Defendant Laughlin did none of these. Other alternatives existed. (**Ex. BB**, Burwell Rule 26 Report, p. 14).

Further, Defendant Laughlin, and Deputies Sanchez and Michel, all out-numbered Mr. May, out-equipped him, and they were all physically larger and stronger than Mr. May. Mr. May could not easily flee the construction site still surrounded by the high fence, and Deputies King, DeMartini, Zeugin, and Sergeant Loubal—were on the perimeter.

Moreover, this was not an instance where officers had to make "split-second judgments" in "rapidly evolving" circumstances. *Garner*, 471 U.S. at 20 (deadly force standard does not require officers to make "impossible, split-second evaluations of unknowable facts."); *see also Chew*, 27 F.3d at 1443 ("Chew was trapped . . . There was time for deliberation and consultation with superiors.").

In addition, the jury may consider whether Defendant Laughlin reasonably should have known that Mr. May was susceptible to an increased risk of harm from the use of force. *Mattos,* 661 F.3d at

1   445; *Winterrowd*, 480 F.3d at 1186.  Before using force, a deputy should take into account a person's

2   physical prowess and age.  (**Ex. Y**, 34:22–25; 35:18–20).  Although Defendant Laughlin testified that

3   he could not tell what age Mr. May was, a jury could disbelieve him and find that Mr. May was readily

4   observable as a sixty-two-year-old man.   (**Ex. B**, 105:17–19).  Mr. May's visibly apparent older age

5   weighs against finding any governmental need to use force.  (**Ex. FF**, Photo of Mr. May).

6       **B.**     **Defendant Laughlin does not have qualified immunity for his violations of Mr.**
            **May's clearly established right.**

7       "[Q]ualified immunity is an affirmative defense, *Harlow*, 457 U.S. at 815, and the burden of

8   proving the defense lies with the official asserting it."  *Houghton v. South*, 965 F.2d 1532, 1536 (9th

9   Cir. 1992) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 819 (1982)).  *See also Moreno v. Baca*, 431

10  F.3d 633, 638 (9th Cir. 2005) (defendant "bears the burden of proof" to establish qualified immunity);

11  *Collins v. Jordan*, 110 F.3d 1363, 1369 (9th Cir. 1997) ("It is the defendant's burden to show that a

12  reasonable . . . officer could have believed, in light of the settled law, that he was not violating a

13  constitutional or statutory right."). (citation and internal quotation marks omitted)).

14      The affirmative defense of qualified immunity has a two-step analysis.  *Pearson v. Callahan*,

15  129 S. Ct. 808, 818 (2009).  Taking the facts in the light most favorable to the plaintiff, the Court may

16  choose to first determine whether the violation of a constitutional right could be established, or it may

17  choose to first decide whether that right was clearly established at that time under the circumstances.

18  *Id.*; *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168 (9th Cir. 2013)

19  ("[T]ypically, taking the facts in the light most favorable to the plaintiffs, we first ask whether those

20  facts demonstrate that the defendant police officers violated one or more of the plaintiffs'

21  constitutional rights.") (citations omitted).

22      "To complete the second step of the qualified immunity analysis, we place our hypothetical

23  reasonable officer in the same situation as the defendant police officers, and then ask whether the

24  reasonable officer also would have committed the act that the plaintiffs contend is unconstitutional."

25  *Johnson*, 724 F.3d at 1168.  "If the answer is 'yes,' the defendant officers are entitled to qualified

26  immunity.  If the answer is "no," the plaintiffs' claim against the defendant officers may proceed."  *Id.*

27  (internal citations omitted).  ". . . Fourth Amendment issues [] are evaluated for objective

28  reasonableness based upon the information the officers had when the conduct occurred."  *Saucier v.*

*Katz*, 533 U.S. 194, 207 (2001).

> **1. At or after trial, this Court must determine the purely legal question of whether the law was clearly established—and special interrogatories to the jury are improper where the jury's liability verdict necessarily implies facts that would render the Defendant's conduct unlawful under clearly established law.**

In the Ninth Circuit, qualified immunity at trial is disfavored, may only be considered in a Rule 50 motion, and special factual interrogatories to the jury generally are inappropriate. *Tortu v. Las Vegas Metro. Police Dep't.*, 556 F.3d 1075, 1085 and n.9 (9th Cir. 2009). The *Tortu* Court explained, at trial, qualified immunity must only be addressed in a Rule 50 motion, either before or after a jury verdict: "As a question of law, the second part of this analysis, when brought at this late stage, is an issue for a judgment as a matter of law under Rule 50(a) and (b)." *Tortu*, 556 F.3d at 1085. Because step two of the qualified immunity analysis "is solely a question of law for the judge," **the district court properly declined a jury instruction on qualified immunity**. *Id.* [11]

The Supreme Court also has held that where triable issues of fact preclude the granting of qualified immunity before trial, then if the requirements of Rule 50 are met, qualified immunity may be considered again after trial as part of a Rule 50 motion. *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) ("After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense. *See* Fed. Rule Civ. Proc. 50(a) and (b)"). Because the defendants in *Ortiz* failed to make a proper motion for Judgment as a Matter of Law (JMOL) before the verdict under Rule 50(a), they were deemed to have waived any post-verdict qualified immunity defense that turned on disputed facts. *Id.*

In the Ninth Circuit, special factual interrogatories to the jury are neither necessary nor appropriate where the implicit factual findings supporting the jury verdict show that the defendant violated a clearly established right. *A.D. v. California Highway Patrol*, 712 F.3d 446 (9th Cir. 2013)

---

[11] The Ninth Circuit does not propose any model jury instruction for qualified immunity. *See*, Ninth Circuit Model Civil Jury Instruction 9.34, Comment: "The committee has not formulated any instructions concerning qualified immunity because most issues of qualified immunity are resolved before trial or the ultimate question of qualified immunity is reserved for the judge to be decided after trial based on the jury's resolution of the disputed facts." *Id. See also*, *Tortu*, 556 F.3d at 1085 (noting that the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation").

(once jury found that defendant officer violated due process right when he acted with a purpose to cause death unrelated to a legitimate law enforcement purpose, court was "essentially compelled" to deny qualified immunity, as that right was clearly established); *Torres v. City of Los Angeles*, 548 F.3d 1197, 1212 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1995 (2009) (under deferential Rule 50 standard, where there was sufficient evidence for a jury to find that defendant officers arrested plaintiff without probable cause, defendants were not entitled to qualified immunity as a matter of law).

The Federal Judicial Center publication, Martin A. Schwartz, Fed. Judicial Ctr. (FJC), *Section 1983 Litigation* 158 (2014), describing varying practices among all circuits, states, "[i]t may be proper" for a district court either to instruct the jury on qualified immunity [which is clearly disfavored in the Ninth Circuit; *see Tortu, supra*.] or "submit the factual issues that are material to qualified immunity to the jury by special verdicts," while reserving step two for the court based on the jury's answers to special interrogatories.  For those general practices, the FJC guide cites many out-of-circuit cases, but only to *A.D., supra.,* and *Torres, supra.*, from the Ninth Circuit, and neither of those cases apply those practices in this Circuit.

