JOHN C. BEIERS, COUNTY COUNSEL (SBN 144282)
By: Justin W. Mates, Deputy  (SBN 261830)
By: Brian E. Kulich, Deputy (SBN 233296)
By: Margaret V. Tides, Deputy (SBN 311177)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA  94063
Telephone:  (650) 363-4760
Facsimile:  (650) 363-4034
E-mail:  jmates@smcgov.org
E-mail:  bkulich@smcgov.org
E-mail:  mtides@smcgov.org

Attorneys for Defendants
SAN MATEO COUNTY and DEPUTY CHRIS LAUGHLIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD EARL MAY,<br><br>                    Plaintiff,<br><br>          vs.<br><br>SAN MATEO COUNTY, a public entity, DEPUTY CHRIS LAUGHLIN, DEPUTY ERIC MICHEL, and DOES 1 through 10, individually, Jointly and Severally,<br><br>                    Defendants. | Case No. 3:16-cv-00252 LB<br><br>**DEFEDNDANTS' TRIAL BRIEF**<br><br>          **Pretrial Conference**<br><br>Date:          May 18, 2017<br>Time:         1:00 p.m.<br>Dept.:         C, 15th Floor<br><br>**THE HONORABLE LAUREL BEELER**<br><br>**TRIAL DATE: JUNE 5, 2017** |

# TABLE OF CONTENTS

Page

I.   STATEMENT OF FACTS ................................................................................... 1

II.  PLAINTIFF'S REMAINING CLAIMS .......................................................... 5

    A.   Deputy Laughlin Is Entitled to Qualified Immunity on the Excessive Force Claim. ........ 5

    B.   Plaintiff's Newly Asserted State-Law False Arrest Claim Lacks Merit. .......................... 7

    C.   To Prevail on His Bane Act Claim, Plaintiff Must Prove Coercion Independent From the Coercion Inherent in a Lawful Arrest. ................................................................ 9

    D.   Defendants Reserve the Right to Move for a Reduction of Any Damages Awarded to Plaintiff for Collateral Sources Received. ....................................................... 11

    E.   Deputy Laughlin Is Not Required to Disclose His Financial Information Unless Plaintiff Makes a Showing of Entitlement to Punitive Damages. .................................. 12

III. EVIDENTIARY ISSUES ................................................................................ 13

    A.   Evidence Pertaining to Plaintiff's Now-Dismissed *Monell* Claim. ............................... 13

    B.   P.O.S.T. Learning Domains. ........................................................................................ 14

    C.   Plaintiff's "Reptile" Arguments. .................................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Beagle v. Vasold*
   65 Cal. 2d 166, 182, fn. 11 (1966) ...................................................................................15

*Blankenhorn v. City of Orange*
   485 F.3d at 486-87 (9th Cir. 2007) ...............................................................................7, 8

*Bordegaray v. Cty. of Santa Barbara*
   No. 214CV08610CASJPR, 2016 WL 7223254, at *15 (C.D. Cal. Dec. 12, 2016)...........11

*Brosseau v. Haugen*
   543 U.S. 194, 201 (2004)...................................................................................................6

*Casteel v. Pieschek*
   3 F.3d 1050, 1053 (7th Cir. 1993) .....................................................................................6

*Chaudhry v. City of Los Angeles*
   751 F.3d 1096, 1105 (9th Cir. 2014) ...............................................................................11

*Chavez v. Cty. of Kern*
   No. 1:12-CV-01004 JLT, 2014 WL 412562, at *9 (E.D. Cal. Feb. 3, 2014) ...................10

*Chew v. Gates*
   27 F.3d 1432, 1441 (9th Cir. 1994) ...................................................................................6

*Collens v. City of New York*
   222 F.R.D. 249 (S.D.N.Y. 2004) .....................................................................................12

*Dorger v. City of Napa,*
   No. 12-CV-00440-WHO, 2013 WL 5804544, at *10 (N.D. Cal. Oct. 24, 2013)..............10

*Drayden v. White*
   232 F.3d 704, 712-13 (9th Cir. 2000) ..............................................................................15

*Drummond v. City of Anaheim*
   343 F.3d 1052, 1062 (9th Cir. 2003) .................................................................................7

*Fields v. Woodford*
   309 F.3d 1095, 1108-1109 (9th Cir.2002) .......................................................................15

*Garcia v. Imperial*
   270 F.R.D. 566, 572-573 (S.D. Cal. 2010) .................................................................12, 13

*Gonzalez v. City of Garden Grove*
   No. CV 05-1506 CAS JTLX, 2006 WL 5112757, at *5 (C.D. Cal. Dec. 4, 2006) ...........14

*Graham v. Connor*
   490 U.S. 386, 396 (1989)...................................................................................................7

*Haynes v. City & Cty. of San Francisco*
   No. C 09-0174 PJH, 2010 WL 2991732, at *7 (N.D. Cal. July 28, 2010) .......................11

*Kowalski v. Anova Food, LLC*
No. CIV. 11-00795HG-RLP, 2015 WL 1117993, at *1 (D. Haw. Feb. 12, 2015)............................13

*Lanier v. City of Fresno*
No. CV F 10-1120 LJO SKO, 2011 WL 149802, at *5 (E.D. Cal. Jan. 18, 2011)...........................10

*Levin v. United Airlines*
158 Cal.App.4th 1002, 1017-19 (2008) ........................................................................................7

*Luong v. SF City & Cty.*
No. C 11-05661 MEJ, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013)..................................14

*Martinez v. City of Los Angeles*
141 F.3d 1373, 1380 (9th Cir. 1998) .............................................................................................9

*Mendoza v. Black*
27 F.3d 1357, 1363 (9th Cir. 1994) ..........................................................................................6, 7

*Miller v. Clark County*
340 F.3d 959, 964 (9th Cir. 2003) .................................................................................................7

*Moore v. City & County of San Francisco*
(1970) 5 Cal.App.3d 728 ...............................................................................................................9

*Mueller v. Auker*
576 F.3d 979, 993 (9th Cir. 2009) .................................................................................................5