There were no special interrogatories given to the juries in either *A.D.* or *Torres*.  In fact, *A.D.* followed and applied *Tortu*, holding again that at trial, qualified immunity must be assessed in the context of a Rule 50 motion.  *A.D.*, 712 F.3d at 452, n. 2.  Reaffirming that as in all Rule 50 motions, either before or after verdict, all facts and inferences must be construed in favor of the non-movant and in favor of the verdict, *A.D.* noted, "[d]eference to the jury's view of the facts persists throughout each prong of the qualified immunity inquiry." *A.D.*, 712 F.3d at 456 (citing *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 528 (1st Cir. 2009)).  The *A.D.* Court simply reviewed the facts that could have supported the verdict and denied the defendants qualified immunity accordingly:

> Further, because we are confined to the jury's factual finding that Markgraf acted with a purpose to cause Eklund's death unrelated to any legitimate law enforcement objective, we are essentially compelled to deny Markgraf qualified immunity--it would be "clear to a reasonable officer" that killing a person with no legitimate law enforcement purpose violates the Constitution.
>
>           *        *        *
>
> Therefore, we affirm the district court's denial of Markgraf's renewed motion for JMOL. The jury reasonably found that Markgraf shot Eklund with a purpose to harm unrelated to the legitimate law enforcement objectives of arrest, self-defense, or defense of others. It was clearly established before their encounter that such conduct violated Plaintiffs' substantive due process rights. Therefore, Markgraf is not entitled to qualified immunity.

*A.D.*, 712 F.3d at 454, 458 (citations omitted).

Similarly, in *Torres*, where the Ninth Circuit reversed a Rule 50 grant of JMOL to the defendants before that case had even been submitted to the jury, the Court held that because there were sufficient facts for a jury to find that defendants lacked probable cause for an arrest, and the law requiring probable cause was clearly established, the defendants were not entitled to qualified immunity "as a matter of law." *Torres*, 548 F.3d at 1211–12. Again, no special interrogatories were required or even suggested. *Id.* The *Torres* Court also noted that "the reasons for the existence of the qualified immunity doctrine 'do not suggest that a *judicial* determination at [the trial] stage is necessarily better than a jury verdict.'" *Id.* (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994)) (emphasis in original). "Indeed, we have explained that 'sending the factual issues to the jury but reserving to the judge the ultimate "reasonable officer" determination leads to serious logistical difficulties.'" *Id.*

The Ninth Circuit discourages special factual interrogatories due to the confusion they can create both with the jury and on appeal. *Ayuyu v. Tagabuel*, 284 F.3d 1023, 1025 (9th Cir. 2002). Where the jury in a police misconduct case had been given a series of special interrogatories tracking the allegations in the complaint, the Court wrote, **"[t]rue to the reputation of special interrogatories in tort cases as the darling of the insurance industry, the verdict form created more legal questions than the pleadings and evidence had presented."** *Id.*

Asking the jury to decide special interrogatories concerning discrete facts undermines the "totality of the circumstances" test by which courts and juries must assess the objective reasonableness of arrests and uses of force under the Fourth Amendment:

> When one picks and chooses a few questions to pose to a jury to ferret out historical facts, staying away from asking the broader question of what constitutes reasonable behavior under those facts, one cannot help but focus attention on some events to the diminution or exclusion of others. In short, a totality-of-the-circumstances test is replaced by a test focusing on those few circumstances featured in the questions a court is able and willing to articulate.

*Curley v. Klem*, 499 F.3d 199, 212 (3d Cir. 2007).

Thus, in another Fourth Amendment case, this time based on an excessive force claim, the Ninth Circuit reversed a district court's grant of JMOL for the defendants after verdict, holding that the defendant officers were not entitled to qualified immunity because based on the **"factual findings the**

**jury must have made to reach its verdict,"** those defendants violated clearly established law. *Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1147–48 (9th Cir. 1996), *cert. denied* 519 U.S. 1009 (1996). **Again, without any special interrogatories, the Ninth Circuit reviewed the post-verdict facts in the light most favorable to the plaintiff and the verdict, and measured such facts against clearly established Fourth Amendment law.** *Id.*

Even in other circuits that may submit special interrogatories to the jury concerning factual issues related to qualified immunity, that procedure is limited to "exceptional circumstances." *See, Keylon v. City of Albuquerque*, 535 F.3d 1210, 1217–18 (10th Cir. 2008) ("we have recognized that *in exceptional circumstances* historical facts may be so intertwined with the law that a jury question is appropriate as to whether a reasonable person in the defendant's position would have known that his conduct violated that right.") (emphasis in original); *McKenna v. Edgell*, 617 F.3d 432 (6th Cir. 2010) (where qualified immunity turned on a single, discrete factual issue of whether defendants officers were acting as law enforcement or as medical responders, that question was properly submitted to the jury); *Curley*, 499 F.3d at 211 ("When the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, … but responsibility for answering that ultimate question remains with the court.").

In the Ninth Circuit, however, qualified immunity is assessed at trial only in the context of a Rule 50 motion after verdict, and the second step is purely a question of law for the court to decide based on "factual findings the jury must have made to reach its verdict." *Acosta, supra.* (no qualified immunity based on jury's verdict of excessive force); *Torres, supra.* (no qualified immunity based on facts from which jury could have found arrest was without probable cause); *A.D., supra.* (no qualified immunity based on jury's verdict that defendant used deadly force without a legitimate law enforcement purpose); *Sloman*, 21 F.3d at 1468–69 (no qualified immunity based on jury's verdict that defendant arrested plaintiff in retaliation for political views). In this circuit, the unlawfulness of an officer's use of excessive force is clearly established.

> **2. It was clearly established by the time of this incident that the use of excessive force, under the circumstances of this case, was unlawful.**

When the district court decides the second step of qualified immunity after a jury verdict, that

must be done "giving significant deference to the jury's verdict," considering all facts in the light most favorable to the plaintiff and all substantial evidence and factual inferences that could support the verdict as required by Rule 50. *A.D.*, 712 F.3d at 453, 456 ("[d]eference to the jury's view of the facts persists throughout each prong of the qualified immunity inquiry").[12]

The Supreme Court reaffirmed the similar qualified immunity standard at summary judgment, reversing a finding of qualified immunity to police officers, because the Fifth Circuit "failed to view the evidence at summary judgment in the light most favorable to [the Plaintiff], and for "failing to credit evidence that contradicted some of its key factual conclusions." *Tolan v. Cotton*, __U.S.__, 134 S. Ct. 1861, 1866 (2014).[13]

To overcome qualified immunity, the exact same violation need not have been previously held unlawful; rather, the contours of the right must be sufficiently clear so that, in light of preexisting law, the unlawfulness of the actions is apparent. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  A defendant is not entitled to qualified immunity merely because no prior case prohibits the precise conduct at issue.  *Young*, 655 F.3d at 1167; *Deorle*, 272 F.3d at 1285–86.  "[A]ny requirement that facts of previous cases be "materially similar" to the case at issue is a "rigid gloss on the qualified

---

[12] In *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150–51 (2000), the Supreme Court noted the standards for motions for summary judgment and for judgment as a matter of law (JMOL) are the same:

> [T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. [ ] Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. [ ] Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.