*Novoa v. County of Ventura*
133 Cal. App. 3d 137 .....................................................................................................................8

*Oberfelder v. Bertoli*
67 Fed. Appx. 408 (9th Cir.2003)................................................................................................12

*Pearson v. Callahan*
555 U.S. 223, 231 (2009)...............................................................................................................6

*Reese v. Cty. of Sacramento*
No. 213CV00559GEBKJN, 2016 WL 3126055, at *13 (E.D. Cal. June 2, 2016)....................10, 12

*Regalado v. Callaghan*
3 Cal. App. 5th 582, 599 (2016) ..................................................................................................16

*Rodriguez v. City of Modesto*
 2013 U.S. Dist. LEXIS 172958, at *35-36 (E.D. Cal. Dec. 9, 2013) ............................................11

*Rodriguez v. Cty. of Los Angeles*
96 F. Supp. 3d 990, 1009 (C.D. Cal. 2014) .................................................................................13

*Saucier v. Katz*
533 U.S. 194, 206 (2001)............................................................................................................5, 6

*Shakespeare v. City of Pasadena*
(1964) 230 Cal.App.2d 375 ...........................................................................................................9

*Sullivan v. County of Los Angeles*
(1974) 12 Cal.3d 710 .....................................................................................................................9

*Tortu v. Las Vegas Metropolitan Police Dept.*
  556 F.3d 1075, 1085 (9th Cir. 2009) ................................................................ 5

*United States v. Lopez*
  482 F.3d 1067 (9th Cir. 2007) ........................................................................ 9

*Velarde v. Union City Police Dep't.*
  No. 13-CV-04011-JD, 2015 WL 6871579, at *6 (N.D. Cal. Nov. 9, 2015) ................ 11

*Vieste, LLC v. Hill Redwood Dev.*
  No. C-09-04024 JSW DMR, 2011 WL 855831, at *2 (N.D. Cal. 2011) .................. 12, 13

*Watkins v. City of Oakland*
  145 F.3d 1087, 1093 (9th Cir. 1998) .................................................................. 6

*White v. Pauly*
  137 S.Ct. 548, 552 (2017) ................................................................................ 6

*Whren v. United States*
  517 U.S. 806, 814-815 (1996) .......................................................................... 7

*Willis v. Mullins*
  No. CIVF046542AWILJO, 2006 WL 2792857, at *1 (E.D. Cal. Sept. 28, 2006) ............ 12

**California Government Code**

§ 985(b) ................................................................................................ 12

§ 985 ............................................................................................... 11, 12

**California Constitutional Provisions**

§ 1983 .................................................................................................. 12

**Federal Rule of Civil Procedure**

Rule 59(e) ............................................................................................ 11

# I.     STATEMENT OF FACTS

At approximately 10:30 p.m. on January 1, 2015, Plaintiff scaled a seven- or eight-foot perimeter security fence around a construction site located at 1 Bloom Lane in Half Moon Bay (the "Site"). The Site, located next to a senior residential complex, was large—between a tenth- and a quarter-mile or more in length—and contained multiple multi-story buildings in various stages of construction, stacks of lumber, and other construction materials. Portions of the security fence were covered with a green mesh that diffused vision into the Site. The security fence also had signs, which Plaintiff observed, warning him to "Keep Out" and notifying him that the Site was private property under video surveillance.

Nevertheless, Plaintiff climbed the fence and entered the Site along with his friend, Sharon Coster. According to Plaintiff, he remained on the Site for up to thirty minutes, and at one point he climbed the scaffolding to the second story of one of the buildings under construction. After being on the Site for about twenty minutes, Plaintiff heard a security alarm with a male voice warning to "go away" or words to that effect. In fact, the Site was being observed via live surveillance video by offsite private security personnel, who saw Plaintiff and Ms. Coster on the Site and triggered an alarm that projected a police siren and a male voice announcing: "Warning. Warning. You have violated an area protected by a security system. The authorities have been notified. Leave immediately."

The security personnel called 911 to report a suspected commercial burglary in progress at the Site. Following that call, at approximately 11:00 p.m., the San Mateo County dispatch operator put a call out on the radio stating that a security company (the "reporting party") called to report a commercial burglary in progress. The dispatcher provided additional details regarding the commercial burglary, including: (1) two males—one in plaid and another in all black—had been seen on the security video; (2) the suspects had been seen stacking items by the fence; and (3) a suspect has been seen climbing up and down the fence. As officers proceeded to the Site, the dispatcher relayed further information obtained from the reporting party, including that: (4) no one was supposed to be on the Site at the time; (5) the items stacked by the suspects next to the fence were possibly tools; (6) a possible third suspect had been seen on Site; and (7) one suspect had been seen outside while the others were inside a structure.

In response to the call, all seven San Mateo County Sheriff's officers on duty on the coast that night reported to the scene, though they did not arrive at the same time. Three of the uniformed

1   deputies—Deputies John Sanchez, Eric Michel, and Chris Laughlin, as well as Deputy Laughlin's K-9

2   (German Shepard) partner Riggs—arrived first and attempted to enter the Site to investigate. The four

3   other officers reported to various locations outside the Site in an attempt to establish a loose perimeter.

4   The shape and size of the Site, along with difficulties accessing it, made establishing a secure perimeter

5   nearly impossible. The Sheriff's Office does not have access to a helicopter and, because it patrols the

6   entire San Mateo County coast from Santa Cruz County to Pacifica, there were no other available law

7   enforcement agencies immediately available to provide assistance.

8          The Deputies who attempted to access the Site discovered that the entry gate on the perimeter

9   fence was locked at the time, so the Deputies gained access by manually pushing down several segments

10  of the chain-link fence, creating a loud crashing sound. To search the large Site, the three Deputies

11  initially split up but eventually regrouped on Deputy Sanchez's position after he reported seeing one of

12  the suspects. Once he arrived at Deputy Sanchez's position, Deputy Laughlin could see a male subject in

13  a plaid shirt approximately 100 yards away, near the fence line.