[13] Even when considering a defendant's qualified immunity claim in the context of a plaintiff's motion for partial summary judgment, the court must construe the facts in the light most favorable to the plaintiff. *Beecham v. City of West Sacramento*, No. S-07-1115 JAM EFB, 2008 U.S. Dist. LEXIS 85126, at *27 (E.D. Cal. Oct. 22, 2008) (Judge John Mendez denied qualified immunity to defendants where plaintiffs had moved for partial summary judgment of claims for false arrest and excessive force).

immunity standard" that is "not consistent with our cases." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The "salient question" is whether the state of the law at the time gave the defendant "fair warning" that his alleged conduct was unconstitutional. *Tolan*, 134 S. Ct. at 1866 (citing *Hope*, 536 U.S. at 739).

The Ninth Circuit has "explained before that the responsibility for keeping abreast of constitutional developments rests 'squarely on the shoulders of law enforcement officials. Given the power of such officials over our liberty, and sometimes over our lives, this placement of responsibility is entirely proper.'" *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065–66 (9th Cir. 2006).

> ### a.   Mr. May's right to be free from excessive force by a police canine trained to bite and hold was clearly established.

It was clearly established under long-standing excessive force jurisprudence that a substantial, intermediate, injurious level of force "is permissible only when a strong government interest *compels* the employment of such force." *Tekle v. United States*, 511 F.3d 839, 844 (9th Cir. 2007). None of the *Graham* factors weigh in favor of the force Defendant Laughlin used against Mr. May.

Since 1994, it has been clearly established that the well-known excessive-force analysis applies to canines. *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994). Defendants are not entitled to qualified immunity on these facts—releasing a canine on a non-violent person and then allowing the attack to continue while he was on the ground. *See Chew*, 27 F.3d at 1471 (disputed issues of fact precluded grant of qualified immunity where police officers released a K-9 in response to a hiding defendant who did not appear violent); *Watkins*, 145 F.3d at 1090; 1093 (affirming denial of qualified immunity to a canine officer who ordered a man "recoiling from the dog's bite" to show his hands, because "it was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation.").

Additionally, when an officer violates a policy or training of his department, he is on notice that his conduct is unreasonable and is not entitled to qualified immunity. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (police department's "training materials" relevant to whether force was unlawful and whether a reasonable officer would have been on notice); *Headwaters Forest Def. v. Cnty. of Humboldt (Headwaters II)*, 276 F.3d 1125, 1131 (9th Cir. 2002) (no qualified immunity where officers violated regional and statewide police protocol); *Young v. Cnty. of Los*

*Angeles*, 655 F.3d 1156, 1162, n. 7, 1168, n.9 (9th Cir. 2011) (qualified immunity denied in part based on defendant's violation of California POST training standards).

Before deploying a dog to apprehend someone under the County's "bite and hold" policy, SMCSO K-9 Manual, §5-01, required Defendant Laughlin to have probable cause to arrest for a "serious or violent felony" **and** to believe that the person posed an "immediate threat of death or serious bodily harm." (*See, supra*, at pp. 5–8; **Ex. Y**, 26:12–27:10). Defendant Laughlin violated that clear rule. Even in the face of testimony from the County's 30(b)(6) witness and others that that rule was mandatory, Defendants are reduced to legalistic argument that it was only a suggestion. (Doc. 62, pp. 21–22).

And, as Defendant County's 30(b)(6) witness agreed, it was clearly established—and trained to SMCSO deputies—that a person being bitten will flail against the bite. *Kerr*, 875 F.2d at 1550. To demonstrate the lawfulness of some of Defendants' policies, Defendants argued in their MSJ that the SMCSO K-9 Manual, §5-01, required officers to disengage the bite "immediately" under such circumstances. (Doc. 62, p. 22). Thus, Defendant Laughlin was on notice of the need to immediately stop *Riggs* from biting Mr. May who was harmlessly flailing in pain and fear.

And, even though the decision to use deadly force can be difficult for an officer and often must be made in a "split second," "this fact alone will never immunize an otherwise unreasonable use of deadly force." *Ford v. Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988) (en banc). The Supreme Court has recognized that the Fourth Amendment's limits on the use of deadly force do not require unreviewable, "split second" decision making. *Garner*, 471 U.S. at 20 ("Nor do we agree … that the rule we have adopted requires the police to make impossible, split-second evaluations of unknowable facts.").

Moreover, a jury could conclude that the present case did not at all require Defendant Laughlin to make split-second decisions to use potentially deadly force. A reasonable officer would have taken more time to assess the situation—and at least would have given Mr. May a warning before siccing a trained canine to bite and apprehend him.

Thus, a jury verdict finding that Defendant Laughlin used excessive force under the facts of this case—as the jury will be instructed on that claim—also would necessarily show violation of this

clearly established law.  This is not such a novel factual situation that existing clearly established law would not have put Defendant Laughlin on notice that an objectively unreasonable use of force under these circumstances would violate Mr. May's right to be free from excessive force.  Assessing any post-verdict claim of qualified immunity under Rule 50 standards as both the Supreme Court and Ninth Circuit require, it should not be difficult to decide whether or not Defendant Laughlin enjoys qualified immunity for his use of force based on "factual findings the jury must have made to reach its verdict." *Acosta, supra.; A.D., supra.*

### 3.  Qualified Immunity Cannot Apply to State Law Claims

Qualified immunity does not apply at all to state law claims, including claims brought under California Civil Code § 52.1, that may be based on violations of federal law.  *Venegas v. Cnty. of L.A.*, 153 Cal. App. 4th 1230, 1246 (2007).

### C.  By siccing *Riggs* to bite and hold Mr. May, Defendant Laughlin violated Mr. May's rights under the Bane Act, incurring his own liability and that of San Mateo County.

California Civil Code § 52.1(b), the Bane Act, provides a private right of action for damages against any person who "interferes . . .," or "attempts to interfere by threat, intimidation, or coercion," with the exercise or enjoyment of rights under California or federal law.  Section 52.1 simply requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998).

Although enacted in response to the increasing incidence of hate crimes in California, "the Bane Act is not limited to hate crimes."  *Bender v Cnty. of L.A.*, 217 Cal. App. 4th 968, 977 (2013). Discriminatory animus is not required, *Venegas v. Cnty. of L.A.*, 32 Cal. 4th 820, 841–43 (2004), nor is "violence or threat of violence."  *Moreno v. Town of Los Gatos*, 267 F. App'x. 665, 666 (9th Cir. 2008) (citing *Venegas*, 32 Cal. 4th at 841) ("Reading section 52.1 on its own terms, as *Venegas* directs, the statutory language clearly requires only 'threats, intimidation, or coercion.'").[14]

---

[14] In 2014, the statute was amended to replace "threats" with "threat." § 52.1, Notes, 2014 Amendment.

The requirement to show "threat, intimidation, or coercion" is not onerous where police directly violate a person's rights.  *See Venegas*, 32 Cal. 4th at 850–51 (Baxter, J., concurring) ("[I]t should not prove difficult to frame many, if not most, asserted violations of any state or federal statutory or constitutional right, including mere technical statutory violations, as incorporating a threatening, coercive, or intimidating verbal or written component.").