14         Deputy Laughlin gave a verbal warning to Plaintiff, stating, "Sheriff's canine, stop right there,

15  show me your hands, get on the ground or you're going to get bit by the dog." Plaintiff saw the Deputies

16  and moved to the fence, in the shadows, the location identified by Dispatch as the suspects' entry/exit

17  point. Under the circumstances, Deputy Laughlin perceived Plaintiff's action as an attempt to flee and

18  decided to deploy Riggs to apprehend Plaintiff. Before deploying Riggs, Deputy Laughlin considered:

19  (1) the information supplied by the reporting party, which itself was derived from live video surveillance,

20  indicating that a suspect in plaid had committed acts consistent with an in-progress felony commercial

21  burglary; (2) the fact that burglars often carry with them tools of the trade that can be used as makeshift

22  weapons; (3) the fact that Plaintiff could pose an immediate threat of harm to individuals he might

23  encounter after climbing over the fence, including a Deputy on the perimeter; and (4) that no other less-

24  than-lethal force tool such as pepper spray, asp, or Taser would have been as effective or as safe as

25  deploying Riggs.

26         After being released, Riggs ran toward Plaintiff with the three Deputies following behind. As

27  they advanced, Deputies Sanchez and Michel focused on the buildings to look out for potential danger as

28  well as the other two reported suspects, who had not yet been located. As a general matter, after

commanding Riggs to apprehend a subject, Deputy Laughlin is still able to verbally "call off" Riggs if Laughlin observes circumstance indicating that the apprehension is no longer necessary or appropriate. But in this instance, Laughlin did not observe any such circumstance, as Plaintiff held his same position near the fence as Riggs and the Deputies approached. Riggs ultimately made contact with Plaintiff but did not bite him; rather, Riggs nudged Plaintiff's arm with his nose, causing no injury.

Riggs turned to run back to Laughlin, who was now about two car lengths from Plaintiff and continuing to approach at the same pace. Despite having now been contacted by Riggs, who was wearing a reflective harness identifying him as a Sheriff's K-9, and after seeing three uniformed Deputies approaching him, Plaintiff said nothing and kept his hands at his waistband, hidden under his untucked flannel shirt.

Based on Plaintiff's actions up to this point in the encounter, Deputy Laughlin now feared that Plaintiff, who remained unsearched for weapons, was potentially armed and intended to engage the Deputies in a physical confrontation. Deputy Laughlin gave Plaintiff two more warnings, stating: "Show hands, get on the ground, the dog is going to bite you." Plaintiff still said nothing, kept his hands hidden at his waistband, and was backing away from the Deputies.

At that point, Deputy Laughlin decided again to deploy Riggs to apprehend Plaintiff. Deputy Laughlin released Riggs, who bit Plaintiff's right leg. While Riggs was still latched to Plaintiff's leg, Plaintiff heard a command from the Deputies to "stop fighting the dog." Plaintiff admits that he was "trying to shake him [Riggs] off my leg." As soon as Plaintiff complied with the Deputy Laughlin's commands, Riggs was immediately commanded to and did release from the bite. The entire bite lasted 15 or 20 seconds.

Plaintiff was thereafter handcuffed by Deputy Michel, searched for weapons, and checked for injuries. At around the same time, Deputy Sanchez located Ms. Coster nearby and placed her in handcuffs. Plaintiff was arrested for commercial burglary. Deputy Laughlin and Riggs then searched the remainder of the Site in an attempt to locate the third suspect, but no third suspect was ever identified. Because of Plaintiff's injuries, the Deputies called for a paramedic who treated Plaintiff at the Site. The treating paramedic described the bite from Riggs as "minor" and noted that, while being treated at the scene, Plaintiff self-reported his pain level as a "2 on a scale 10." Plaintiff was then cleared for transport.

1  The paramedics told Deputy Michel that Plaintiff did not need to immediately go to the hospital, which is

2  located about 30 minutes away in San Mateo.

3  Plaintiff was then transported to the Sheriff's sub-station in Half Moon Bay, a few minutes away

4  from the Site.  Deputy Laughlin interviewed Plaintiff about the commercial burglary, and Deputy Michel

5  conducted a "post bite" interview.  Both interviews were recorded.  During the interviews, Plaintiff:  (1)

6  admitted to illegally entering the Site; (2) described the Deputies' actions during his arrest as

7  "reasonable" and understood that, from the their perspective, "[y]ou have no idea what you were getting

8  into. Who was there, what was going on.  No, I understand;" (3) felt the medical treatment he received at

9  the scene was "[v]ery professional, first class;" and (4) admitted that he was only bit in the right leg.  At

10 no point during either interview did Plaintiff complain about being in pain or express any discomfort.

11 Deputy Laughlin then transported Plaintiff to the hospital.  During the drive, Deputy Laughlin

12 and Plaintiff discussed a number of topics, including their experiences with dogs.  While at the hospital,

13 Deputy Laughlin gave Plaintiff a sticker depicting Riggs, an action which Plaintiff understood as an

14 attempt to "lighten up the situation."  Deputy Laughlin released Plaintiff from custody at the hospital and

15 issued him a citation for violations of criminal trespass and resisting arrest.

16 In the meantime, Deputies continued to investigate the commercial burglary throughout the

17 morning of January 2, 2015.  After conducting a search of the Site, Deputies discovered a box containing

18 large flanges along with copper tubing connectors near where Plaintiff was apprehended.  Although the

19 copper tubing appeared to be out of place under the circumstances, no responsible party was available to

20 confirm that fact.