Further, Mr. May need not prove coercion apart from the coercion inherent in Defendant Laughlin's violation of Mr. May's Fourth Amendment right to be free from excessive force.  As this Court observed in its summary judgment order, "[t]he California Court of Appeal recently explained:

> The parties have not cited, and we have not found, a California case that addresses the precise question presented here: whether a Bane Act claim arises from excessive force or an unlawful search following a lawful arrest. However, the majority of federal district courts in California have held that "[w]here Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, **there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force.**" Dillman v. Tuolumne County[, 2013 WL 1907379, at *21 (E.D. Cal., May 7, 2013)].

(Doc. 78, p. 25) (citing *Simmons v. Superior Court of San Diego Cnty.*, 7 Cal. App. 5th 1113, 1126 (2016) (citations omitted) (final emphasis added).  This Court also observed in its summary judgment order that the Ninth Circuit, interpreting California law, is in accord: "The Ninth Circuit has similarly said:

> The district court erred in dismissing the Estate's § 52.1 claim . . . . The Estate won its excessive force claim under § 1983 at trial. The City defendants concede in their brief to us that a successful claim for excessive force under the Fourth Amendment provides the basis for a successful claim under § 52.1. *See Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir.2013) ("[T]he elements of the excessive force claim under § 52.1 are the same as under § 1983."); *Bender v. Cnty. of L.A.*, 217 Cal. App. 4th 968, 159 Cal.Rptr.3d 204, 212–15 (2013).

(Doc. 78, p. 25) (citing *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105–06 (9th Cir. 2014) (emphases added); *see also Brown v. City & Cnty. of S.F.*, No. C 11-02162 LB, 2014 U.S. Dist. LEXIS 48386, at *59–61 (N.D. Cal. Apr. 7, 2014) ("[The court finds persuasive the line of cases permitting Bane Act claims based on the same conduct as an underlying constitutional violation.").  The settled law, contra *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947 (2012), and especially in light of *Chaudhry*, is that a plaintiff need not prove a defendant committed an independent coercive act.

1    Indeed, numerous state and federal courts have limited *Shoyoye* to its unique facts,[15] and they have

2    held that the coercion element may be intrinsic to constitutional violations.[16]

3            *Shoyoye* recognized that coercion could be shown in *Venegas*, 32 Cal. 4th 820, for example,

4    because there a jury could find "the probable cause that initially existed to justify stopping the

5    plaintiffs eroded at some point, such that the officers' conduct became intentionally coercive and

6

7    _____

8    [15] Unlike Defendants' volitional conduct amounting to excessive force using a police canine trained to
     bite and hold Mr. May—*Shoyoye* arose from a mistakenly prolonged incarceration in a county jail.
9    *Shoyoye*, 203 Cal. App. 4th at 951–53.  A clerical error resulted in the plaintiff being held in jail 16
     days too long.  *Id.*  *Shoyoye* held that the accidentally prolonged incarceration did not automatically
10   satisfy the coercion element of § 52.1, and that plaintiff would have to make a separate showing of
     coercion.  *Id.* at 947.

11

12   [16] *D.V. v. City of Sunnyvale*, 65 F. Supp. 3d 782, 788 (N.D. Cal. 2014) ("[T]he great weight of
     authority in the Northern District of California has … confined *Shoyoye* to circumstances involving
13   negligent conduct."); *M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 898 (N.D. Cal. 2013) ("[T]he
     relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct, and
14   . . . *Shoyoye* applies only when the conduct is unintentional."); *Bass v. City of Fremont*, No. C12-4943
     TEH, 2013 U.S. Dist. LEXIS 32590, at *13–14 (N.D. Cal., Mar. 8, 2013) (rejecting "a broad reading
15   of *Shoyoye*—one that would, perversely, preclude any [Bane Act] action in which the underlying
     statutory or constitutional violation involved 'threats, intimidation, or coercion'" and finding such a
16   reading "contrary to the plain language of the statute" and contrary to *Venegas*); *Davis v. City of San
     Jose*, No. 14-CV-02035 BLF, 2014 U.S. Dist. LEXIS 84641, at *24 (N.D. Cal. June 20, 2014)
17   ("However, the [defendants] ignore the wealth of subsequent case law that has limited *Shoyoye* to its
     narrow circumstances—case law with which this Court agrees."); *Brown*, 2014 U.S. Dist. LEXIS
18   48386, at *60 ("[T]he court finds persuasive the line of cases permitting Bane Act claims based on the
     same conduct as an underlying constitutional violation."); *Mateos-Sandoval v. Cnty. of Sonoma*, No.
19   C11-5817 TEH, 2013 U.S. Dist. LEXIS 104549, at *24–27 (N.D. Cal. July 25, 2013) (seizure of
     vehicle was intentional and inherently coercive, satisfying Bane Act requirements); *Sanchez v. City of
20   Fresno*, No. 1:12-CV-00428-LJO-SKO, 2013 U.S. Dist. LEXIS 68561, at *37 (E.D. Cal. May 14,
     2013) (Eastern District adopts analysis of *M.H.* court in Northern District); *Dillman v. Tuolumne Cnty.*,
21   No. 1:13-CV-00404 LJO SKO, 2013 U.S. Dist. LEXIS 65206, at *54–58 (E.D. Cal., May 7, 2013)
     (same); *Little v. City of Richmond*, No. C-13-02067 JSC, 2013 U.S. Dist. LEXIS 149804, at *12–13
22   (N.D. Cal. Oct. 17, 2013)  (§ 52.1 does not necessarily require coercion independent from violation of a
     constitutional right, especially where conduct was intentional, i.e. volitional); *Rodriguez v. City of
23   Modesto*, No. 1:10-CV-01370-LJO-MJS, 2013 U.S. Dist. LEXIS 172958, at *31–32; *35–36 (E.D.
     Cal. Dec. 9, 2013) ("the legal landscape has evolved" such that a separate showing of coercion is not
24   necessary under the Bane Act; "there is no need for a plaintiff to allege a showing of coercion
     independent from the coercion inherent in the seizure **or** use of force."); *Skeels v. Pilegaard*, No. C12-
25   2175 TEH, 2013 U.S. Dist. LEXIS 34302, at *11–12 (N.D. Cal. Mar. 12, 2013) (limiting *Shoyoye* to
     non-intentional conduct).

26

27

28

1    wrongful." *Shoyoye*, 203 Cal. App. 4th at 961.  In other words, the simple continued arrest of a person

2    after investigation eroded probable cause could constitute coercion that met the *Shoyoye* Court's

3    definition of a "volitional" rather than a "mere negligent" act.  *Id.* at 957, 961.

4         Furthermore, even a lawful arrest with probable cause followed by excessive force (a strip

5    search) satisfies the Bane Act.  *See Simmons*, 7 Cal. App. 5th at 1127 ("Even assuming the officers had

6    probable cause to arrest Simmons, the complained-of conduct asserted here—multiple nonconsensual,

7    roadside, physical body cavity searches—is necessarily intentional conduct that is separate and

8    independent from a lawful arrest for being in a park after it closed, for riding a bicycle in the dark

9    without a headlight, or for resisting a peace officer.").  In *Simmons*, the violation of rights was an

10   unlawful strip search, and the coercion element was fully satisfied by the coercion intrinsic to a *lawful*

11   arrest.  The *Simmons* court recognized that even a lawful arrest is "inherently coercive underlying

12   conduct."  *Id.*  Clearly, where the coercion element was satisfied in *Simmons* by a lawful arrest, the

13   coercion element here need not be an unlawful act—just something threatening, intimidating, or

14   coercive.