21 Daniel Edward Houseman, M.D., the treating physician at the emergency room, characterized

22 Plaintiff's injuries as moderate relative to other dog bites.  Plaintiff was treated for two punctures to his

23 right leg, a "3 cm simple laceration" to the front of his right leg and a "4 cm simple laceration" to his

24 right calf.  He received seven (7) stiches and was discharged from the hospital within hours.  His

25 outpatient physician, Josefina Enriquez, M.D., described the bite to Plaintiff's right leg as "not really that

26 serious."  And Plaintiff appeared to agree—he had two or three follow-up medical visits in January and

27 February 2015, saw Dr. Enriquez one more time in December 2015, and never saw her (or any other

28 doctor) again for treatment of the injuries to his right leg.  Plaintiff's billed medical expenses totaled

$3,296.80, all of which were paid by the Health Plan of San Mateo County.  Plaintiff is not seeking any future medical expenses.  Finally, though he claims to have suffered emotional distress, his alleged distress consisted of "crazy dreams" about being bit by other dogs and being "a little more skittish when the big dogs bark…"  Ultimately, he testified "I'm going to be fine.  I'm just fine."

## II.      PLAINTIFF'S REMAINING CLAIMS

Plaintiff's sole surviving federal claim alleges a violation of the Fourth Amendment, arising from excessive force, against the only individual defendant, Deputy Chris Laughlin. Plaintiff also alleges four state tort claims against Deputy Laughlin: negligence, battery, assault, and false arrest. Finally, Plaintiff has brought a claim under the Bane Act, alleging deprivations of rights under the Fourth Amendment, the California Constitution, and California Civil Code. San Mateo County faces only vicarious liability (for the tort and Bane Act claims).

### A.  Deputy Laughlin Is Entitled to Qualified Immunity on the Excessive Force Claim.

The Court denied Deputy Laughlin's Motion for Summary Judgment on the issue of qualified immunity based on a dispute of material fact.  Specifically, the Court concluded:  "The principal disputed fact — maybe the only key disputed fact — involves Mr. May's movement while the police officers stood before him.  Did Mr. May move?  Did he remain still?  Did he move toward the fence?  Did his movement suggest that he was trying to flee?  A jury must hear testimony to resolve this point.  How they view this fact will almost surely affect how they view Deputy Laughlin's decision to deploy Riggs."  (ECF No. 78 at 17:20-18:4.)

The issue of qualified immunity is a two-pronged analysis:  "whether the official's conduct violated a constitutional right, and if so, whether that right was clearly established at the time of the event in question."  *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).  The second prong of the analysis—whether the right was clearly established—"is solely a question of law for the judge."  *Tortu v. Las Vegas Metropolitan Police Dept.*, 556 F.3d 1075, 1085 (9th Cir. 2009).  Thus, the question for the Court remains:  were Deputy Laughlin's actions so egregious or so obviously excessive that no reasonable officer could have found them objectively reasonable under the

particular circumstances of this case?  The answer must be no.[1]

Even assuming that the force used against Plaintiff was excessive (which it was not), Deputy Laughlin would still be entitled to qualified immunity if he reasonably, but mistakenly, believed that his conduct was lawful.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity protects against officers' actions that fall somewhere in the "hazy border between excessive and acceptable force." *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004 (quoting *Saucier v. Katz,* 533 U.S. 194, 206 (2001).  The Court must look to the pertinent legal landscape as it existed on January 1, 2015 and, from there, determine whether it would have been clear to a "reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 198–99.  "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson*, 555 U.S. at 244.  "[T]he clearly established law must be 'particularized' to the facts of the case.  Otherwise, 'plaintiffs would be able to convert the rule of qualified immunity…into a rule of virtually unqualified liability by alleging violation of extremely abstract facts.'"  *White v. Pauly*, 137 S.Ct. 548, 552 (2017).  Deputy Laughlin is entitled to qualified immunity under the particularized facts of this case based on the law as it existed on January 1, 2015.

As the Court explained in the Summary Judgment Order, Deputy Laughlin's use of Riggs in this case, "in these circumstances, was not so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional.  *See Mendoza*, 27 F.3d at 1361 (quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir. 1993))."  (ECF No. 78 at 19:3-8 (internal quotations removed).)  Thus, this case is not like *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998), where officers released a K-9 "on a handcuffed arrestee who has fully surrendered and is completely under control."  Nor is this case like *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994), where the K-9 was out of the handler's control and, therefore, continued to bite plaintiff while he "attempted to surrender and yelled to the police to call of the dog."  Here, Deputy Laughlin released Riggs before Plaintiff was handcuffed and immediately after he stopped struggling, which is

---

[1] Deputy Laughlin intends to move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure Section 50(a) and 50(b).

1  entirely consistent with *Mendoza v. Black*, 27 F.3d 1357, 1363 (9th Cir. 1994) (using police K-9 to

2  secure suspect "until he stopped struggling and was handcuffed, was objectively reasonable under the

3  circumstances.")

4          For purposes of this analysis, the Sheriff's internal policies are irrelevant.  Plaintiff argues that

5  Deputy Laughlin is not entitled to qualified immunity because he knew his actions violated the Sheriff's

6  K-9 Manual, § 5-01, which according to Plaintiff prohibits deployment of a K-9 unless officers (1) have

7  probable cause to arrest for a serious or violent felony <u>and</u> (2) believe the suspect poses an immediate

8  threat of death or serious bodily harm.  However, it is undisputed that the Sheriff's Department

9  concluded that Deputy Laughlin's actions did ***not*** violate § 5-01.  Further, local enforcement standards

10 cannot form the basis of a Constitutional violation.  *See e.g. Whren v. United States*, 517 U.S. 806, 814-

11 815 (1996).  Even if they could, § 5-01 would create a use of force standard ***stricter*** than the

12 Constitutional standard.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (which requires neither a

13 serious or violent felony nor immediate threat of death or serious bodily harm for use of force); *Miller v.*

14 *Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (same as specifically applied to use of K-9).