15        Defendant Laughlin violated the Bane Act, because he used excessive force against Plaintiff in

16   the course of an arrest.  Defendant San Mateo County is vicariously liable for Defendant Laughlin's

17   violation of the Bane Act.  Cal. Gov't Code § 815.2.

18        **D.    By violating Mr. May's Fourth Amendment Rights, Defendant Laughlin is also
             liable for the California torts of assault and battery.**

19        Plaintiff's California assault and battery claims are proven by the same wrongful acts that

20   support his § 1983 claim.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 486–488 (9th Cir. 2007);

21   *Robinson v. Solano Cnty.,* 278 F.3d 1007, 1016–17 (9th Cir. 2002) (en banc) (constitutional violations

22   support state tort claims for false arrest and imprisonment, assault and battery, and negligence, and

23   there is no immunity for such claims).  There is no state law immunity for such claims either.  *Id.  See*

24   *also*, *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274–75 (1998) (holding that the state tort of

25   battery by a police officer essentially tracks a claim for use of excessive force under the Fourth

26   Amendment and is measured by the same reasonableness standard).

27

28

1

**E.      As to Mr. May's false arrest and imprisonment claim under California law,
Defendant Laughlin bears the burden of proving that he had probable cause to
continue Mr. May's arrest.**

2

3      Under California law, the existence of probable cause in a false arrest claim is a question of

4   law.  *See* Judicial Council of California Civil Jury Instructions "CACI" No. 1402, False Arrest Without

5   Warrant—Affirmative Defense—Peace Officer—Probable Cause to Arrest; *Levin v. United Air Lines,*

6   *Inc.*, 158 Cal. App. 4th 1002, 1018–19 (2008).  The tort consists of the "'nonconsensual, intentional

7   confinement of a person, without lawful privilege, for an appreciable length of time, however short.'"

8   Judicial Council of California Civil Jury Instructions "CACI" No. 1400. No Arrest Involved—

9   Essential Factual Elements (citing *Scofield v. Critical Air Medicine*, *Inc.*, 45 Cal. App. 4th 990, 1001

10  (1996)).  Further, "[t]he burden is on the defendant to prove justification for the arrest."  *Cervantez v.*

11  *J.C. Penney Co.*, 24 Cal. 3d 579, 592 (1979); CACI No. 1402.

12     Here, Defendant Laughlin cannot satisfy his burden to prove the justification for his custodial

13  arrest of Mr. May.  Even if Defendant Laughlin had probable cause to arrest Mr. May for trespass or

14  some other crime at the moment of the arrest, by the time he cited him for trespass and resisting arrest

15  two hours later, the jury can find that a reasonable officer would have known better because any

16  probable cause for those misdemeanors had dissipated as a result of his investigation.  Mr. May also

17  suffered emotional distress from issuance of the citation and the more than three month delay until he

18  learned that he would not be charged with any crime.  Defendant Laughlin's continued arrest and

19  citation of Mr. May after any probable cause had dissipated constitutes false arrest and imprisonment.

        As the Ninth Circuit explained in *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007),

20

21      In some instances there may initially be probable cause justifying an arrest, but additional
        information obtained at the scene may indicate that there is less than a fair probability
        that the defendant has committed or is committing a crime.  In such cases, execution of

22      the arrest or continuation of the arrest is illegal. As we explained in *United States v.*
        *Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005), *cert. denied*, 127 S. Ct. 358, 166 L.

23      Ed. 2d 132 (2006):

24          A person may not be arrested, or must be released from arrest, if previously
            established probable cause has dissipated. "As a corollary . . . of the rule

25          that the police may rely on the totality of facts available to them in
            establishing probable cause, they also may not disregard facts tending to

26          dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir.
            1988); *Be Vier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (citation

27          omitted) ("The continuation of even a lawful arrest violates the Fourth

28

Amendment when the police discover additional facts dissipating their earlier probable cause.").

See also, *Shoyoye*, explaining *Venegas*, 32 Cal. 4th 820: "the probable cause that initially existed to justify stopping the plaintiffs eroded at some point, such that the officers' conduct became intentionally coercive and wrongful." *Shoyoye*, 203 Cal. App. 4th at 961.

First, Defendant Laughlin cannot justify his continued arrest of Mr. May for California Penal Code § 602(m), because he learned during his interrogation of Mr. May that he was not "squatting" at the construction site, but was only looking for a cat. The Deputy District Attorney reviewing this arrest of course noted the lack of any evidence to meet the "occupation" element, and for that very reason declined to prosecute. (**Ex Q**, DA memo) (". . . we cannot proceed with the 602(m) trespass charge because that section requires occupation, which caselaw dictates is akin to squatting").

Nor could Defendant Laughlin justify Mr. May's continued arrest under California Penal Code § 602(l).[17] Defendant Laughlin has never mentioned § 602(l) as grounds to arrest Mr. May. (**Ex. B**, Laughlin Dep. Trans.). First, § 602(l) specifically requires "the owner of the land, the owner's agent, or . . . the person in lawful possession" to have requested Mr. May to leave—not a pre-recorded, automated track without any of the specifically described individuals present. Second, probable cause to arrest must be based on Defendant Laughlin's contemporaneous knowledge. The record does not show that Defendant Laughlin knew—before arresting Mr. May—that Mr. May "refused to leave after hearing a security alarm activated by security personnel that ordered him to 'get away,' or words to that effect." (Doc. 65, p. 10:20–23). Defendant Laughlin admits he never heard the alarm, or saw any flashing lights, that would have accompanied the automated announcement. (**Ex. B**, 95:23–96:6).

---

[17] California Penal Code § 602(l) provides in pertinent part: "Entering any lands under cultivation or enclosed by fence, belonging to, or occupied by, another, or entering upon uncultivated or unenclosed lands where signs forbidding trespass are displayed at intervals not less than three to the mile along all exterior boundaries and at all roads and trails entering the lands without the written permission of the owner of the land, the owner's agent, or the person in lawful possession, and any of the following: (1) Refusing or failing to leave the lands immediately upon being requested by the owner of the land, the owner's agent, or by the person in lawful possession to leave the lands."

Furthermore, "[u]nder California Penal Code § 836(a)(1) . . . in order to effectuate a lawful warrantless arrest for a misdemeanor offense, an officer must have 'probable cause to believe that the person to be arrested has committed [an offense] in the *officer's presence*.'" *Mackey v. Meyer*, No. 15-55186, 2017 U.S. App. LEXIS 517, at *6 (9th Cir. Jan. 11, 2017) (emphasis and alterations in original). "'Whether the offense is committed in the officer's presence is to be determined by the events observable to the officer at the time of the arrest.'" *Id.* at *6–*7 (citing *Padilla v. Meese*, 184 Cal. App. 3d 1022, 1027–28 (1986) (quoting *People v. Welsch*, 151 Cal. App. 3d 1038, 1042 (1984))). "'If the officer cannot testify, based on his or her senses, to acts which constitute every material element of the misdemeanor, it cannot be said that he officer has reasonable cause to believe that the misdemeanor was committed *in his presence*.'" *Padilla*, 184 Cal. App. 3d at 1027 (quoting *Welsch*, 151 Cal. App. 3d at 1042).