15 *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003), and related cases which provide that

16 training materials are, in certain cases, potentially relevant to the issue of qualified immunity make clear

17 that the relevancy of such materials is limited to whether they would put a reasonable officer on notice

18 that his or her actions were ***unlawful***.[2]  Here, because § 5-01 creates a more exacting standard than the

19 Constitutional standard, it has no bearing on the lawfulness of Deputy Laughlin's actions under the

20 Fourth Amendment and is, therefore, irrelevant for the purposes of qualified immunity.

21       **B.  Plaintiff's Newly Asserted State-Law False Arrest Claim Lacks Merit.**

22          The Court correctly found that Deputy Laughlin had probable cause to arrest Plaintiff under the

23 Fourth Amendment and that "the state-law claim tracks the fate of its federal counterpart.  *See Levin v.*

24 *United Airlines*, 158 Cal.App.4th 1002, 1017-19 (2008), as modified (Jan. 14, 2008) (applying Fourth

25 Amendment probable-cause standards to California false-arrest claim); *Blankenhorn*, 485 F.3d at 486-87

26

27 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   [2] Moreover, the *Drummond* line of cases all deal with officer actions which were patently
28 unconstitutional, which is not the case here.

1  (same)…" (ECF No. 78 at 26:5-8). Undeterred, Plaintiff argues that the jury could find that Defendant

2  Laughlin's continued custodial arrest of Plaintiff was unlawful, because probable cause dissipated after

3  he knew or should have known that Plaintiff was only rescuing a cat.

4       First, it must be noted that, while this litigation has been pending since January 2016, Plaintiff

5  raised this argument for the ***first time*** in the parties' Joint Proposed Jury Instructions (Disputed and

6  Undisputed) exchanged and filed on April 28, 2017, less than 40 days before trial and long after the

7  hearing on the cross-motions for summary judgment. (ECF No. 104.)[3]

8       Second, there is no authority for Plaintiff's newly asserted claim. Under California law, "[f]alse

9  imprisonment is the unlawful violation of the personal liberty of another, the interference being

10  absolutely unlawful and without color of legal authority." *Novoa v. County of Ventura*, 133 Cal. App. 3d

11  137, 142. Here, it is stipulated and undisputed that, "[a]t all times, Defendant Laughlin acted under color

12  of law." (Joint Proposed Pretrial Order, ECF No. 103 at p. 2:19.) Therefore, the detention of Plaintiff at

13  the Half Moon Bay sub-station for the purpose of questioning him about the commercial burglary after a

14  valid arrest cannot be false imprisonment. *Novoa*, 133 Cal.App.3d at 142 (detention "was under color of

15  legal authority and therefore cannot be false imprisonment"); *see also* Cal. Pen. Code, § 847(b) (officer

16  acting within the scope of his or her authority immune from liability "for false arrest or false

17  imprisonment" if "arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause

18  to believe the arrest was lawful"); *Blankenhorn v. City of Orange*, 485 F.3d at 486-87 (9th Cir. 2007)

19  (officer cannot be held civilly liable for state-law false imprisonment "where the officer, acting within

20

21

22

23

24

25

26  ―――――――――――――

27  [3] It is also worth noting that Plaintiff's proposed jury instruction is CACI 1400, which is false imprisonment with "NO ARREST INVOLVED." (ECF No. 104 at p. 31.) Compare CACI 1401 –

28  FALSE ARREST WITHOUT WARRANT BY PEACE OFFICER. (ECF No. 104 at 35-36.)

the scope of his or her authority, made a lawful arrest or had reasonable cause to believe the arrest was lawful").[4]

Even if Plaintiff's alleged false imprisonment after a lawful arrest were a valid claim under California law, it is undisputed that, once Deputy Laughlin and Deputy Michel completed their interviews and learned that Plaintiff was claiming he was only on the Site looking for Ms. Coster's cat, Deputy Laughlin drove Plaintiff to the hospital and released him from custody. Deputy Laughlin did so before the Deputies concluded their commercial burglary investigation, which continued into the morning of January 2, 2015 when the Deputies were unable to confirm theft from the Site. Thus, Deputy Laughlin's actions must be contrasted with, for example, officers in *United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007) (dealing with a false arrest claim under the Fourth Amendment, not a false imprisonment claim under California law). In that case, officers knew based on information they had gathered that plaintiff was not the suspect ***before they questioned him*** at the police station, which was "the critical issue." 428 F.3d at 1073-1075 ("It should then have been manifest that Lopez was not Gamez, the registered owner of the getaway car").

**C. To Prevail on His Bane Act Claim, Plaintiff Must Prove Coercion Independent From the Coercion Inherent in a Lawful Arrest.**

Plaintiff has brought claims under the Bane Act, alleging deprivations of the following rights:

- The right to be free from excessive force and unlawful arrest under the Fourth Amendment;

- The right to be free from excessive force and unlawful arrest under Section 13 of the California Constitution

---

[4] There are limited circumstances where, under California law, an unlawful detention may give rise to a false imprisonment action even after a lawful arrest. However, none of those limited circumstances apply here, e.g., the failure to release a suspect after bail was posted (*Moore v. City & County of San Francisco* (1970) 5 Cal.App.3d 728, 737; *Shakespeare v. City of Pasadena* (1964) 230 Cal.App.2d 375, 383-386), the failure to release a suspect after the charges were dismissed (*Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710), or the failure to release a prisoner where "the jailer knows that the imprisonment is unlawful or if there is 'some notice sufficient to put him, as a reasonable man, under a duty to investigate the validity of the ***incarceration***'" (*Martinez v. City of Los Angeles*, 141 F.3d 1373, 1380 (9th Cir. 1998) (emphasis added)).

- The right to enjoy and defend life, liberty, property, safety, happiness, and privacy under Section 1 of the California Constitution; and

- The right of protection from bodily restraint or harm, personal insult, defamation, and injury to personal relations under Section 43 of the Civil Code.

(*See* ECF No. 44 at 14:6-15 (First Amended Complaint).

As an initial matter, the Court's Summary Judgment Order found "[t]he undisputed facts gave Deputy Laughlin probable cause to arrest Mr. May for either commercial burglary or criminal trespass." (ECF No. 78, p. 8:2-3.)  In his Motion for Reconsideration, Plaintiff challenges only the finding of probable cause to arrest for commercial burglary, not for criminal trespass.  (ECF No. 79.)  Thus, as a matter of law, Deputy Laughlin had probable cause to arrest Plaintiff under the Fourth Amendment. (*See also* ECF No. 78 at 12:23-27.)  The Court also ruled that Plaintiff's state-law false arrest claim tracks the fate of his federal claim.  (*Id*. at 26:5-8.)  This effectively disposes of the false arrest component of the Bane Act claim.