Here, Defendant Laughlin did not personally observe Mr. May violating California Penal Code § 602(l). When Defendant Laughlin arrested Mr. May, Defendant Laughlin had not witnessed Jatagan security's robotic alarm tell Mr. May to leave the premises, and in fact knew nothing about it. Before arresting Mr. May, Defendant Laughlin did not even know that an automated announcement to leave had been made, or that Mr. May had refused to heed it—perhaps why he never mentioned § 602(l).

Finally, Defendant Laughlin cannot justify the continued arrest of Mr. May under California Penal Code § 148(a)(1). An arrest under California Penal Code § 148(a)(1) requires probable cause to believe the following: (1) the defendant willfully resisted, delayed, or obstructed a peace officer; (2) when the officer was engaged in the performance of his or her duties; and (3) the defendant knew or reasonably should have known the other person was a peace officer engaged in the performance of his or her duties. *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002) (citing Cal. Penal Code § 148(a)(1)).

First, Defendant Laughlin cannot satisfy element (2), "the lawfulness of the officer's conduct" which is "an essential element of the offense of resisting, delaying, or obstructing a peace officer." *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005) (en banc) (citations omitted). Defendant Laughlin cannot satisfy the *essential* element (2), because when Defendant Laughlin employed

excessive force by siccing *Riggs* to bite and hold Mr. May, he was not engaged in the lawful performance of his duties.  *Id.*

Nor could Defendant Laughlin justify his continued arrest of Mr. May under element (1), that Mr. May was resisting, delaying, or obstructing a peace officer.  Defendants have argued that Defendant Laughlin properly arrested Mr. May for § 148(a)(1) because Mr. May was fleeing, relying on *In re Gregory S.*, 112 Cal. App. 3d 764, 778 (1980) (Doc. 65, p. 11:6–7).  But *In re Gregory S.* affirmed the court's finding that a juvenile had violated § 148 where he: ignored the arresting officer's two commands to come over to him; walked away and disappeared; then reappeared and struggled against the officer when the officer grabbed him by the arm.  *Id.* at 770–771.  On these facts, the court held that substantial evidence underlay the conviction, because "the physical activity that appellant engaged in, flight and concealment, which *delayed* the officer's performance of his official duty, violated the statute."  *Id.* at 778.  "Since appellant here knew that the officer desired to detain him, it was his duty to submit to it.  His forceful attempt to leave violated the statute."  *Id.*

Here, Mr. May engaged in no such "forceful attempt to leave."  Just before releasing *Riggs* to bite and hold Mr. May, Defendant Laughlin only saw Mr. May "backing up towards the fence line[;]" Mr. May was a "couple steps" from the fence line, with Mr. May's body facing Defendant Laughlin.  (**Ex. B**, 111:9–25).  Defendant Laughlin conceded that he never even saw Mr. May turn to face the fence as if he were going to try to climb it or jump over it.  (**Ex. B**, 114:15–17).  Indeed, Defendant Laughlin never saw Mr. May assume any other body position other than standing up and moving slowly.  (**Ex. B**, 125:24–126:1).

Nor can Defendant Laughlin justify his continued arrest of Mr. May under § 148(a) for failing to comply swiftly with Defendant Laughlin's commands.  That a person is slow to comply with an officer's orders does not mean that the person has either delayed or obstructed the officer for § 148 purposes.  *See, e.g., People v. Quiroga*, 16 Cal. App. 4th 961, 964, 966 (1993) (holding that, even where defendant was uncooperative, argued before complying with an officer's orders, and was slow to comply, § 148 does not criminalize "**a person's failure to respond with alacrity to police orders**.") (emphasis added).  And, Defendant Laughlin admits he does not even know whether Mr. May heard his command.  (**Ex. B**, 101:9–10; 127:10–13).

1    Nor is Defendant Laughlin entitled to state law immunity under California Penal Code § 847.

2    Qualified immunity does *not* apply at all to state law claims, specifically false arrest claims, including

3    claims brought under California Civil Code § 52.1.  *Venegas v. County of Los Angeles*, 153 Cal. App.

4    4th 1230, 1236, 1240–44 (2007).  Moreover, Defendant Laughlin lacked "probable cause," and

5    therefore "reasonable cause," (as that term is used in § 847) to arrest Mr. May.  Section 847 uses the

6    term "reasonable cause," which California law uses interchangeably with the term "probable cause."

7    *See Pool v. City of Oakland*, 42 Cal. 3d 1051, 1070–71 (1986) ("reasonable cause" to arrest); CACI

8    1402 (using "reasonable cause" in place of "probable cause."); *Levin*, 158 Cal. App. 4th at 1017 n.18

9    (citing *People v. Ingle*, 53 Cal. 2d 407, 412 (1960) ("The terms reasonable cause and probable cause as

10   used in the context of an arrest appear to be interchangeable.")); *People v. Talley*, 65 Cal. 2d 830, 835

11   (1967) ("Reasonable or probable cause exist when the facts and circumstances within the knowledge of

12   the officers at the moment of the arrest are sufficient to warrant a prudent man in believing that the

13   defendant has committed an offense.") (citations omitted); *see also Garcia v. Cnty. of Riverside*, 817

14   F.3d 635, 644–45 (2016), *cert. denied sub. nom. Baca v. Garcia*, 137 S. Ct. 344 (2016) (observing that

15   Cal. Penal Code § 847's application is "premised on reasonable beliefs[.]").  Accordingly, California

16   Government Code § 820.4 provides: "A public employee is not liable for his act or omission,

17   exercising due care, in the execution or enforcement of any law.  Nothing in this section exonerates a

18   public employee from liability for false arrest or false imprisonment."  *Accord, In re James D.*, 43 Cal.

19   3d 903, 914 (1987) (detention without reasonable suspicion is "unlawful, even though the officer may

20   be acting in complete good faith.").

21        Section 847 does not immunize Defendant Laughlin for Mr. May's unlawful arrest. [18]

---

[18] No officer could reasonably believe that Mr. May's arrest without probable cause was lawful. Further, California Penal Code § 836(a)(1) clearly established that Defendant Laughlin could not arrest Mr. May for having violated California Penal Code § 602(l) or (m) because he did not personally observe Mr. May violating those provisions.  "'In evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest.'"  *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 950 (9th Cir. 2003) (quoting *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1038 (9th Cir. 1996)).  No reasonable officer would have believed that he or she could effect a custodial arrest for a misdemeanor *not* committed in his or her presence.

1     As a result, Defendant San Mateo County is vicariously liable for Defendant Laughlin's false

2  arrest of Mr. May.  *See Robinson*, 278 F.3d at 1016 (citing Cal. Gov't Code § 815.2) (observing that

3  "California, however, has rejected the *Monell* rule and imposes liability on counties under the doctrine

4  of *respondeat superior* for acts of county employees; it grants immunity to counties only where the

5  public employee would also be immune.").