On the remaining excessive force component of Plaintiff's Bane Act claim, numerous cases recognize that the Bane Act generally requires a showing of some act of coercion ***independent*** of any coercion inherent in the constitutional violation itself, and this showing has been required specifically in the context of excessive force claims.  *See e.g. Reese v. Cty. of Sacramento*, No. 213CV00559GEBKJN, 2016 WL 3126055, at *13 (E.D. Cal. June 2, 2016) (granting defendants' motion for new trial on the basis that the jury instruction on Bane Act as given did not require plaintiff to demonstrate "threat, intimidation, or coercion" beyond the excessive force at issue (a shooting)); *Lanier v. City of Fresno*, No. CV F 10-1120 LJO SKO, 2011 WL 149802, at *5 (E.D. Cal. Jan. 18, 2011) ("Although the FAC alleges facts that Officer Castillo interfered with Mr. Lanier's Fourth Amendment rights, there are no allegations that Officer Castillo did so with threats, intimidation or coercion or interfered with rights separate from those under the Fourth Amendment."); *Dorger v. City of Napa*, No. 12-CV-00440-WHO, 2013 WL 5804544, at *10 (N.D. Cal. Oct. 24, 2013) (shooting of mentally ill individual not sufficient for Bane Act claim because there was no evidence that officers deliberately threatened, intimidated or coerced decedent); *Chavez v. Cty. of Kern*, No. 1:12-CV-01004 JLT, 2014 WL 412562, at *9 (E.D. Cal. Feb. 3, 2014) (no Bane Act violation when deputies shot decedent because no evidence of independent

1   constitutional violation other than excessive force); *Velarde v. Union City Police Dep't*, No. 13-CV-

2   04011-JD, 2015 WL 6871579, at *6 (N.D. Cal. Nov. 9, 2015) (Dismissing Bane Act claims based on

3   excessive force because plaintiffs failed to establish separate acts of violence, threats or coercion beyond

4   their excessive force claims); *Bordegaray v. Cty. of Santa Barbara,* No. 214CV08610CASJPR, 2016 WL

5   7223254, at *15 (C.D. Cal. Dec. 12, 2016) ("[P]laintiff fails to provide evidence or allege facts showing

6   that he faced a threat, intimidation, or coercion independent from Calderon's alleged use of excessive

7   force.").

8       While some cases have held that no independent threat, intimidation, or coercion other than the

9   acts constituting excessive force is required under the Bane Act, many of those cases do not purport to

10   adopt a general rule of law but are instead either expressly limited to the circumstances of those cases or

11   the more liberal standards applicable at the pleading stage. *See, e.g., Rodriguez v. City of Modesto*, 2013

12   U.S. Dist. LEXIS 172958, at *35-36 (E.D. Cal. Dec. 9, 2013) ("this Court agrees with other courts

13   holding that, at the pleading stage, the relevant distinction for purposes of the Bane Act is between

14   intentional and unintentional conduct, and that *Shoyoye* applies only when the conduct is

15   unintentional."); *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (acknowledging

16   that the defendant conceded under the facts of that case that the successful excessive force claim

17   provided the basis for a claim under the Bane Act); *Haynes v. City & Cty. of San Francisco*, No. C 09-

18   0174 PJH, 2010 WL 2991732, at *7 (N.D. Cal. July 28, 2010) (acknowledging the split among district

19   courts on whether a Fourth Amendment excessive force violation alone qualifies for the element of

20   interference with a legal right under § 52.1 but generally finding a genuine dispute of material fact in the

21   circumstances of that case on whether the defendant acted with the requisite threats, intimidation, or

22   coercion).

23   **D.  Defendants Reserve the Right to Move for a Reduction of Any Damages Awarded to**
     **Plaintiff for Collateral Sources Received.**

24

25       Defendants reserve the right to move under Federal Rule of Civil Procedure 59(e) for a post-trial

26   order amending judgment and reducing any award to Plaintiff.  A judgment in favor of Plaintiff may be

27   reduced by collateral sources received, pursuant to California Government Code section 985. The

28   applicability of Government Code Section 985 to damages in federal cases is not novel.  *See Reese v.*

*Cty. of Sacramento*, No. 213CV00559GEBKJN, 2016 WL 3126055, at *9 (E.D. Cal. June 2, 2016) (In a case involving federal excessive force claims, state torts, and Bane Act claims, Defendants moved for reduction of damages pursuant to California Government Code section 985(b), but the Court ultimately decided to reduce the award based on parties' stipulation); *Willis v. Mullins*, No. CIVF046542AWILJO, 2006 WL 2792857, at *1 (E.D. Cal. Sept. 28, 2006) (unpublished) (citing *Oberfelder v. Bertoli*, 67 Fed. Appx. 408 (9th Cir.2003) (applying Section 985) (unpublished)).  Here, Plaintiff's entire medical bill of $3,296.80 was paid by the Health Plan of San Mateo County and is, therefore, subject to reduction under California Government Code Section 985.

**E.   Deputy Laughlin Is Not Required to Disclose His Financial Information Unless Plaintiff Makes a Showing of Entitlement to Punitive Damages.**

Plaintiffs have renewed their requests for financial information from Deputy Laughlin.  (ECF No. 103 at 8:20-9:2.)  Defendants do not dispute that certain financial information from Deputy Laughlin would be relevant to a punitive damages calculation.  However, Plaintiff's request remains premature and overbroad.