6     **F.     Defendant Laughlin is also liable in negligence, and the County is vicariously**
          **liable.**

7     Under California law, a peace officer may be held liable for negligence because "'*a public*

8  *employee* is liable for an injury caused by his act or *omission to the same extent as a private person*,'

9  except as otherwise specifically provided by statute." *Lugtu v. California Highway Patrol*, 26 Cal. 4th

10 703, 715 (2001) (quoting Cal. Gov't Code § 820(a)).  Officers have "a duty 'to perform their official

11 duties in a reasonable manner,'" and "a law enforcement officer has a duty to exercise reasonable care

12 for the safety of those persons whom the officers stops . . ." *Id.* at 717–18 (citing *Whitton v. State of*

13 *California*, 98 Cal. App. 3d 235, 241 (1979)).  Finding duty, *Lugtu* approved the determination of the

14 standard of care based on the department's training and policy materials, as well as the plaintiff's

15 expert's testimony.  *Id.* at 720–24.  *See also Dillenbeck v. City of L.A.*, 69 Cal. 2d 472, 480 (1968)

16 (holding, in a negligence case, that a trial court should have admitted a police department's rules as

17 "evidence of the component requirements of due care[;]" "[the] safety rules of an employer are . . .

18 admissible as evidence that due care requires the course of conduct prescribed in the rule."); *Grudt v.*

19 *City of L.A.*, 2 Cal. 3d 575, 588 (1970) (citing *Dillenbeck*, 69 Cal. 2d at 588) (a police department's

20 manual was relevant to plaintiff's negligence claim, because it "prescribed rules regarding occasions

21 for the limited use of firearms by police officers.").

22     "In order to establish a claim for negligence under California law, [the plaintiff] must show: (1)

23 a legal duty to use due care; (2) a breach of that duty; and (3) that the breach was the proximate or

24 legal cause of the injury." *Ting v. United States*, 927 F.2d 1504, 1513 (9th Cir. 1991).  *See also*

25 Judicial Council of California Civil Jury Instructions "CACI" No. 400. Negligence—Essential Factual

26 Elements; CACI No. 401 Basic Standard of Care.

27     A peace officer's duty to use reasonable care extends to the officer's use of force; therefore, a

28 plaintiff may hold a peace officer liable in negligence for the officer's use of force, including for the

officer's conduct leading up to that use of force.  *See Grudt*, 2 Cal. 3d at 587 (holding that the trial

judge erred in not instructing the jury on the plaintiff's negligence theory predicated on the defendant-

officers' actions before using deadly force); *Munoz v. Olin*, 24 Cal. 3d 629, 634 (1979) (reaffirming

*Grudt*, and stating that the "an officer's lack of due care can give rise to negligence liability for the

intentional shooting death of a suspect." (citing *Grudt*, 2 Cal. 3d 575 (1970))).

A negligence claim may be based on a use of excessive force.  *Hernandez v. City of Pomona*,

46 Cal. 4th 501, 513–14 (2009).  Additionally, "[l]aw enforcement personnel's tactical conduct and

decisions preceding the use of [ ] force are relevant considerations under California law in determining

whether the use of [ ] force gives rise to negligence liability."  *Hayes v. County of San Diego ("Hayes

II")*, 57 Cal. 4th 622, 639 (2013).  The Court explained that considering an officer's tactical conduct

and decisions preceding the officer's use of force is appropriate under California law because

California "state negligence law, which considers the totality of the circumstances surrounding any use

of deadly force . . . is broader than federal Fourth Amendment law, which tends to focus more

narrowly on the moment when deadly force is used."  *Hayes*, 57 Cal. 4th at 639 (citations omitted).

The Court explained, "In other words, preshooting circumstances might show that an otherwise

reasonable use of deadly force was in fact unreasonable."  *Hayes*, 57 Cal. 4th at 629.

On remand from the California Supreme Court, the Ninth Circuit wrote:

> The California Supreme Court has responded to our certification order and clarified California's
> negligence doctrine in cases where, as here, a plaintiff attacks peace officers' "tactical conduct
> and decisions leading up to the use of deadly force." *Hayes II, 305 P.3d at 253*. …  There is "no
> sound reason to divide plaintiff's cause of action . . . into a series of decisional moments . . . and
> then to permit plaintiff to litigate each decision in isolation, when each is part of a continuum of
> circumstances surrounding a single use of deadly force." *Id. at 262, 256*. Instead, under *Grudt
> [v. City of Los Angeles, 2 Cal. 3d 575, 586, 86 Cal. Rptr. 465, 468 P.2d 825 (1970)]*, an
> officer's preshooting conduct is properly "included in the totality of circumstances surrounding
> [his] use of deadly force, and *therefore the officer's duty to act reasonably when using deadly
> force extends to preshooting conduct*." *Id. at 257* (emphasis in original).

*Hayes v. County of San Diego*, 736 F.3d 1223, 1236 (9th Cir. 2013).

While *Hayes* arises from a use of deadly force, its holding applies equally to non-deadly force.

The Ninth Circuit and United States Supreme Court have explained that there is no conceptual legal

difference between excessive deadly and non-deadly force.  *Acosta v. Hill,* 504 F.3d 1323 (9th Cir.

2007) (following *Scott v. Harris*, 550 U.S. 372 (2007)).  *See also*, Comment, Ninth Circuit Model Civil

Jury Instruction 9.25.

Here, then, to determine if Defendant Laughlin acted negligently, the jury must examine his conduct leading up to and including his siccing of *Riggs* to bite and hold Mr. May, as well as Defendants Laughlin's violations of his departments policies, his training, and generally accepted law enforcement standards as presented by expert testimony.

As discussed above with regard to Mr. May's Fourth Amendment excessive force claim, Defendant Laughlin's siccing of *Riggs* to bite and hold Mr. May was unreasonable under traditional Fourth Amendment analysis. But similarly unreasonable were Defendant Laughlin's tactics and conduct leading up to his use of *Riggs*, including his failure to give an audible canine warning-announcement, and his decision to escalate the situation by deploying *Riggs*. Defendant Laughlin failed to follow his employer's policies, including § 5-01 of the Canine Manual, further supporting Mr. May's negligence claim.

## III.  OTHER LEGAL ISSUES

### A.      No Comparative Fault for Intentional Torts

There is no comparative fault for intentional torts, battery, excessive force, or for civil rights claims brought pursuant to § 1983 or California Civil Code § 52.1 (The Bane Act):

> An intentional tortfeasor's liability is not subject to apportionment where the plaintiff's injuries resulted in part from the plaintiff's contributory negligence. *See Thomas v. Duggins Const. Co., Inc.*, 139 Cal. App. 4th 1105, 1112, 44 Cal. Rptr. 3d 66 (2006) (citing *Heiner v. Kmart Corp.*, 84 Cal. App. 4th 335, 348-50, 100 Cal. Rptr. 2d 854 (2000)); *see also Quezada v. County of Bernalillo*, 944 F.2d 710, 721 (10th Cir. 1991) (comparative negligence does not apply to damages for federal constitutional rights violations pursuant to § 1983), *overruled on other grounds* by *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001); *Clappier v. Flynn*, 605 F.2d 519, 530 (10th Cir. 1979) (same). Therefore, the Court concludes that plaintiff Fred Johnson's judgment on his § 1983 claims and his state claims for false arrest and violation of § 52.1 of California's Civil Code should not be reduced based on Fred Johnson's contributory negligence, although his judgment based on his claim for negligence should be reduced by 25%. A judgment consistent with the Court's conclusion shall be filed separately.