Deputy Laughlin is not required to disclose financial information relevant to punitive damages "absent some showing of entitlement to punitive damages." *See Vieste, LLC v. Hill Redwood Dev.*, No. C-09-04024 JSW DMR, 2011 WL 855831, at *2 (N.D. Cal. 2011) (specifically distinguishing cases in which punitive evidence may be admitted without a prima facie showing of liability—i.e. fraud and contract claims—from those involving Section 1983 claims against individual police officers).  This is because Deputy Laughlin's right to privacy under the California Constitution outweighs Plaintiff's stated need for financial information at this stage of the litigation. *See Garcia v. Imperial*, 270 F.R.D. 566, 572-573 (S.D. Cal. 2010) (in a Section 1983 action, a defendant-officer's right to privacy under the California Constitution outweighed a plaintiff's request for financial information relative to punitive damages, absent any showing of entitlement) (overruled on other grounds); *see also Collens v. City of New York*, 222 F.R.D. 249 (S.D.N.Y. 2004) (rejecting request for officer's private information for punitive damages purposes based on privacy rights and because the "issue of punitive damages . . . may never arise, and discovery on that issue is not necessary at this time.")  Section 1983 excessive force claims against individual officers "implicate an additional layer of liability analysis on the question of qualified

immunity for police officers." *See Vieste*, No. C-09-04024 JSW DMR, 2011 WL 855831, at *2 (N.D. Cal. 2011).  These two rationales—the protection of privacy and an augmented analysis of liability— provide justification for postponing disclosure of detailed financial records.  Therefore, unless and until Plaintiff submits evidence that tends to show Deputy Laughlin acted maliciously and with wanton and willful disregard, Plaintiff's stated need for financial information does not outweigh Deputy Laughlin's privacy rights. *Garcia* 270 F.R.D. at 573.

Plaintiff's request is also overbroad.  Plaintiff requested 19 categories of extremely private information from Deputy Laughlin, including his personal state and federal income tax returns, detailed information about his home, all of his bank account and credit card statements, and his disability information and medical records. This request far exceeds the information sufficient for a punitive damages finding.  *See*, *e.g.*, *Rodriguez v. Cty. of Los Angeles*, 96 F. Supp. 3d 990, 1009 (C.D. Cal. 2014) (Excessive force case evaluating punitive damage claims against individual defendants, stating " . . . Defendants provided[d] single-page declarations listing general monthly "income," monthly "expenses," total "assets," and total "liabilities.").

### III.        EVIDENTIARY ISSUES

#### A.  Evidence Pertaining to Plaintiff's Now-Dismissed *Monell* Claim.

In light of the Court's dismissal of Plaintiff's *Monell* claim, evidence related to the County and its policies and procedures has been rendered irrelevant to Plaintiff's remaining claims.  (*See* Defs.' MIL No. 6 (ECF No. 99).)  Such evidence includes documentary evidence such as voluminous general Sheriff's Office policies as well as K-9-specific policies, the testimony of various Sheriff's deputies regarding County practices, the testimony of the County's designated Rule 30(b)(6) witness (Lt. Mark Duri), and Plaintiff's retained expert's opinions regarding all such evidence.  In particular, since the direct claim against the County has been dismissed, the County faces no liability for its own actions, policies, or practices, and any admissions made during Lt. Mark Duri's Rule 30(b)(6) deposition are now no longer admissible as a party admission or otherwise under FRCP 32(a)(3).  *See*, *e.g.*, *Kowalski v. Anova Food, LLC*, No. CIV. 11-00795HG-RLP, 2015 WL 1117993, at *1 (D. Haw. Feb. 12, 2015) (statement of then-dismissed defendant entity not admissible as party admission against related party).

///

Nonetheless, Defendants anticipate that Plaintiff will seek to admit evidence of the County's policies and practices or evidence of the County's investigation of the January 1, 2015 incident, even if the Court grants the County's motion to exclude evidence relevant to the *Monell* issue.  For example, as part of Plaintiff's opposition to the County's motion in limine, even though Plaintiff concedes that certain evidence is indeed irrelevant (*e.g.*, materials concerning the County's review of the January 1, 2015 incident), Plaintiff still reserves the right to introduce such evidence for impeachment or other purposes. (*See* Pl.'s Opp. to Defs.' MIL No. 6 (ECF No. 99-1) at 4:3-5.)  Defendants contend that such evidence is categorically irrelevant, but furthermore, even if such evidence is relevant, its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.  FRE 403.

## B.  P.O.S.T. Learning Domains.

Plaintiff, for the first time, disclosed in his exhibit list that he intends to offer as evidence four "Learning Domains" or "Basic Course Workbook Series Student Materials" published by the California Commission on Peace Officer Standards and Training ("P.O.S.T.").  (*See* proposed Exs. 41-44, Joint Exhibit List (ECF 103-1).)   These voluminous Learning Domains spanning many tens of pages cover the topics of "Leadership, Professionalism, and Ethics;" "Property Crimes;" "Laws of Arrest"; and "Use of Force."  It is unknown at this time for what purpose Plaintiff intends offer these exhibits, however, courts in similar cases have excluded such Learning Domains as impermissible hearsay.  *See Luong v. SF City & Cty.*, No. C 11-05661 MEJ, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) (POST Learning Domains properly excluded as hearsay without applicable exception); *Gonzalez v. City of Garden Grove*, No. CV 05-1506 CAS JTLX, 2006 WL 5112757, at *5 (C.D. Cal. Dec. 4, 2006) (same).

## C.  Plaintiff's "Reptile" Arguments.

Plaintiff's newly disclosed pre-marked trial exhibits, including the P.O.S.T. Learning Domain concerning "Leadership, Professionalism, and Ethics," indicate that Plaintiff is likely to employ an approach in this case that has long been known as the "Golden Rule" argument but is now more recently being couched as the "Reptile" approach.  Through such an approach, Plaintiff's counsel may attempt to inquire, comment, or argue (directly or implicitly) to the jury during voir dire or trial that the jurors should make an example of Deputy Laughlin because to do so will make the community *safer*.

Additionally, Plaintiffs' counsel may suggest that jurors award damages through comparison to what they would require to endure a similar injury or that they award high damages in an attempt to send a message that law enforcement agencies should place more importance on community safety.