*Johnson v. Cnty. of San Diego*, No. 05-CV-02233-H (WMC), 2007 U.S. Dist. LEXIS 66273, at *2–3 (S.D. Cal. Aug. 24, 2007); *see also Heiner v. Kmart Corp.*, 84 Cal. App. 4th 335; 100 Cal. Rptr. 2d 854, 864–865; *Quezada v. County of Bernalillo*, 944 F.2d 710, 721 (10th Cir. 1991) ("Comparative negligence is not applied in suits for violations of federal constitutional rights under § 1983."); *Clappier*

*v. Flynn*, 605 F.2d 519, 530 (10th Cir. 1979) (§ 1983 does not allow comparison of fault between the plaintiff and defendant); *Bartosh v. Banning*, 251 Cal. App. 2d 378, 385 (1967) ("[A]ssault and battery are intentional torts. In the perpetration of such crimes negligence is not involved. As between the guilty aggressor and the person attacked the former may not shield himself behind the charge that his victim may have been guilty of contributory negligence, for such a plea is unavailable to him.").

### B.   Properly Disclosed Expert Testimony is Admissible in a Police Misconduct Case

The Ninth Circuit has held repeatedly that properly disclosed police experts' testimony concerning generally accepted police protocol is relevant to claims for wrongful seizures, arrests, and use of force.  *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (citing *Larez v. City of Los Angeles* 946 F.2d 630, 635 (9th Cir. 1991) (testimony of "an expert on proper police procedures and policies was relevant and admissible")).  *See also Davis v. Mason County*, 927 F.2d 1473, 1484–85 (9th Cir. 1991) (testimony of plaintiff's police practices expert that officers violated law enforcement standards was properly admitted); *Young v. County of Los Angeles*, 655 F.3d 1156, 1163–64 (9th Cir. 2011) (same).

The *Davis* Court also noted, "[m]oreover, Fed. R. Evid. 702 permits expert testimony comparing conduct of parties to the industry standard."  *Id.*  The same is true under California law: *McCleery v. City of Bakersfield,* 170 Cal. App. 3d 1059, 1070-72 (1985) (testimony from a police practices expert was relevant to a negligence claim arising from a police shooting, even where the expert's opinion went to the ultimate issues); *Mendoza v. City of West Covina,* 206 Cal. App. 4th 702, 710, 714 (2012) (verdict for plaintiff supported by expert testimony that "use of the Taser was unnecessary and excessive," "[T]he computerized log from the Taser used showed excessive force because it was discharged 14 times …," and "Macias used excessive force and failed to ensure that Mendoza was restrained in a way that did not impair his breathing.").  *See also*, *Munoz v. City of Union City,* 120 Cal. App. 4th 1077, 1090–92 (2004) (allowing expert testimony concerning standard of care for negligence and battery claims based on police excessive force).

Plaintiff's police practices expert, Ernest Burwell, has testified in courts as an expert in generally accepted police practices and procedures.  (**Ex. BB,** Ernest Burwell Rule 26 Report Prior Expert Testimony List).  He is eminently qualified.  Mr. Burwell is a 27-year veteran of the Los

Angeles County Sheriff's Department, and from 1989 to 2003, he trained Sheriff's deputies newly assigned to the canine unit to work as canine handlers.  (**Ex. BB**, Burwell Resume).

## IV.   DAMAGES ISSUES

### A.     Compensatory Damages

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  Cal. Civ. Code § 3333.  "Tort damages are awarded to compensate a plaintiff for *all* of the damages suffered as a legal result of the defendant's wrongful conduct."  *North American Chemical Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (1997).  Compensatory damages may include such injuries as "… personal humiliation, mental anguish, and suffering."  *Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, (1974)).

Defendant Laughlin caused Mr. May to suffer a painful, needlessly prolonged attack by a german shepherd trained to bite and hold.  Mr. May required emergency medical treatment, including stitches, and his wounds did not fully heal for about a year.  Plaintiff seeks damages for the following injuries: physical injuries, including bite wounds, punctures, and scrapes; physical pain and suffering; and emotional and mental distress.

### B.     Punitive Damages

Punitive damages are permitted against an individual defendant in a § 1983 case.  *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (citing *Smith v. Wade*, 461 U.S. 30, 49 (1983)).  Punitive Damages are available where the plaintiff proves by a preponderance of evidence that "the defendant's conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard of the plaintiff's rights."  *Id*.

> Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring the plaintiff. **Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law.** An act or omission is oppressive if the defendant injures or damages or otherwise violates the rights of the plaintiff with unnecessary harshness or severity, **such as by the misuse or abuse of authority or power or by the taking advantage of some weakness or disability or misfortune of the plaintiff**.

1   *Id.* (emphasis added).  *See also*, Ninth Circuit Model Civil Jury Instr. 5.5.

2       Defendant Laughlin's use of force easily satisfies these standards.  Defendant's abuse of his

3   authority over this older, non-threatening man also meets the standard of oppression, which the Ninth

4   Circuit has further explained as a "misuse of authority or power or exploitation of a plaintiff's

5   weakness." *Dang*, 422 F.3d at 809.   "When a jury is instructed that it may award punitive damages

6   for oppressive acts, the jury must consider the relative positions of power and authority between the

7   parties and determine whether the defendant misused his power or authority or abused the plaintiff's

8   weakness in the course of the wrongful conduct." *Id.*

9       California law also allows a plaintiff to recover punitive damages in a non-contract action

10  where clear and convincing evidence shows "the defendant has been guilty of oppression, fraud, or

11  malice."  Cal. Civ. Code § 3294(a).  To avoid jury confusion, Plaintiff will only seek punitive damages

12  under federal law, in connection with his § 1983 claim.  Plaintiff must prove entitlement to punitive

13  damages by a preponderance of the evidence.  *Dang*, 422 F.3d at 807.

14      **C.    Attorneys' Fees and Costs**

15      Prevailing civil rights plaintiffs also are entitled to costs and attorneys' fees under both 42

16  U.S.C. § 1988 and California Civil Code § 52.1(h).

17      **D.    No Nominal Damages**

18      As explained in the Comment to Ninth Circuit Model Civil Jury Instruction 5.6, "[n]ominal

19  damages are not available in every case. The court must determine whether nominal damages are

20  permitted."  Ninth Circuit Model Civil Jury Instruction 5.6 (rev'd March 2017) (citing *Chew v. Gates*,

21  27 F.3d 1432, 1437 (9th Cir.1994) (Section 1983 action)).  Nevertheless where, as here, "a plaintiff has

22  indisputably suffered an actual injury, an award of compensatory damages is mandatory."  Ninth Cir.

23  Model Civil Jury Instruction 5.6 (citing *Hazle v. Crofoot*, 727 F.3d 983, 991–92 (9th Cir. 2013) (citing

24  *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("The Supreme Court has held that entitlement to compensatory

25  damages in a civil rights action is not a matter of discretion: 'Compensatory damages . . . are

26  mandatory; once liability is found, the jury is *required* to award compensatory damages in an amount

27  appropriate to compensate the plaintiff for his loss.'") (emphasis added by *Hazle* panel).

28

1

2   Dated:  May 4, 2017                    HADDAD & SHERWIN LLP

3
                                          /s/ Michael J. Haddad
4
                                          MICHAEL J. HADDAD
5                                         Attorneys for Plaintiff
                                          Richard Earl May, Jr.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28