Some of these plaintiff strategies are referred to as "Golden Rule" arguments, described as when "counsel asks the jurors to place themselves in the plaintiff's shoes and to award such damages as they would 'charge' to undergo equivalent pain and suffering." *Beagle v. Vasold*, 65 Cal. 2d 166, 182, fn. 11 (1966). Such arguments have been rejected by the Ninth Circuit as prejudicial and impermissible. *See Drayden v. White*, 232 F.3d 704, 712-13 (9th Cir. 2000); *Fields v. Woodford*, 309 F.3d 1095, 1108-1109 (9th Cir.2002) (a "golden rule argument" is typically a request by a prosecutor or plaintiff's attorney that the jurors step into the shoes of the victim or plaintiff, and is prohibited).

There is also a relatively recent trend suggesting that plaintiff's lawyers should appeal to the jurors' own sense of self-protection ("reptilian instinct") in order to seek higher damage awards or disregard the applicable standard of care by converting every issue into one of self-protection or community safety. In broad strokes, such a "Reptile" argument begins with plaintiff's counsel linking the case in some way to a juror's sense of personal or community safety, usually by citing (and getting the defendant to agree to) a general, indisputably agreeable principle or community value (*e.g.*, the purpose of law enforcement is to keep the community safe), and then suggesting that the defendant has violated this broader community rule, and a plaintiff's verdict is thus necessary to protect the community value.

This approach is the subject of a book (David Ball and Don Keenan, REPTILE: The 2009 Manual of the Plaintiff's Revolution (2009)) and several personal injury seminars. The book's authors assert that the reptilian part of the human brain's primary instinct is self-preservation. "When the Reptile sees a survival danger, even a small one, she protects her genes by impelling the juror to protect himself and the community." *Id., Reptile* at p. 17. "The Reptilian brain houses basic life functions, such as breathing…and the fundamental life force: survival." *Id.* Consequently, if a case can be presented to a jury as a matter of self-survival, this instinct will be more important than the force of logic, the facts of the case, and the instructions provided by the court requiring the jury to dispassionately follow the law. *See id.* at 62 ("The Reptile is not fooled by defense standard-of-care claims. . .When there are two or

1   more ways to achieve exactly the same result, the Reptile allows – demands! – only one level of care: the

2   safest.").  The technique advises plaintiff's attorneys not only to play to the jury's self-preservation

3   instinct but to extend this instinct by creating fear regarding their families and their communities.

4   One Reptile strategy is to create a safety or "umbrella" rule and separate it from the danger it is

5   supposed to protect against.  Examples of such rules would be that law enforcement officers are trusted

6   to keep the community safe, that the community expects that law enforcement will only use force for a

7   lawful purpose, or that police dogs must be trained and obedient.  The attorney would then get a

8   defendant or defense witness to agree with the rule, and suggest that the more consequential a violation

9   of the rule would be, the more careful the defendant must be not to violate it.  The attorney would then

10  apply the rule to the case, in our facts law enforcement employing a police K-9 to inflict physical injury

11  to a suspected commercial burglar (but alleged actual cat rescuer), to show the rule was violated so to

12  require a verdict adverse to the rule violator.  The attorney would then argue that by violating this rule

13  the defendant harmed the plaintiff, and by extension the jurors and the community.  This method of

14  advocacy purposefully distracts juror's attention from the rules of law by which the defendant's conduct

15  must be assessed and directs jurors to assess liability and damages on an irrefutable moral principle

16  steeped in a person's emotional core.

17  Defendants request this Court follow the lead of other courts and recognize the "Reptile"

18  approach for what it truly is, an attempt to resurrect and reframe the impermissible "Golden Rule."  *See*

19  *Regalado v. Callaghan*, 3 Cal. App. 5th 582, 599 (2016) (finding that plaintiff's counsel's "reptile"

20  argument appealing to the jury's instinct to keep the community safe was improper).

21  In this case, several of Plaintiff's pre-trial maneuvers indicate they may intend to employ these

22  techniques in voir dire or in trial.  For example, Plaintiff has pre-marked as exhibits a number of P.O.S.T.

23  Learning Domains.  Aside from the fact such sources constitute inadmissible hearsay, they are also

24  largely irrelevant to Plaintiff's claims.  However, several of the cited Learning Domains contain the sort

25  of "safety rules" that exemplify the "Reptile" approach.  For example, Learning Domain 1 (proposed Ex.

26  41) contains such statements as: "To maintain the community's trust, peace officers must maintain

27  consistently high standards of ethical conduct," and "The community expects that peace officers will

28  serve the public interest and conduct themselves in an ethical manner."  (Ex. 41 at p. 2-7, 2-9; see also

proposed Ex. 39 (Sheriff's Office "Standards of Conduct and Performance").)  Such statements related to officer ethics are irrelevant to the matters at issue, but Plaintiff's counsel has already demonstrated during depositions an intention to concentrate on such irrefutable general statements and obtain agreement from law enforcement witnesses.  (*See, e.g.*, John Sanchez Dep. Tr. at 26:5-12 ("Q. . . So this learning domain says: The community expects that its peace officers will use only reasonable amounts of force.  Likewise, it expects that someone, including peace officers, will intervene if reasonable force is exceeded.  Is that consistent with the training you've gotten starting in your POST academy?  A. I believe so.").)

   None of this has any relevance to issues of this case:  whether Deputy Laughlin violated Plaintiffs' Fourth Amendment and state law rights by deploying a police K-9 to apprehend him.  However, such exhibits would certainly contribute to arguments or overtures that Deputy Laughlin failed in his job to keep Plaintiff or the community safe, that Deputy Laughlin has betrayed the community's trust, that Defendants should be made examples of to teach the County and the Sheriff's Office that it needs to improve, and many other Reptile arguments.  Defendants request that the Court be aware of Plaintiff's counsel's likely strategy regarding these matters and rule on appropriate objections accordingly.


Dated:  May 4, 2017                              Respectfully submitted,

                                                 JOHN C. BEIERS, COUNTY COUNSEL


                                                 By: _____/s/_____
                                                       Justin W. Mates, Deputy
                                                       Brian E. Kulich, Deputy
                                                       Maggie V. Tides, Deputy

                                                 Attorneys for Defendants
                                                 SAN MATEO COUNTY and DEPUTY CHRIS
                                                 LAUGHLIN